**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

_____

|  |  |  |
|---|---|---|
| MICHAEL FORD | ) | |
| 6320 S. Kings Highway, #101 | ) | |
| Alexandria, Virginia 22306 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZALCO REALTY, INC. | ) | |
| 8701 Georgia Avenue, Third Floor | ) | |
| Silver Spring, Maryland 20910 | ) | |
| | ) | |
| MDV MAINTENANCE, INC. | ) | Civil Action No. 1:08-CV-1318 (LO/TRJ) |
| 8701 Georgia Avenue, Third Floor | ) | |
| Silver Spring, Maryland 20910 | ) | |
| | ) | |
| HORIZON HOUSE CONDOMINIUM | ) | |
| UNIT OWNERS ASSOCIATION | ) | |
| 1300 Army Navy Drive | ) | |
| Arlington, Virginia 22202 | ) | |
| | ) | |
| JAMES MANSFIELD, ESQ. | ) | |
| Hartsoe, Mansfield & Morgan, P.L.L.C. | ) | |
| 4084 University Drive, Suite 100-A | ) | |
| Fairfax, Virginia 22030 | ) | |
| | ) | |
| DAVID FAISON | ) | |
| 1300 Army Navy Drive #1002 | ) | |
| Arlington, Virginia 22202 | ) | |
| | ) | |
| ERIC MUCKLOW | ) | |
| 7109 Woodland Drive | ) | |
| Springfield, Virginia 22151 | ) | |
| | ) | |
| VIRGINIA O. SMITH | ) | |
| 13708 General Slocum Drive | ) | |
| Fredericksburg, Virginia 22407 | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.      This is a civil action against defendants Zalco Realty, Inc. ("Zalco") and MDV Maintenance, Inc. ("MDV Maintenance"), for declaratory and monetary relief for injuries plaintiff Michael Ford sustained as a result of defendants Zalco's and MDV Maintenance's discrimination against him on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and against defendants Zalco, MDV Maintenance, Horizon House Condominium Unit Owners Association ("Horizon House"), James Mansfield, Esquire, David Faison, Eric Mucklow, and Virginia O. Smith, for race discrimination and racial harassment against Mr. Ford, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

### Jurisdiction and Venue

2.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Virginia.

### Parties

4.      Plaintiff Michael Ford is a citizen of the United States and of the Commonwealth of Virginia who resides at 6320 S. Kings Hwy., #101, Alexandria, Virginia 22306.  From December 5, 2005 until February 17, 2006, Mr. Ford was a Building Manager employed by defendants Zalco and Horizon House.  Mr. Ford is an African-American.

5.      Defendant Zalco is a Maryland corporation with its corporate headquarters located at 8701 Georgia Avenue, Third Floor, Silver Spring, Maryland 20910.  Zalco's registered

2

agent in the Commonwealth of Virginia is Mr. Seth Stark, 10106 Community Lane, Fairfax

Station, Virginia 22039.  Zalco is a real estate services firm.

6.      Defendant Horizon House is a condominium within the meaning of the Virginia

Condominium Act, Virginia Code § 55-79, et seq.  Horizon House is located at 1300 Army Navy

Drive, Arlington, Virginia 22202.  Upon information and belief, at all times relevant to this

complaint, less than five percent of Horizon House's residents have been African American.

7.      Defendant MDV Maintenance, Inc. is a Maryland corporation and a subsidiary of

defendant Zalco, with its headquarters located at 8701 Georgia Avenue, Third Floor, Silver

Spring, Maryland 20910.  MDV Maintenance's registered agent in the Commonwealth of

Virginia is Mr. Seth Stark, 10106 Community Lane, Fairfax Station, Virginia 22039.

8.      Defendant James Mansfield, Esq. is a resident of the Commonwealth of Virginia

and is an attorney licensed to practice law in the Commonwealth of Virginia.  At all times

relevant to this complaint, defendant Mansfield represented defendant Horizon House, or

claimed to represent defendant Horizon House.  Defendant Mansfield is white.

9.      Defendant David Faison is a resident of the Commonwealth of Virginia.  At all

times relevant to this complaint, defendant Faison resided in Unit 1002 at defendant Horizon

House and was a member of the Board of Directors of defendant Horizon House.  Defendant

Faison is white.

10.     Defendant Eric Mucklow is a resident of the Commonwealth of Virginia.  At all

times relevant to this complaint, defendant Mucklow resided in Unit 725 at defendant Horizon

House, was a former member of the Board of Directors of defendant Horizon House, and

managed defendant Horizon House's official website, and controlled the postings on the website.

Defendant Mucklow is white.

3

11.     Defendant Virginia O. Smith is a resident of the Commonwealth of Virginia.  At all times relevant to this complaint, defendant Smith resided in Unit 114 at defendant Horizon House.  Defendant Smith is white.

### Factual Allegations

12.     Mr. Ford is a disabled veteran who served in the United States Army from March 28, 1989 to March 2, 1993.  He is one semester short of a Bachelor's Degree in Marketing and Finance, and has received training in property management and accounting.  He held Special Police Commission licenses for Maryland, Virginia and the District of Columbia between 1992 and 1997.  Mr. Ford has six years of experience in property management.

13.     In the summer of 2005, Mr. Ford was employed as a property manager by Lerner Corporation at their Surrey Square property.

14.     On August 3, 2005, a female tenant in the building Mr. Ford managed accused him of assault.  At no time had Mr. Ford touched the accuser.  The accuser made the charges in retaliation against Mr. Ford because he had refused to renew her lease, after he discovered that she was occupying the unit unlawfully, because the lawful tenant was hospitalized.

15.     Lerner Corporation asked Mr. Ford to resign from his position while the charges against him were pending.  Because the court process took so long, Mr. Ford eventually looked for a new job.

16.     Mr. Ford's trial was scheduled for October 15, 2005 in the District Court for Prince George's County, Maryland.  His accuser failed to appear in court on that day, so the judge continued the case to January 25, 2006, in order to give her the opportunity to appear.

17.     In fall 2005, defendant Horizon House started interviewing applicants for its Building Manager position.  Defendant Zalco, which was defendant Horizon House's property

4

management company, assisted with the process by screening applicants, helping to arrange interviews with defendant Horizon House's Board of Directors ("Board"), and conducting background checks on applicants.  Defendant Zalco's Community Manager, Michael Constant, who is white, was responsible for coordinating the hiring process.

18.     Earlier in 2005, defendant Horizon House had hired an interim Building Manager, Jennifer O'Keefe, who is white.  Ms. O'Keefe applied for the permanent Building Manager position at Horizon House, but was not chosen.

19.     On November 4, 2005, defendants Zalco and Horizon House interviewed Mr. Ford for the Building Manager position.  Mr. Ford was interviewed by Board President Vondell Carter, who is black; Board Vice President Susan Morris, who is white, and Board Treasurer Greg Weatherman, who is white.  Mr. Constant of Zalco was also involved with the interviewing process.  Mr. Carter, Ms. Morris and Mr. Weatherman found Mr. Ford to be "by far the best-qualified candidate for the position."  Although Mr. Carter, Ms. Morris and Mr. Weatherman had asked the other two Board members – Adrienne Garretson and defendant Faison – to participate in the interview and hiring process, they failed to do so.

20.     Defendant Zalco's Human Resources office conducted a background check on Mr. Ford as part of the application process.  The background check revealed the pending charges against Mr. Ford, and a 1995 conviction for assault.  In 1995, Mr. Ford pled guilty to an assault charge stemming from a minor family altercation, in which Mr. Ford had a fight with his uncle.

21.     Mr. Constant told Mr. Carter, Ms. Morris and Mr. Weatherman that the baseless assault accusation against Mr. Ford was not unusual in the property management industry, and that in fact a disgruntled tenant had filed false charges against Mr. Constant as well.

22.     After learning the results of the background check, Mr. Constant and Mr. Carter

consulted with Horizon House attorney James Mansfield, who is white.  Upon information and belief, Mr. Mansfield was not typically responsible for background checks or investigations regarding the hiring of employees at Horizon House.

23.     Mr. Mansfield contacted either Mr. Maurice Smets, the Area District Manager at Lerner Corporation, or Ms. Susann Holt, the Vice President of Residential Services at Lerner Corporation, to request an employment reference for Mr. Ford.  Upon information and belief, either Mr. Smets or Ms. Holt told Mr. Mansfield that Mr. Ford was eligible for rehire by the Lerner Corporation.  In fact, the Lerner Corporation subsequently offered Mr. Ford a job.

24.     On November 14, 2005, Mr. Carter called Mr. Ford, and asked him about the pending charges against him.  Mr. Ford explained that he had never touched the accuser, and that be believed the accuser had made the charges in retaliation for his refusing to renew her lease.

25.     On November 22, 2005, Mr. Carter called Mr. Ford and asked to speak with Mr. Ford's attorney, William Ray Ford ("Mr. William Ford").  He also requested that Mr. William Ford contact Mr. Mansfield.  Mr. Ford agreed and asked Mr. William Ford to contact Mr. Carter and Mr. Mansfield.

26.     Mr. William Ford spoke with Mr. Carter and Mr. Mansfield on November 23, 2005.  During their conversation, Mr. Mansfield requested that Mr. Ford take a polygraph test, which he apparently believed would reveal whether Mr. Ford was lying about the alleged assault.

27.     Mr. William Ford advised Mr. Ford about Mr. Mansfield's request that he take a polygraph test.  Mr. Ford agreed to take the test, and told Mr. William Ford that he would contact Mr. Mansfield to set up the test.

28.     On November 29, 2005, Mr. Ford called Mr. Mansfield.  Mr. Ford explained that he had never touched the accuser, and that be believed she had made the charges in retaliation

against him for refusing to renew her lease.  Mr. Mansfield told Mr. Ford that he wanted Mr.

Ford to take a polygraph test, and that Mr. Ford would have to pay $500 for the test.  Mr. Ford

agreed to take the test, but refused to pay for it.  Mr. Mansfield said he would discuss the matter

with Mr. Carter.

29.     Because Horizon House would be responsible for the cost of the polygraph test,

Mr. Mansfield decided not to conduct the test.

30.     The Horizon House Board subsequently requested that defendant Zalco and

defendant MDV Maintenance hire Mr. Ford and make him available to Horizon House as an

interim Building Manager on a probationary basis.  The probationary period would last for

ninety days, or until Mr. Ford's January 2006 trial.  Upon information and belief, defendants

Zalco and Horizon agreed that, if Horizon House were unhappy with Mr. Ford's work, Zalco

would place him at another property.

31.     On December 2, 2005, Mr. Constant met with Ms. O'Keefe, Horizon House's

temporary Building Manager, who is white.  Mr. Constant told her that Zalco and Horizon House

had hired Mr. Ford as building manager, and that her temporary position was being terminated.

Ms. O'Keefe immediately complained about losing her position to Marie Eckes, a white Horizon

House resident, and Adrienne Garretson, a white Horizon House Board Member and resident.

Ms. O'Keefe also complained to Mr. Mansfield.

32.     On December 5, 2005, Mr. Ford reported for his first day of work at Horizon

House.

33.     Mr. Ford's employers were both defendants Zalco and MDV Maintenance during

the period that he was employed also by Horizon House.

34.     Mr. Ford reported to the Board of Directors of Horizon House, who included Mr.

7

Carter, Ms. Morris, Mr. Weatherman, Ms. Garretson, and Mr. Faison, and to Mr. Constant, of

Zalco and MDV Maintenance.

35.     If Mr. Ford needed to change his regular schedule, he was required to inform both

defendant Horizon House and defendant Zalco.

36.     If Mr. Ford had to make purchases of more than $800, he had to get approval

from the President of the Horizon House Board.  For purchases under $800, he had to get

approval from Zalco.  Horizon House, Zalco and MDV Maintenance all had the authority to set

up meetings with Mr. Ford.  Mr. Constant and Mr. Carter gave Mr. Ford permission to hire

employees, but Mr. Ford always checked with both men before doing so.  Mr. Ford had the

authority from Horizon House, Zalco and MDV Maintenance to fire employees.

37.     Horizon House, Zalco and MDV Maintenance were responsible for furnishing

Mr. Ford's work space and providing him with work tools.

38.     Zalco, MDV Maintenance, and Horizon House each had authority to fire Mr.

Ford.

39.     Mr. Ford supervised thirteen (13) employees.  One of the employees he

supervised was paid by Amtek Corporation.  Two of the employees were janitors whose salaries

were paid by a company other than the defendants, but whom Mr. Ford supervised.  The

remaining employees' salaries were set by the Horizon House Board, and paid by defendant

Zalco.  Mr. Ford supervised payroll, and tracked pay, vacation time, and bonuses or increases for

these employees.

40.     Mr. Ford was the first black male Building Manager that Horizon House had

employed since its inception.

41.     Throughout his time as the Horizon House building manager, defendants Zalco

and Horizon House, through their agents, promised Mr. Ford that the entities would employ him permanently if the outcome of the trial were in his favor.  Specifically, Mr. Constant, Mr. Carter, Ms. Morris, Mr. Weatherman and Arthur Dubin, President of defendant Zalco, told Mr. Ford and his attorney that defendants Zalco and Horizon House would employ him permanently if he were found not guilty.

42.     Throughout his employment at Horizon House, Mr. Ford worked hard to improve conditions there, including often working overtime, nights and weekends.  Among other things, Mr. Ford helped to sell a unit that had been vacant for a year; revised the bylaws; instituted new policies; reorganized the front desk position; eliminated unnecessary expenses; and improved Horizon House's contracts for services.  He also saved Horizon House thousands, if not hundreds of thousands of dollars, by replacing the boiler before it deteriorated any further, thereby preventing it from exploding.  He also interviewed and hired two new employees.  His predecessor had left the office files in disarray, so he devoted substantial time to organizing those files.

43.     On December 12, 2005, Ms. Garretson confronted Mr. Ford in an angry, rude and disrespectful manner, and stated that a note he had posted on a bulletin board in the lobby was not posted properly.  Ms. Garretson told Mr. Ford that he "need[ed] to get some education."  Ms. Garretson was so disrespectful and rude that Mr. Ford asked her to leave his office or he would call the police.  Ms. Garretson refused to leave Mr. Ford's office.  Ms. Garretson falsely stated to several Horizon House members, including those who belonged to the so-called "Concerned Citizens Group," that one of the Horizon House desk clerks, Donna Faison, had quit her job because of Mr. Ford.

44.     On December 16, 2005, Ms. Garretson again entered Mr. Ford's office and spoke

to him in an angry, rude and disrespectful manner.  She demanded that Mr. Ford provide her with a copy of the Horizon House bylaws.  Mr. Ford and Mr. Constant had just located the only copy of the bylaws in the Horizon House office, which was a mess, and Mr. Constant had directed Mr. Ford to keep them in a safe place.  He had specifically directed Mr. Ford to give people access to the bylaws only at the front desk.  When Mr. Ford refused to give her the documents, Ms. Garretson again told Mr. Ford that he "need[ed] to get some education," and that he did not know what he was doing.  Later on December 16, 2005, when Ms. Garretson was standing at the front desk speaking to the front desk clerk, Mr. Ford interjected to ask the clerk a question, and Ms. Garretson called him "Boy."  These and other remarks she made constituted racially stereotyped statements.

45.     On December 17, 2005, Ms. Eckes confronted Mr. Ford in an angry, rude and disrespectful manner.  She requested a copy of the Horizon House bylaws, and when Mr. Ford refused, she became even more angry, rude and disrespectful.

46.     On December 17, 2005, an anonymous letter was sent to Mr. Weatherman, which contained the false and defamatory statement, "We are informed the individual recently employed as Building Manager – Mr. Michael Ford – has a history of violence.  This is a matter of grave concern.  Getting accurate references – honest references – is always a problem.  We do not need violence, or abusive conduct, in Horizon House.  If something happens you would be liable.  Anonymous."

47.     Upon information and belief, only residents of Horizon House, including board members, were aware that Mr. Ford sometimes brought his young son to work with him on the weekends.

48.     On December 24, 2005, Christmas Eve, Mr. Ford brought his son with him to

10

work.  Mr. Ford's son was sitting nearby as Mr. Ford opened his mail.  In the mail that day, Mr.

Ford received an anonymous letter, which stated, "U R DED NIGGER UR FAMILY TOO."

The letter was addressed to: "mike ford man[a]ger 1300 army navy dr arl. Va 22202."  It had

been mailed on December 23, 2005 from postal area "NO VA 220."  The envelope had two

stamps featuring Wilma Rudolph, an African American track and field star, affixed to it.  Other

than Horizon House residents and Zalco employees, no one else knew Mr. Ford's place of

employment or position.

49.     Mr. Ford reported the death threat to the Arlington, Virginia Police Department

on December 26, 2005.  The police department apparently conducted an investigation, but was

not able to determine who had sent the death threat.

50.     At no time did defendants Horizon House, Zalco, MDV Maintenance, or

Mansfield investigate the death threat against Mr. Ford and his family, or take appropriate

corrective action, even though Mr. Carter requested that they do so.

51.     During Mr. Ford's employment at Horizon House, at no time did Horizon House,

Zalco, or MDV Maintenance provide Mr. Ford with any policies or training covering

discrimination and harassment, and they did not have any policies or procedures available to Mr.

Ford and his co-workers, other than several routine posters on an office bulletin board at the

Horizon House.  Nor did defendants Horizon House, Zalco, or MDV Maintenance provide any

training to others who worked at Horizon House during Mr. Ford's employment.

52.     During Mr. Ford's employment at Horizon House, Vondell Carter, a retired

Colonel of the U.S. Air Force, who is black, and was the President of the Board of Directors of

Horizon House, complained on several occasions to Mr. Dubin about his concerns that certain

other residents at Horizon House were subjecting Mr. Ford to a hostile environment.

11

53.     Mr. Ford, Mr. Carter, Ms. Morris, Mr. Weatherman, Marcia Cash, Susan Morris, Adam (Fred) MacAdam, William Dally, and Ed O'Connell had together or severally at least five meetings or communications with Mr. Constant of Zalco to discuss the racially discriminatory treatment of Mr. Ford, and related issues at Horizon House.  Other residents who also attended these meetings, but not as frequently, included Bobbi Fisher, Ghada Abu-rahmeh, and Margenia King.  Several of these meetings were attended by Ed O'Connell, Juan Cardenas, and William Daley, who are attorneys from the Rees, Broome & Diaz law firm.  Mr. Constant helped Horizon House and Mr. Carter with identifying and hiring these attorneys for Horizon House, since Mr. Constant had previously worked with them.  During these meetings, the participants discussed the racial tensions at Horizon House, and how the so-called "Concerned Citizens Group" was inciting the community.  The participants also discussed how to continue to move forward in addressing these problems and how to counteract what was happening at Horizon House.  Mr. Ford also had frequent discussions with Mr. Constant, whose mother lives in Horizon House, to discuss the problems that he was experiencing at the Horizon House, including the racially hostile work environment.

54.     Other residents of Horizon House have also complained to the Board about racially discriminatory treatment that they experienced, and that they witnessed at the Horizon House.  For example, Ms. Bobbie Fisher, a black female who has resided at Horizon House since March 2005, complained several times, in writing, to the Board that Horizon House residents had personally harassed and discriminated against her based on her race, since she was penalized for incidents for which white residents were not penalized.  She also witnessed the Horizon House board fire several other minority employees, including Diane Hall and Martina Hall, without justification, or force them to resign.

12

55.     Starting on December 15, 2005, libelous statements about Mr. Ford were posted on the official Horizon House website, http://www.horizonhousecondo.org, which is accessible to all residents.  Eric Mucklow, a white resident of Horizon House who was also a former President of the Horizon House Board, managed the official website on behalf of Horizon House. Defendant Mucklow controlled all access to the web postings, and had to approve all proposed posts before they would be posted on the website.  The false and libelous statements that Mr. Mucklow allowed to be posted included statements that Mr. Ford was a rapist; that he assaulted a woman in Ohio and raped her daughter; and that he sent the December 24, 2005 death threat to himself.

56.     On December 27, 2005, an "open message to Mr. Vondell Carter [the Board President]" was posted on Horizon House bulletin boards by an anonymous "concerned HH resident."  The notice stated, "You [Mr. Carter] even had the audacity to illegally hire a criminal – yes, it is public record – to be our building manager!!!"

57.     On January 12, 2006, Mr. Carter suspended the monthly meetings of the Board of Directors because he feared that board members or residents would become violent against Mr. Ford, since, upon information and belief, certain residents had made a death threat and other threats against Mr. Ford and his family over the previous three weeks.

58.     On January 17, 2006, Mr. Mansfield wrote a letter, which was labeled, "Confidential; Attorney Client Privilege," to Mr. Carter, Ms. Morris, Mr. Weatherman, Ms. Garretson, and defendant Faison, who were then the five Board members of Horizon House's board.  In the letter, Mr. Mansfield made false and defamatory statements about Mr. Ford, including that, "Mr. Ford was fired by his previous employer for cause."  He stated falsely that he had confronted Mr. Ford, and that Mr. Ford had "admitted wrongdoings," including that "he

13

had consensual sexual relations with a tenant on two occasions, once in her apartment and once

in his office." Defendant Mansfield demanded that the three Board members who had hired Mr.

Ford resign. Defendant Mansfield's statements were intended to, and had the effect of, creating

a racially hostile work environment, since the false statements about his alleged sexual

misconduct constituted racially stereotyped remarks.

59. Adam (Fred) MacAdam, a resident of Horizon House, was concerned that Mr.

Mucklow had improperly distributed this confidential letter since it was being sent to renters who

were not members of the Horizon House owners' association. Mr. MacAdam promptly called

defendant Mansfield's law firm, and spoke directly with his law partner, Alex Morgan. Mr.

MacAdam told Mr. Morgan that defendant Mansfield's purportedly privileged communication

was being generally distributed throughout the building, and requested that he take immediate

corrective action, if it was not the intent of defendant's law firm to incite and inflame the

community in a racial manner against Mr. Ford. Defendant Mansfield took no corrective action.

Subsequently, defendant Mansfield defended defendant Mucklow's use of the official Horizon

House website for this purpose.

60. On January 18, 2006, Mr. Carter, Ms. Morris, and Ms. Weatherman fired

defendant Mansfield and hired Juan Cadenas, Esquire and William Daly, Esquire, of Rees,

Broome & Diaz, P.C., to represent the Horizon House Board. Defendant Mansfield was fired

because he was disqualified from representing Horizon House owing to his conflict of interest in

having made false allegations about Mr. Ford, which meant that defendant Mansfield was a

principal, not merely an outside attorney

61. On January 19, 2006, an anonymous "Concerned Citizens Group" sent out a

packet containing, among other documents, defendant Mansfield's January 17, 2006 letter to all

Horizon House residents.  Upon information and belief, defendant Faison and other individual

defendants participated in distributing the packet.  Renters who were not members of the

Horizon House Condominium Unit Owners Association also received the packet.  Defendant

Mansfield's letter contained false and defamatory statements about Mr. Ford, and statements that

were based on racial stereotypes about African Americans.

62.     On January 19, 2006, several Horizon House residents held a "Concerned

Citizens Meeting."  Upon information and belief, defendant Faison participated in organizing the

meeting.  The agenda for the January 19, 2006 meeting included the "Alleged 'hate mail'

incident," and "Discussion of the process used to select building manager."

63.     Approximately fifty people attended the January 19, 2006 meeting.

64.     Defendant Mansfield directed the January 19, 2006 meeting, even though the

Board had terminated his representation on the previous day.  During the meeting, among other

false and defamatory statements, defendant Mansfield stated that Mr. Ford had "admitted

wrongdoing;" that Mr. Ford was a "rapist;" and that Mr. Ford had defended his actions by

claiming that he had consensual sex with his accuser.  Defendant Mansfield also stated falsely

that Mr. Ford had refused to take a polygraph test, when it was the defendant who decided not to

conduct that test because of its cost.  As a result of defendant Mansfield's false statements, and

his inciting the crowd into a mob-like frenzy, many of the attendees wanted Mr. Ford's

immediate termination.  One resident, Mr. MacAdam, challenged defendant Mansfield's

assertion that Board meetings were not being properly held, and questioned the appropriateness

of the content of the January 17, 2006 letter, upon which defendant Mansfield became very

defensive and argumentative, and refused to provide a substantive response to Mr. MacAdam.

65.     On January 20, 2006, Mr. Mansfield sent his defamatory January 17, 2006 letter

to every Horizon House resident, as had the "Concerned Citizens Group." Renters who were not members of the Horizon House Condominium Unit Owners Association also received the letter.

66.    Between January 20, 2006 and January 23, 2006, Mr. Ford and defendant Faison exchanged emails regarding contracts to replace piping in the Horizon House boiler room. Defendant Faison's tone in the emails became increasingly belligerent and angry. On January 23, 2006, defendant Faison wrote to Ms. Garretson about the exchange, and he falsely described Mr. Ford as "belligerent, disrespectful and insubordinate," and claimed, without justification, that Mr. Ford had "jerked [his] chain."

67.    On January 21, 2006, defendant Mucklow stated in an email to several Horizon House residents that defendant Mansfield had told him that he could distribute Mr. Mansfield's January 17, 2006 letter, which contained false and defamatory statements about Mr. Ford, to the entire Horizon House community. Defendant Mucklow also stated, "our plans are to bring all these issues out in a meeting… As you can see from this letter, the people will be outraged once they are revealed."

68.    On January 21, 2006, Ms. Garretson sent defendant Mansfield's January 17, 2006 letter, which contained false and defamatory allegations against Mr. Ford, to all the residents of Horizon House, as had defendant Mansfield and the "Concerned Citizens Group." Upon information and belief, defendant Faison participated in sending the letter. Renters who were not members of the Horizon House Condominium Unit Owners Association also received the packet. The letter contained false and defamatory statements about Mr. Ford.

69.    On January 24, 2006, defendant Mucklow falsely stated in an email to all Horizon House residents that Mr. Ford had written the December 24, 2005 death threat to himself. Defendant Mucklow's actions were part of a concerted effort on the part of the management of

16

Horizon House to create a racially hostile work environment in order to drive Mr. Ford out of his job. Defendant Mucklow's email also demonstrated that he and other members of the Horizon House board (including defendant Faison) did not intend to maintain a safe working environment or to take any steps to determine the persons in Horizon House who had sent Mr. Ford the threatening note.

70.     On January 24, 2006, defendant Mansfield, Ms. Garretson, and a "Concerned Citizens Group" again sent out a packet of documents to all residents of Horizon House. Upon information and belief, defendant Faison participated in sending out the packet. The packet contained defendant Mansfield's January 17, 2006 letter, which contained false and defamatory statements about Mr. Ford.

71.     On January 25, 2006, Mr. Ford's trial was held. The judge found Mr. Ford not guilty, and found that his accuser lacked credibility during her testimony. The case was then expunged, so that there is no public criminal record of this matter.

72.     Defendant Mansfield was present at the courthouse during Mr. Ford's trial. Mr. Mansfield's law partner, Mr. Hartsoe, was also present in the courtroom during the trial, so that both individuals knew that the outcome of the case was in Mr. Ford's favor

73.     On February 2, 2006, a "Concerned Citizens Group" held a "Special Meeting of the Association" to "remove Vondell Carter, Susan Morris, and Greg Weatherman" from the Board. Upon information and belief, defendant Faison participated in organizing the meeting. Among other allegations, the flier announcing the meeting stated falsely that these individuals hired a building manager who "was also fired, with cause, from his previous position…" In fact, the Board had hired Mr. Ford and two of the Board members (defendant Faison and Ms. Garretson) had refused to participate in the hiring process. At this meeting, defendant Mucklow

17

was elected as Vice President of the new board, and the other board members included defendant

Faison and Ms. Garretson.

74.     On February 3, 2006, Mr. Dubin called Mr. Ford and told him that the Board had

fired him, and he was to immediately leave the Horizon House property.

75.     Zalco subsequently moved Mr. Ford to a different property.

76.     On February 6, 2006, Mr. Constant and Mr. Dubin called Mr. Ford and told him

he could return to work at Horizon House.

77.     When Mr. Ford returned to work at Horizon House on February 6, 2006, several

Horizon House residents confronted him in the lobby and yelled, "You should not be here!," "Go

away!," and "How are you back?"  These members included Maria Eckes, defendant Mucklow,

Robert Platt, Lenny Conrad, and Virginia Babin.

78.     On February 7, 2006, several unit owners at Horizon House, represented by

Virginia O. Smith, wrote a letter to Mr. Dubin.  The letter was sent on behalf of defendants

Smith, Mucklow and Faison, and five other owners (Julia Dragun, Adrienne Garretson, Bonnie

Williams, Paco Martinez-Alvarez, and Paige McManus).  The letter stated, "the owners are

VERY uncomfortable with Mr. Ford as our building manager.  Under his watch, in-house mail

has disappeared from our unit boxes at the front desk/office.  Communications from the loyal

opposition have not reached the people to whom they were sent.  Messages about meetings have

disappeared from bulletin boards.  This is illegal activity.  The legal history about which Mr.

Ford has shared details leaves us concerned for our safety.  The association lawyers suggested

Mr. Ford not be hired until his legal situation was resolved, but the impeached directors ignored

that advice and signed him on."  The letter implied falsely that Mr. Ford was responsible for

illegal activities at Horizon House, and was part of defendants' concerted effort to drive Mr.

18

Ford out of his job by maintaining a racially hostile work environment.

79.     On February 7, 2008, an owner from Horizon House called Shelley Hudson, Zalco's administrative assistant.  The owner, a woman, refused to give her name or telephone number.  She stated that if Zalco did not remove Mr. Ford from his position at Horizon House, she would contact the media and "spread Zalco's name all over the local news."  She stated that Zalco had hired Mr. Ford, with a criminal record, to manage the property.  She stated that the owners did not want Mr. Ford at Horizon House, that residents had been "hollering" at Mr. Ford, and that owners had changed their locks because they did not want Mr. Ford in their units.

80.     On February 15, 2006, Zalco notified Horizon House that it would no longer serve as its property management company as of May 31, 2006.

81.     On February 17, 2006, a Virginia state judge ruled that Mr. Carter, Ms. Morris and Mr. Weatherman could no longer serve as Horizon House Board members, based on a petition filed by several other Horizon House residents, including defendants Faison, Mucklow, and Smith.

82.     Immediately after the court's February 17, 2006 bench ruling, unknown parties contacted defendant Zalco and directed Zalco to fire Mr. Ford immediately and change the locks on the Horizon House office.  Mr. Dubin immediately terminated Mr. Ford's employment at Horizon House, based on the racially motivated discriminatory actions of defendants and other Horizon House residents.

83.     Mr. Carter told Mr. Dubin, after Mr. Ford was directed to leave the Horizon House, that this dismissal was completely unwarranted, and that it was clearly discriminatory. Mr. Carter told Mr. Dubin that it was only fair and professionally responsible if Zalco placed Mr. Ford, who was a valuable manager, at another property.  Mr. Dubin promised Mr. Carter that

Zalco would do so, but this did not happen.

84.     On March 1, 2006, an unknown person called Ms. Hudson, at defendant Zalco's office.  The caller stated that if defendant Zalco placed Mr. Ford at another property, the caller would contact the site's owners and tell them about Mr. Ford's criminal record, in an effort to have him fired.  In fact, the charges against Mr. Ford were dismissed and the case was expunged, so there was no criminal record.

85.     Upon information and belief, based on the racially discriminatory actions of Horizon House residents and board members, Zalco refused to place Mr. Ford at another building site, and terminated Mr. Ford's employment at Zalco.

86.     In or about April 2006, Zalco hired Lynn Mangione, a white woman, for the position of Horizon House Building Manager.

87.     Since defendants terminated Mr. Ford's employment, the named Horizon House defendants have continued to make false and defamatory statements about Mr. Ford, including that he shredded documents, stole petty cash, and removed files upon his departure.

88.     In the first year after defendants terminated his employment, Mr. Ford experienced anxiety, depression and sleep disturbances as a result of defendants' actions.  He continues to experience anxiety and sleep disturbances as a result of defendants' actions.

89.     Mr. Ford was hired at an annual salary of $55,000, and was told that he would receive $65,000 – the salary paid his predecessor – after completing the probationary period.  His replacement (Lynn Mangione, a white woman) was paid an annual salary of $72,000, and the current resident manager (Judith McNeilus, also a white woman) is paid $102,000.  If defendants had not discriminated against Mr. Ford in his compensation and not fired him for discriminatory reasons, he would have been paid an annual salary of $72,000 for 2006, a projected annual salary

of $80,000 for 2007, a projected annual salary of $90,000 for 2008, and a projected annual salary of $102,000 for 2009.

90.     Mr. Ford filed a timely EEOC charge against Zalco on April 10, 2006.  He amended his charge to add defendant MDV Maintenance on April 10, 2008.

91.     On July 7, 2006, defendant Zalco falsely claimed to the EEOC investigator, in writing, that it had never employed Mr. Ford.  On January 28, 2008, after the EEOC investigator contacted Zalco again, Zalco repeated its assertion that it had never employed Mr. Ford.  Mr. Ford, at the EEOC's request, then provided the EEOC with his W2 forms, which clearly showed that Zalco and MDV Maintenance were paying Mr. Ford's salary.

92.     On August 29, 2008, the EEOC issued a probable cause determination that defendants Zalco and MDV Maintenance discriminated against Mr. Ford on the basis of his race. The EEOC found that the hiring of Mr. Ford "resulted in the development of a racially hostile work environment which eventually led to his discharge from employment," and that Mr. Ford had also been discriminated against in his compensation, i.e., Zalco and MDV Maintenance paid him less than white resident managers.

### COUNT I –    RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq., AGAINST DEFENDANTS ZALCO AND MDV MAINTENANCE.

93.     Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows.

94.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), forbids an employer from discriminating against an employee on the basis of race.

95.     Defendants Zalco and MDV Maintenance were plaintiff's employers within the meaning of 42 U.S.C. § 2000e(b).

21

96.     Defendants Zalco and MDV Maintenance were a joint employer for purposes of Title VII at all times relevant to the complaint.

97.     At all relevant times, Mr. Ford was an employee of defendants, and defendants had total control over the means and manner of his work. Defendants Zalco and MDV Maintenance, together with Horizon House, jointly controlled Mr. Ford's schedule, duties, equipment, office and subordinates.

98.     Plaintiff's qualifications and work performance were excellent, and but for his race and color, defendants Zalco and MDV Maintenance would have continued to employ him in the position of Building Manager.

99.     Defendants Zalco and MDV Maintenance discriminated against Mr. Ford, in violation of Title VII, on the basis of his race (African-American) and his color (black).

100.     Defendants Zalco and MDV Maintenance did not subject similarly situated white employees to similar intimidation, threats, humiliation or abuse.

101.     Throughout plaintiff's employment with defendants, defendants subjected him to discriminatory treatment on the basis of his race.  Defendants discriminated against plaintiff on the basis of his race by, inter alia, subjecting him to a racially hostile work environment; and by failing to take steps to protect Mr. Ford and his family when he was threatened with death because of his race.

102.     Defendants also discriminated against Mr. Ford by paying him substantially less than the white individuals who held the position after his termination.

103.     Defendants Zalco and MDV Maintenance, together with defendant Horizon House further discriminated against Mr. Ford by terminating his employment on February 3, 2006.  Defendants reinstated Mr. Ford on February 6, 2006.  In final acts of discrimination,

22

defendants terminated Mr. Ford's employment at Horizon House again on February 17, 2006, and defendants Zalco and MDV Maintenance terminated Mr. Ford's employment on March 1, 2006.

104.    Defendants Zalco and MDV Maintenance, together with Horizon House hired a white employee who was not as qualified as Mr. Ford to replace him at Horizon House.

105.    Defendants Zalco and MDV Maintenance, together with Horizon House, engaged in their discriminatory actions intentionally, willfully, maliciously, with reckless indifference to Mr. Ford's federally protected rights, and with intent to harm Mr. Ford.

106.    Defendants Zalco's and MDV Maintenance's actions described above constitute racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

107.    Defendants Zalco's and MDV Maintenance's actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer severe emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, damage to his reputation and loss of past income and benefits, and future income and benefits.

**COUNT II –   RACE DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981, AGAINST ALL DEFENDANTS**

108.    Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows.

109.    The Civil Rights Act of 1866 ("Section 1981") prohibits discrimination on the basis of race in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

23

110.    Section 1981 prohibits an employer from engaging in harassment that creates a hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or insult because of the employee's race.

111.    Plaintiff's qualifications and work performance were excellent, and but for his race and color, defendants would have continued to employ him in the position of Building Manager.

112.    Defendants discriminated against Mr. Ford on the basis of his race (African-American) and his color (black).

113.    Defendants did not subject similarly situated white persons to similar intimidation, threats, humiliation or abuse.

114.    Throughout plaintiff's employment, all defendants subjected him to discriminatory treatment on the basis of his race.  Defendants discriminated against plaintiff on the basis of his race by, inter alia, subjecting him to a racially hostile work environment; by failing to take steps to protect Mr. Ford and his family when he was threatened with death because of his race; and by paying him substantially less than they paid his white successors.

115.    Throughout plaintiff's employment, defendants also discriminated against plaintiff on the basis of his race by, inter alia, making demeaning and derogatory comments about him and by spreading false statements, in writing and in public, about his background and character.  These false and defamatory statements were based on stereotypes of African Americans as criminals, sexually aggressive, dangerous and dishonest.

116.    Defendant Mansfield discriminated against plaintiff on the basis of his race by, inter alia, attempting to subject Mr. Ford to a polygraph test; failing to take any action, as Horizon House's attorney, to investigate the threats, including the death threat, against Mr. Ford

24

and his family; defaming Mr. Ford in writing and in public statements to residents of Horizon House; and distributing false material in order to ruin Mr. Ford's reputation.

117.     Defendant Mansfield also discriminated against plaintiff on the basis of his race by, inter alia, distributing materials marked "attorney-client privileged" to third parties; lying to his client about Mr. Ford's alleged statements to him; lying to his client about Mr. Ford's background; continuing to act on behalf of Horizon House even after the attorney-client relationship had been terminated; and making false and defamatory statements about Mr. Ford in his capacity as Horizon House's attorney.

118.     Defendant Mansfield's actions were not privileged insofar as they were unethical, defamatory per se, beyond the scope of his legal representation of Horizon House, or otherwise illegal under the law.

119.     Defendant Faison discriminated against plaintiff on the basis of his race by, inter alia, making false statements about Mr. Ford to people in a position to terminate Mr. Ford's employment.

120.     Defendant Mucklow discriminated against plaintiff on the basis of his race by, inter alia, making false statements about Mr. Ford to residents of Horizon House and others in a position to terminate Mr. Ford's employment; making false statements about Mr. Ford on the official Horizon House website, including the false accusation that Mr. Ford sent the December 24, 2005 death threat to himself; and allowing others to make false and defamatory statements about Mr. Ford on the official Horizon House website.

121.     Defendant Smith discriminated against plaintiff on the basis of his race by, inter alia, making false statements about Mr. Ford to people in a position to terminate Mr. Ford's employment.

25

122.    Defendants Zalco, MDV Maintenance, and Horizon House further discriminated against Mr. Ford by terminating his employment on February 3, 2006, although defendants reinstated Mr. Ford on February 6, 2006.  In final acts of discrimination, defendants terminated Mr. Ford's employment at Horizon House again on February 17, 2006, and defendants Zalco and MDV Maintenance terminated Mr. Ford's employment on March 1, 2006.

123.    Defendants hired a white employee who was not as qualified as Mr. Ford to replace him at Horizon House, yet paid his replacement substantially more.

124.    Defendants' actions described above constitute the creation of a hostile work environment in violation of 42 U.S.C. § 1981.

125.    Defendants' actions described above constitute race discrimination, including the creation of a racially hostile work environment, in violation of 42 U.S.C. § 1981.

126.    Defendants engaged in their discriminatory actions intentionally, willfully, maliciously, with reckless indifference to Mr. Ford's federally protected rights, and with intent to harm Mr. Ford.

127.    Defendants' actions described above directly and proximately have caused, and continue to cause, plaintiff to suffer severe emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, damage to his reputation and loss of past income and benefits, and future income and benefits.

## **Requested Relief**

NOW, WHEREFORE, plaintiff prays this court for the following relief:

1.    Issuance of a declaratory judgment that defendants Zalco and MDV Maintenance discriminated against plaintiff in violation of Title VII of the Civil Rights Act of 1964;

2.    Issuance of a declaratory judgment that defendants Zalco, MDV Maintenance,

26

Horizon House, Mansfield, Mucklow, Faison, and Smith discriminated against plaintiff in the terms and conditions of his employment, subjected plaintiff to a racially hostile work environment, and terminated his employment, all in violation of the Civil Rights Act of 1866;

3.      An award to plaintiff of compensatory damages, including back pay, front pay, and emotional distress damages in an amount appropriate to the proof presented at trial;

4.      An award to plaintiff of punitive damages in an amount appropriate to the proof presented at trial;

5.      An award to plaintiff of reasonable attorneys' fees and costs; and

6.      All other relief the court deems just.

Respectfully submitted,


/s/ Alan R. Kabat
_____
Alan R. Kabat
Virginia Bar # 76898
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942 (Tel)
(202) 745-2627 (Fax)
kabat@bernabeipllc.com

Lynne Bernabei, Esquire
Not Admitted in Virginia
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942 (Tel)
(202) 745-2627 (Fax)
Bernabei@bernabeipllc.com
*Attorneys for Plaintiff Michael Ford*

DATED:  April 21, 2009

**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

_____
                                                    )
MICHAEL FORD,                                       )
                                                    )
            Plaintiff,                              )
                                                    )
      v.                                            )      Civil Action No. 1:08-CV-1318 (LO/TRJ)
                                                    )
ZALCO REALTY, INC., *et al.*,                       )
                                                    )
            Defendants.                             )
_____)

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

                              Respectfully submitted,

                              /s/ Alan R. Kabat
                              _____

                              Alan R. Kabat
                              Virginia Bar # 76898
                              Bernabei & Wachtel, PLLC
                              1775 T Street, N.W.
                              Washington, D.C. 20009-7124
                              (202) 745-1942 (Tel)
                              (202) 745-2627 (Fax)
                              kabat@bernabeipllc.com

                              Lynne Bernabei, Esquire
                               Not Admitted in Virginia
                              Bernabei & Wachtel, PLLC
                              1775 T Street, N.W.
                              Washington, D.C. 20009-7124
                              (202) 745-1942 (Tel)
                              (202) 745-2627 (Fax)
                              Bernabei@bernabeipllc.com
                              *Attorneys for Plaintiff Michael Ford*

DATED:  April 21, 2009

**Certificate of Service**

I hereby certify that on this 21st day of April, 2009, a copy of the foregoing First

Amended Complaint was filed in the Court's Electronic Case Filing System, and was also served

on undersigned counsel by email and by first class mail, postage prepaid, to:

Hope Eastman, Esquire
Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chartered,
4800 Hampden Lane,
Bethesda, Maryland, 20814-2930
         *Counsel for Defendants Zalco Realty, Inc. and MDV Maintenance, Inc.*

Kevin A. Kernan, Esquire
Whiteford, Taylor Preston, LLP,
1025 Connecticut Avenue N.W., Suite 400,
Washington D.C. 20036-5405
         *Counsel for Defendants Horizon House Condominium Unit Owners Association, David*
         *Faison, and Eric Mucklow*

William Wilder, Esquire
Baptiste & Wilder, P.C.
1150 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20036-4104
         *Counsel for Virginia Smith*

David Hudgins, Esquire
Robert Draim, Esquire
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
         *Counsel for James Mansfield*

                                        /s/ Alan R. Kabat
                              _____
                              Alan R. Kabat
                              Virginia Bar # 76898
                              Bernabei & Wachtel, PLLC
                              1775 T Street, N.W.
                              Washington, D.C. 20009-7124
                              (202) 745-1942 (Tel)
                              (202) 745-2627 (Fax)
                              kabat@bernabeipllc.com

2