ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
----------------------------x
MICHAEL FORD,                :
                             :
          Plaintiff,         :
                             :
     v.                      : No. 1:08CV1318
                             :
ZALCO REALTY, INC., et al.,  :
                             :
          Defendants.        :
----------------------------x
```

Alexandria, Virginia

Friday, October 23, 2009

Deposition of

VONDELL CARTER

a witness, called for examination by counsel for

Defendant Mansfield, pursuant to notice and

agreement of counsel, beginning at approximately

9:37 a.m., at the law offices of Hudgins Law Firm,

515 King Street, Alexandria, Virginia, before

Stephan K. Garland of Anderson Court Reporting,

notary public in and for the Commonwealth of

Virginia, when were present on behalf of the

respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180   Fax (703) 519-7190
www.andersonreporting.net



EXHIBIT
2

2

1    APPEARANCES:

2        On behalf of Plaintiff:

3            ALAN R. KABAT, ESQUIRE
             LYNNE BERNABEI, ESQUIRE
4            Bernabei & Wachtel, P.L.L.C.
             1775 T Street, NW.
5            Washington, D.C. 20009
             (202) 745-1942
6
         On behalf of Defendant Mansfield:
7
             ROBERT E. DRAIM, ESQUIRE
8            Hudgins Law Firm
             515 King Street, Suite 400
9            Alexandria, Virginia 20314
             (703) 739-3300
10

11                    *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

4

```
 1                    P R O C E E D I N G S

 2    Whereupon,

 3                    VONDELL CARTER

 4    was called as a witness and, having been first

 5    duly sworn, was examined and testified as follows:

 6               EXAMINATION BY COUNSEL FOR DEFENDANT

 7               MANSFIELD

 8               BY MR. DRAIM:

 9          Q    Good morning, Mr. Carter.  I represent

10    Defendant James Mansfield.  Could you state your

11    name for the record, please?

12          A    Yes.  It's Vondell Carter.

13          Q    And your address?

14          A    I'm at ███████████████  █████

15    ████████████, Arlington Virginia.  The Zip code

16    is 22202.

17          Q    Have you ever had your deposition taken

18    before?

19          A    Yes.

20          Q    How many times?

21          A    I don't know.  Perhaps a half a dozen or

22    so.
```

16

1        A    It was two terms of 2 years each, so it

2    was 4 years prior to -- so -- so it must have been

3    from 2001 to 2005 I would say.

4        Q    When you were first elected to the board

5    in about 2001, would it have been at an August

6    meeting?

7        A    Yes, the regular annual meeting is in

8    August.

9        Q    To put it into context to help you

10   remember when it would have been, would your

11   memory be that you were first elected about a

12   month before September 11 then?  Does that sound

13   like the right year?

14       A    I didn't connect the two, but --

15       Q    Obviously there's no connection.

16       A    No, no, but I'd never thought of it in

17   that way and one of the reasons is I happened to

18   be in the Pentagon on that day and experienced

19   that -- that catastrophe certainly not in serious

20   a way as many other people did, but I hadn't

21   thought of it that way.  That's why I referred to

22   the -- going backwards from that August '05 date.

17

1      Q     But on September 11 you were on the

2   board of directors at that time?

3      A     Yeah.

4      Q     Did you remember what percentage vote

5   you received when you were first elected to the

6   board in August 2001?

7      A     I don't remember the exact percentage.

8   I do remember that I received the highest

9   percentage vote of all the candidates and one of

10  the reasons I recall that which isn't kind of

11  normal thing for me to commit to memory is the

12  fact that a number of -- of the residents were of

13  the impression that having received the highest

14  percentage of the votes that that automatically

15  meant that I would be president of the board which

16  is not a part of the rules.

17     Q     Do you recall how many residents in

18  total actually ran for a position on the board of

19  directors at that meeting in August 2001?

20     A     It may have been five.  Typically there

21  -- there are not a lot of candidates, and at that

22  time the membership on the board was five.  The

20

1        A    Yes, to the best of my recollection.

2        Q    You indicated that you received the

3    highest percentage of any of the candidates.

4    Would it be fair to say that you did not perceive

5    any racial discrimination against you by the

6    Horizon House residents in connection with the

7    vote for directors at the August 2001 meeting?

8    That would be fair?

9        A    That -- that never entered my mind.

10       Q    You don't have any basis do you to

11   believe that there was any racial discrimination

12   against you in connection with that vote for the

13   directors at the August 2001 meeting?

14       A    I guess I would find it difficult to

15   have those two comport.

16       Q    Given that you won and also won by the

17   highest percentage?

18            MS. BERNABEI:  Objection as to form.

19            THE WITNESS:  I can't draw a conclusion.

20   I can only give you the factual information that I

21   received the largest number of votes.  If any

22   assumption were made, I would have to assume that

32

1          A    I don't recall.

2          Q    When you ran for reelection to the board

3     in August 2003, was that election to fill two open

4     spots?

5          A    There would have been three because it's

6     three- two, three-two, and so when I ran the first

7     time it was three people as I recall, three seats

8     were filled, and of course then 2 years later

9     three seats would be filled.

10          Q    Three seats?

11          A    Yeah.  Each -- each seat has two terms,

12     so if you fill three in '01, then you would fill

13     three in '03, 2 years later.  And in -- and in

14     2002 and in 2004 it would be two seats.  Now,

15     there are also other things that occur such as

16     people resigning and so on and -- and people who

17     the board had the authority to -- to appoint

18     people in an interim status and so on, so there

19     are a lot of things that can happen.

20          Q    In August 2001, were there any other

21     African Americans, I may have asked this, who

22     actually ran for the board or were you the only

34

1      A    Yeah, there should have been three open

2   seats.

3      Q    And you ran for reelection?

4      A    Yeah.

5      Q    Do you recall how many other residents

6   ran for the board in August 2003?

7      A    How many?

8      Q    How many?

9      A    No, but it must have been at least two

10   others since they were elected, and so maybe there

11   was another one or two.

12      Q    In August 2003 were you the only African

13   American running for election to the board?

14      A    Yes.

15      Q    Do you recall whether in August 2003 you

16   received the highest percentage or where you stood

17   in terms of relative percentages of the vote?

18      A    I did not receive the highest.  I think

19   Greg Weatherman did as I recall.

20      Q    Do you recall in August 2003 whether

21   there were more people running that seats to be

22   filled?

35

1          A     I think so.

2                MS. BERNABEI:   Objection, asked and

3     answered.

4                BY MR. DRAIM:

5          Q     You think so?

6          A     Yeah.   Yeah.   I'm pretty sure.   I think

7     there were five.   I -- I just visualize there were

8     five names tallied in terms of the number of

9     votes, so it was probably five.

10         Q     If Greg Weatherman had the highest

11    number of votes, do you recall whether you were

12    second or third?

13         A     No, not really.

14         Q     But you would have either been second or

15    third.   Correct?

16         A     Yeah.

17         Q     Is there any reason for you to think

18    that the vote of the residents at the August 2003

19    meeting reflected any racial discrimination

20    against you in any way?

21               MS. BERNABEI:   Objection.  Calls for a

22    legal conclusion and objection as to form.

36

1          BY MR. DRAIM:

2     Q     I'm sorry.  Your answer is no?

3     A     I have no reason to even consider that.

4     Q     What position did you then hold on the

5  board after your reelection in August 2003?

6     A     I think it was vice president.

7     Q     The actual position assignment, was that

8  one that was made by the residents as part of the

9  vote at the annual meeting or was that decided

10  amongst the elected board of directors?

11    A     The bylaws require that it be a decision

12  among the -- the board members.

13    Q     The residents would elect individuals to

14  fill the open seat and then after the meeting the

15  five directors would then decide who would be

16  president and who would fill the other positions?

17         MS. BERNABEI:  Objection as to form.

18         BY MR. DRAIM:

19    Q     Is that correct?

20    A     Yes.  At that time it was five.

21    Q     To your recollection, after your

22  reelection in August 2003, you were a vice

43

1      infrequently.

2           Q    Infrequently?

3           A    Yes.

4           Q    Approximately how many per year?

5           A    I don't know, perhaps a couple.  Maybe

6      -- maybe three, but I don't remember a precise

7      number, but it certainly was not every meeting.

8           Q    To your knowledge, was Mr. Mansfield

9      asked to come to every meeting or invited at

10     particular meetings where some legal issues were

11     anticipated as being discussed?

12               MS. BERNABEI:  Objection as to form.

13               BY MR. DRAIM:

14          Q    Do you understand the question?

15          A    Repeat it, please.

16          Q    I'll rephrase.  Was Mr. Mansfield asked

17     to attend all of the monthly meetings?

18          A    Not to my knowledge.

19          Q    So to your understanding, he would have

20     come to those meetings where he was specifically

21     requested to come to address any issues of a legal

22     nature?

44

1          A    I don't know if he would have come, but

2     on occasions when he was asked to come as I recall

3     he -- he came.

4          Q    During your first two terms from August

5     2001 to August 2005, did you observe Mr. Mansfield

6     speaking at any of the monthly meetings at Horizon

7     House?

8               MS. BERNABEI:  The board meetings?

9               MR. DRAIM:  Yes.

10              THE WITNESS:  As I recall, he responded

11    to questions that were asked of him or issues

12    where he may have been asked to make comment or

13    something of that sort.  He -- he had no standing

14    to speak on the agenda.

15              BY MR. DRAIM:

16         Q    During either of these two terms from

17    August 2001 to August 2005, did you ever hear Mr.

18    Mansfield say anything at a board of directors'

19    meeting or at any other location that was in any

20    way racially derogatory?

21         A    When you say any other location you're

22    referring to what?

45

1        Q    First at any of the board meetings or

2    annual meetings during your first two terms, 2001

3    to 2005, did you ever observe Mr. Mansfield make

4    any racially derogatory statement or comment?

5             MS. BERNABEI:  Objection, compound

6    question.

7             THE WITNESS:  Not that I recall.

8             BY MR. DRAIM:

9        Q    When you ran for reelection in 2005,

10   were there three seats open to be filled or a

11   different number because of resignations?  Do you

12   recall?

13       A    Even if someone had been appointed

14   temporarily to fill a seat, that seat would have

15   been up for -- for election at the meeting so --

16   so that there should been two seats available at

17   that time.

18       Q    Two seats?

19       A    Um-hum.  2001 -- you said 2005.  Right?

20       Q    That's right.

21            MS. BERNABEI:  Or are you asking are

22   there more than three seats available?  Is that

47

1    involve two?

2         A    Correct.

3         Q    In August 2005 when you were up for

4    reelection, do you remember how many total

5    candidates there were for the three spots?

6         A    I would estimate five or six.  I think

7    it was a little larger number than normally might

8    be the case.

9         Q    I take it you were reelected.  Correct?

10        A    Um-hum.  Yes.

11        Q    Do you recall where you stood in terms

12   of percentage of votes compared to the other

13   candidates?

14        A    No.

15        Q    Was your wife Susan Morris one of the

16   candidates for the board in that year, August

17   2005?

18        A    Yes.

19        Q    And you recall now that that may have

20   been the first time she actually ran for the

21   board?

22        A    Yes.

59

1    appropriate.  I'm going to move on to questions

2    for Mr. Carter.

3              BY MR. DRAIM:

4        Q    Mr. Carter, I apologize for the little

5    diversion right there.

6              MS. BERNABEI:  Mr. Draim, why don't you

7    just wait?  But since you continue to press the

8    system, we'll just take another break.  Just hold

9    on for one second.  Mr. Kabat can come earlier.

10             MR. DRAIM:  If you want him to

11   participate by telephone --

12             MS. BERNABEI:  If you want to press the

13   point, that's fine.  Just excuse me for one

14   moment.

15                  (Recess)

16             MR. DRAIM:  We're back on the record.

17   First I'll note that Mr. Kabat has joined the

18   deposition.

19             BY MR. DRAIM:

20       Q    Mr. Carter, you indicated off the record

21   just before we resumed that you'd like to add to

22   or modify your answer to one of the previous

60

1    questions, so let me give you an opportunity to do

2    that.  Go ahead.

3         A    Yes.  With regard to when Susan Morris,

4    my wife, joined the Horizon House board of

5    directors, my conversation with her indicated that

6    she was off cycle with the dates in which I -- or

7    the years in which I ran for the board, so that it

8    was 2004 when she first ran for and was successful

9    in being elected to the board.

10        Q    Mr. Carter, from August 2001 until

11   August 2005 for those first 4 years of your

12   service on the board, did the board of directors

13   of Horizon House have a meeting each month?

14        A    Generally.  There may have been one or

15   two exceptions to it, but -- well, as a matter of

16   fact, let me -- let me reconsider that because

17   actually when I first joined the board, there was

18   a recess or meetings were held in abeyance for I

19   think it was July and -- and August, so there were

20   only 10 -- 10 meetings per year.  And somewhat of

21   a humorous point, one of the board members had

22   their family roots in I think Iowa and so she

93

1    in September, but I think it was mostly October

2    and November.  And as I recall, I think we had a

3    total of four interviews and at least two were

4    African Americans.

5         Q    There were four candidates actually

6    interviewed?

7         A    As I -- as I recall, there -- there were

8    four.  Now, not -- not all four may have showed up

9    for an interview.  I think we had four, maybe even

10   five referrals, but --

11        Q    Four or five referrals from Zalco?

12        A    Yes, and two of those that showed up for

13   interviews were African Americans, Michael Ford

14   and one other person.

15        Q    Do you know the other person's name?

16        A    Not offhand, but it happened to be the

17   person who -- who had a good background and who

18   was the manager of a property in D.C. at the time.

19        Q    Of the four or five candidates that

20   Zalco referred during this process, did any have

21   any pending criminal charges at the time other

22   than Michael Ford?

98

1    in the middle of the day and the board members

2    were people who had jobs as well, so it wasn't the

3    greatest thing to have them in the middle of the

4    day.  So they were either in the evening or on

5    Saturday mornings.  We had them both.  So I don't

6    -- I don't recall exactly when -- when he was

7    interviewed.  If I were to guess, it may have been

8    a Saturday morning, but that's a guess.

9         Q    Who was present during the interview of

10   Michael Ford?

11        A    As -- as I recall it was Greg

12   Weatherman, Susan Morris and myself as board

13   members, and Michael Constant as the property

14   manager.

15        Q    Your recollection is that Michael

16   Constant was actually present during the interview

17   of Michael Ford?

18        A    Yeah, of -- of him as well as some of

19   the others as I recall.  We tried to arrange it in

20   such a way that he could be present and that all

21   the board members could be present.  That was the

22   idea.  The idea was that the board members and the

99

1    property manager were there because the property

2    manager is in a unique position to advise us with

3    regard to the professional background of the

4    applicants.  I mean, he's the property management

5    expert as far as we are concerned, and so the

6    intent was to have interviews designed in terms of

7    date, time and place to have every board member

8    there as well as the property manager.

9        Q    Why were David Faison and Adrian

10   Garretson  not at the interview of Michael Ford?

11            MS. BERNABEI:  Objection.  Lack of

12   foundation.

13            BY MR. DRAIM:

14       Q    Let me back up.  Were David Faison and

15   Adrian Garretson at the interview of Michael Ford?

16       A    They were not, nor were they at some of

17   the others for various reasons that they offered

18   which as far as I know had to do with personal

19   reasons.  I think on one occasion David suddenly

20   had to go out of town.  They were all notified and

21   requested to be there, scheduled at reasonable

22   times and if they were there, they were there

125

1     I think it was some response to his inquiries or

2     efforts where the courthouse acknowledged that it

3     had now been expunged from his records.

4        Q    You stated that Mr. Ford was hired on

5     what you called an interim basis subject to the

6     outcome of the pending sexual-assault charges in

7     Maryland.  Is that correct?

8        A    Yes, it was.  In fact, temporary isn't

9     exactly the right term.  It was really a

10    probationary sort of thing with the understanding

11    that less than a satisfactory outcome would --

12    would mean that he would not be hired on a

13    permanent basis.

14       Q    As building manager did Michael Ford

15    have a master key to the units of Horizon House?

16       A    I think at the beginning we restricted

17    his access to the building and to office kinds of

18    things or facility activities until his permanent

19    status as I recall.

20       Q    The previous building manager or interim

21    building manager, Jennifer O'Keefe, did she have

22    keys that would allow her access to units?

131

1  Q Do you recall having a discussion with

2 Michael Constant about having Zalco or its

3 subsidiary MDV serve as the actual employer of

4 Michael Ford in order to potentially limit any

5 liability to Horizon House because of the sexual-

6 assault charges in Maryland?

7  A Yes, I said I did not -- I would like

8 for -- for Michael to be in a probationary status

9 not directly affiliated with Horizon House because

10 I did not want to have that image until we were

11 certain of what the circumstance was and therefore

12 you're in a defensible position.

13  Q And you knew as president of the board

14 of directors that hiring as building manager an

15 individual with pending sexual criminal assault

16 charges could raise liability concerns in the

17 event that something were to happen at Horizon

18 House.  Correct?

19  MS. BERNABEI:  I'm going to object.  It

20 calls for a legal conclusion and it's also vague

21 as to what liability you're talking about.  I

22 think there's also lack of foundation as to what

151

1    the obvious.

2         BY MR. DRAIM:

3         Q    Mr. Carter, I'm telling you now I'm

4    going to ask some questions and I'm going to ask

5    whether Mr. Mansfield made any expressed

6    statements.  So I'm not asking you do you think

7    something was in someone's mind or something was

8    inferred, so let me ask this.  Did Mr. Mansfield

9    expressly refer to Mr. Ford as either black or

10   African American?

11        A    I don't recall those words.

12        Q    Did Mr. Mansfield at any time at the

13   special meeting refer expressly to any residents

14   as white women or Caucasian women?

15        A    I don't recall that.

16        Q    Did Mr. Mansfield at any time during the

17   January meeting refer to you expressly as either

18   black or African American?

19        A    I don't recall that.

20        Q    Did Mr. Mansfield reference Mr. Ford's

21   pending criminal charges in Maryland?

22        A    Yes.

155

1    -- with an image of authority, the -- the attorney

2    to the association, telling them how terrible this

3    decision was of the president which of course was

4    inaccurate because it wasn't the decision of the

5    president.  It also mischaracterized the whole

6    situation and -- and -- and would naturally cause

7    and they were intimidated by -- by the -- the

8    circumstances that were -- were described.  So I

9    don't know what was in the mind of the people who

10   responded, but I know how they responded and that

11   response was to a large degree if not entirely in

12   response to the -- to the environment created by

13   -- by what I would call a harangue on the part of

14   Mr. Mansfield.

15         BY MR. DRAIM:

16    Q    Did any of the residents at that meeting

17   refer to Mr. Ford as black or African American

18   expressly?

19    A    I don't recall who said what because

20   there were a whole number of people who were

21   pretty vocal and -- and somewhat chaotic in -- in

22   what they had to say.  But an example of -- of

156

1    what that environment can produce is the -- is the

2    woman, a Caucasian woman if you will, who referred

3    to my wife as poor white trash.  That's the kind

4    of environment created by -- by this sort of

5    thing.  Now, what was in her mind before that

6    happened I don't know, but she obviously felt that

7    the environment was such that she could make that

8    kind of a statement and that it would be accepted

9    and if not applauded by her audience.

10        Q    Are you referring to any statement that

11   any particular resident made at the January 19

12   special meeting?

13        A    It was not at that particular meeting,

14   but is indicative of what came about as a result

15   of that meeting and the environment created by

16   that meeting.

17        Q    So there was no one at the January 19,

18   2006 meeting who referred to your wife as poor

19   white trash.  Is that correct?

20        A    I don't know that.  Maybe I didn't hear

21   them, but they may have referred to it.  I can't

22   say that.

157

1      Q    But do you recall?

2      A    No, I didn't hear that at that meeting.

3      Q    Did you ever hear any resident of

4  Horizon House referring to your wife with the

5  exact words poor white trash?

6      A    Did I ever hear what?  I'm sorry.

7      Q    Did you ever hear any resident at

8  Horizon House refer to your wife as poor white

9  trash?

10     A    Yes.  Yes, that's just what I said.

11     Q    When was it if not the January 19

12  meeting?

13     A    It was at -- it was at a board meeting,

14  and -- and it was recorded on film, by the way,

15  because the meeting was being taped, and it was

16  related to this but I don't remember just -- I can

17  find out exactly what meeting it was, but it was

18  related to his whole issue.

19     Q    So the statement that this woman made

20  referring to your wife as poor white trash, if

21  that wasn't at the January 19 meeting, then you

22  did not intend did you to suggest that Mr.

1          BY MR. DRAIM:

2          Q    Mr. Carter, did you attend the February

3     2, 2006 meeting?

4          A    Yes.

5          Q    And that was the meeting where there was

6     a vote to remove you, Greg Weatherman and your

7     wife Susan Morris as directors.   Correct?

8          A    Yes.

9          Q    How long did that meeting last?

10         A    At least a couple of hours or more.

11         Q    Did you yourself record either audio or

12    video either of the meetings on January 19, or

13    February 2?

14         A    On February 2 it's my understanding that

15    it was recorded.

16         Q    But not by yourself personally?

17         A    No.  No.

18         Q    Do you know who recorded the February 2

19    meeting?

20         A    It was either Greg or -- or Michael

21    Ford, and I think that recording was made

22    available in our -- in our court case.  I thought

201

1    it was anyway.

2         Q    You're referring to the Arlington

3    Circuit Court case?

4         A    Yes.

5         Q    Have you yourself listened to the tape

6    of the February 2 meeting?

7         A    No.

8         Q    Do you know whether the January 19 was

9    recorded by anyone?

10        A    I do not, no.

11        Q    In the February 2 meeting did Mr.

12   Mansfield speak to your recollection?

13        A    I know both he and his partner were --

14   were there and -- and I -- as I recall, I was

15   somewhat amazed by the fact that the meeting I

16   guess was supposed to be conducted by Eric Mucklow

17   or at least it was assumed that he would, and as I

18   recall, he asked Mr. Mansfield and then his

19   partner if they wanted to conduct the meeting

20   which made no sense to me, but anyway, it was

21   their meeting so to speak.

22        Q    Was attorney Juan Cardenas of Rees

202

1    Broome also at that meeting?

2        A    Yes.  A representative, not -- yeah, you

3    said -- did say a representative of Rees Broome,

4    yes.

5        Q    Or I take it from your question you

6    don't recall whether Mr. Cardenas personally or

7    another attorney?

8        A    No, I don't think it was Juan.  I think

9    it was -- I know the guy, but I don't think -- but

10   it wasn't Juan as I recall.

11       Q    But an attorney from Rees Broome was

12   there?

13       A    Yes.

14       Q    And that was the law firm that you, Mr.

15   Weatherman and your wife retained?

16            MS. BERNABEI:  Objection.  Misstates the

17   testimony.

18            THE WITNESS:  That -- that was an

19   interim law firm that the board obtained with the

20   full intention of going through a solicitation and

21   a -- and a competitive evaluation process for a

22   permanent representative.

203

1           BY MR. DRAIM:

2       Q    At the February 2 meeting did Mr.

3   Mansfield refer to Mr. Ford's race?

4       A    I don't recall.

5       Q    You don't recall Mr. Mansfield ever

6   referring to Mr. Ford as either black or African

7   American?

8       A    I -- I don't recall any such statements.

9       Q    At the February 2 meeting did Mr.

10  Mansfield refer to your race?

11      A    Not that I recall.

12      Q    Do you recall anyone at the February 2

13  meeting referring to Mr. Ford's race?

14      A    No, I don't know, but I have no way of

15  really evaluating that when there's a room full

16  of, you know, people and I can't say whether

17  anybody there referred to --

18      Q    That you heard.

19      A    No, I don't recall any.

20      Q    Do you recall yourself hearing anybody

21  at the February 2 refer to your race?

22      A    Well, depends upon interpretation.  If

220

1    very likely.  I know that I talked with them on

2    more than one occasion and I had the guy's card

3    around somewhere, so it's -- it's a matter of

4    record that -- that I requested that this be

5    investigated.  We had a session at which an FBI

6    agent was present.  I mean, it's -- it was not a

7    small issue and it was not hidden under a bushel.

8    It was made very visible to the community.

9         Q    It was investigated by both the

10   Arlington County Police and the FBI?

11        A    Correct.

12        Q    Is it correct that no determination was

13   ever made by either the Arlington police or FBI as

14   to the source of that note?  Is that your

15   understanding?

16        A    No conclusions were drawn.  I cannot say

17   that the case was closed.  I don't -- it's not

18   unlike a number of other cases you -- you know --

19   maybe it's one of those cold cases or something.

20   I don't know.

21        Q    To your knowledge, did the Arlington

22   police --

223

1      Q   Do you have any facts to your knowledge

2  that would rule out the complaining witness or the

3  accuser in the Maryland case as the potential

4  source of that note?

5      A   I have -- no, I didn't do an

6  investigation.

7      Q   Did you ever yourself direct Mr.

8  Mansfield to take any specific action in

9  connection with that note?

10     A   I don't recall.

11     Q   And likewise, the board of directors at

12  the time did not direct Mr. Mansfield to conduct

13  an investigation or do anything specific relating

14  to the note that was being investigated by the

15  Arlington police and FBI?

16      MS. BERNABEI:  Objection as to form.

17      THE WITNESS:  No, I don't recall any

18  specific direction, but the -- on the surface of

19  it, it was potentially a hate crime and therefore

20  the appropriate jurisdiction for it was law

21  enforcement.  It's not an administrative issue

22  associated with the board that I think would be

224

1    appropriate for it.  I don't have any objection to

2    them knowing about it.  In fact, I would imagine

3    he probably was told about it and so on.

4              BY MR. DRAIM:

5       Q    Would it be fair to say that you don't

6    have any reason to believe that Mr. Mansfield

7    could have uncovered the author of the note where

8    the Arlington police and the FBI were

9    unsuccessful.  Is that fair?

10             MS. BERNABEI:  Objection.  Calls for

11   speculation.

12             THE WITNESS:  What we -- we do know is

13   some things that were mailed to -- to the -- to

14   the organization or to Michael Ford were mailed

15   either through or had some connection with Mr.

16   Mansfield's office.  I've forgotten just what

17   those items were right now.

18             BY MR. DRAIM:

19      Q    Let's talk about the note.  You're not

20   saying that you have any facts or evidence that

21   that particular note which we're calling a death

22   threat to Mr. Ford was mailed through Mr.

227

1   maybe over the weekend we can even make that

2   determination.

3            BY MR. DRAIM:

4       Q    Mr. Carter, are you available?  We know

5   how to get in touch with you even if it's over the

6   weekend?

7       A    Yeah.

8       Q    Thanks.

9                (Whereupon, at 4:45 p.m., the

10               deposition of VONDELL CARTER was

11               adjourned.)

12                  *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

1          CERTIFICATE OF NOTARY PUBLIC

2

3          I, Stephen K Garland, notary public in and for the Commonwealth of Virginia, do

4     hereby certify that the witness whose testimony appears in the foregoing transcript was

5     reduced to print under my direction; that said testimony is a true record of the testimony

6     given by said witness; that I am neither counsel for, related to, nor employed by any of

7     the parties to the action in which this deposition was taken; and, furthermore, that I am

8     not a relative or employee of any attorney or counsel employed by the parties hereto, nor

9     financially or otherwise interested in the outcome of this action.

10

11

12

13

14

15     Notary Public, in and for the Commonwealth of Virginia # 258192

16     My Commission Expires: 31 July 2011

17

18

19

20

21

22

23

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180   Fax (703) 519-7190

1       **To the Witness:**

2              Please note any errors and the

3    corrections thereof, on this errata sheet.  Any

4    change or correction should have a reason.  It may

5    be a general reason, such as "To correct

6    stenographic error," or "To clarify the record,"

7    or "To conform with the facts."  Once you have

8    completed the sheet, signed and dated it, return

9    the sheet to your attorney, not to the court

10   reporting agency.  Attorneys should exchange

11   errata sheets among the parties.

12

13

14

15

16

17

18

19

20

21

22

1          ERRATA SHEET FOR THE DEPOSITION OF

2                    _____

3     Case Name: _____

4                         **CORRECTIONS**

5     Pg. Ln.   Now Reads      Should Read      Reasons:

6     _____  _____    _____    _____

7     _____  _____    _____    _____

8     _____  _____    _____    _____

9     _____  _____    _____    _____

10    _____  _____    _____    _____

11    _____  _____    _____    _____

12    _____  _____    _____    _____

13    _____  _____    _____    _____

14    _____  _____    _____    _____

15    _____  _____    _____    _____

16    _____  _____    _____    _____

17    _____  _____    _____    _____

18    _____  _____    _____    _____

19    _____  _____    _____    _____

20    _____  _____    _____    _____

21    Reviewed by:                     Date:

22    _____    _____