**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| _____ )<br>MICHAEL FORD )<br> )<br>　　　　Plaintiff, )<br> )<br>　　v. )<br> )<br>ZALCO REALTY, INC., *et al.*, )<br> )<br>　　　　Defendants )<br>_____) | Civil Action No. 1:08-cv-1318 (LO/TRJ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTFF'S OPPOSITION TO
DEFENDANT JAMES MANSFIELD'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael Ford, through undersigned counsel, hereby submits his memorandum of law in support of his opposition to defendant James Mansfield's Motion for Summary Judgment.

**I.　Summary.**

On February 2, 2006, the Board of Directors ("Board") of the Horizon House Condominium Association ("Association"), in their first official action as a newly-elected Board, terminated the employment of Michael Ford, a military veteran and the first African-American building manager at Horizon House.  This was the culmination of a campaign of racially-based discrimination and harassment, initiated and orchestrated by former Horizon House counsel, James Mansfield.  Acting on his own, not as Association counsel, Mansfield repeatedly distributed defamatory statements about Mr. Ford based on racial stereotypes of African-Americans, in order to drive him out of his job.

As an Arlington County Circuit Court judge stated, in disqualifying Mansfield from representing the Association, she had never seen a case in which an attorney was more involved as a central player in the actions of a client.

When the Association first hired Mr. Ford as building manager, Mansfield threatened to sue on the baseless claim that Mr. Ford's replacement of a white building manager was reverse discrimination.  Immediately after Mr. Ford started, Mansfield commissioned an investigation to see if Vondell Carter, President of the Association, and Mr. Ford were related to one another, because they were both African American.  He began this investigation without authorization from the Board, and for the sole purpose of discrediting both men.  On December 17, 2005, in the midst of Mansfield's multiple investigations of Mr. Carter and Mr. Ford, and less than two weeks after Mr. Ford started work at Horizon House, an anonymous letter went out to all residents of Horizon House claiming falsely that Mr. Ford had a history of violence that would endanger Horizon House residents.  On Christmas Eve, 2005, Mr. Ford received an anonymous death threat.  It read "U R DED [sic] NIGGER UR FAMLY [sic] TOO."

In January 2006, in a highly racially charged atmosphere, Mr. Mansfield sent a letter to all residents that falsely claimed that Mr. Ford had admitted to wrongdoing and consensual sex with a tenant of the building he previously managed; that he had been fired for cause; and that a tenant had accused him of rape.  Mansfield repeated these false and racially stereotyped attacks at a public meeting of the Concerned Citizens group, a group that he advised and coordinated. Mansfield's only reason to perpetuate these false views of Mr. Ford was to play on racial stereotypes of black men, to frighten the white women living alone at Horizon House. The record evidence is clear that Mansfield acted outside the scope of his role as an attorney, in order to incite the residents to fire Mr. Ford and remove Mr. Carter for racially discriminatory reasons, and on the basis of racial stereotypes.

## II. **Statement of Genuine Issues of Fact in Dispute.**[1]

### A. **Horizon House.**

1.      Horizon House is a condominium building in Arlington, Virginia.  All unit owners are members of the Association, (Horizon House Condominium Bylaws ("Bylaws"), Art. III, Sec. 3.1 (Def.'s Mem. Ex. 1), which is governed by an elected Board of Directors.  (Id. Art. III, Sec. 3.7.)  The Board President serves as the point of contact for, and gives direction on behalf of, the Board to Horizon House counsel, the property manager, and the building manager.  (Mansfield Dep. 45:15-46:9; Carter Dep. 29:18-30:4; Faison Dep. 111:19-21.)

2.      In August 2005, Defendant Mansfield served as Horizon House counsel.  (Mansfield Dep. 12-13.)  In 2005 and 2006, Zalco Realty ("Zalco"), a management company, managed Horizon House, and typically employed a property manager and an on-site building manager for that purpose.  In 2005, Zalco assigned Michael Constant to serve as the property manager at Horizon House.  (Constant Dep. 14:16-20.)  In August 2005, Jennifer O'Keefe served as the temporary interim building manager.  (Mansfield Dep. 47-50; Carter Dep. 75.)

3.      At the August 31, 2005 annual meeting of the Association, Vondell Carter, Susan Morris, Greg Weatherman, Adrienne Garretson, and David Faison were elected as the new Board.  (Faison Dep. 17.)  Mr. Carter, a Air Force colonel, was first elected to the Board in 2001, (Carter Dep. 15:21-16:3), and in August 2005, became the first African-American President of the Board.  (Id. at 215:20-216:11).  Ms. Morris is Caucasian and married to Mr. Carter.  (Morris Dep. at 11:6-15.)  Ms. Garretson is Caucasian, and served as President prior to Mr. Carter.  (Carter Dep. 86.)

---

[1] This section also includes undisputed facts for background purposes.  The exhibits referenced in this section are attached in alphabetical order by the last name of deponent or declarant.  Other than sections A, B, D, E, F, H, I, U, and V set forth in Defendant's Memorandum, Mr. Ford does not concede or stipulate to the facts asserted by Mansfield.

**B.      Mansfield Was Supposed to Take Direction from the Board President.**

4.      Prior to Mr. Carter's election as Board President, Mansfield routinely took direction from

the President, under Horizon House protocol.  (Mansfield Dep. 45:15-46:3; Carter Dep. 29:18-

30:4; Faison Dep. 111:19-21.)[2]  After Mr. Carter's election as Board President, Mansfield began

to act on his own, rather than taking direction from the Board President.[3]

**C.      Horizon House Sought to Hire a Permanent Building Manager.**

5.      In November 2005, Mr. Constant provided the Board with a group of qualified

applicants' résumés, including Mr. Ford's.  (Carter Dep. 92:15-93:14; Constant Dep. 27:14-

29:4.)  Zalco scheduled interviews with these applicants and notified Board members of the

interview date.  (Weatherman Dep. 64:22-65:8, 68:5-15, 70:20-22.)  Mr. Carter, Ms. Morris, and

Mr. Weatherman showed up for Mr. Ford's interview, as did Mr. Constant.  (Carter Dep. 98:9-

14.)[4]  After the interviews, the Board members and Mr. Constant discussed the applicants and

recommended three finalists, including Mr. Ford.  (Constant Dep. 41-42.)

**D.      False Charges Pending Against Mr. Ford.**

6.      Zalco performed routine background checks on all three finalists (Constant Dep. 43:15-

21.)  It found that a second degree assault charge and a fourth degree sex offense charge were

pending against Mr. Ford in Prince George's County, Maryland.  (Id. at 47:7-12; W. R. Ford

Dep. 108:2-9.)  Mr. Constant gave Mr. Carter this information.  (Constant Dep. 47:13-19.)

7.      Over the next few days, Mr. Ford spoke with Mr. Carter and Mr. Constant to explain that

---

[2] When Ms. Garretson was President, Mansfield took direction from her.  (Mansfield Dep. 45:15-46:3.)

[3] Bernard DiMuro, plaintiff's expert witness, testified that for a condominium association, while the client is the association, "that is an artificial entity," so the Board is "treat[ed] as the client." (DiMuro Dep. 24:14-18 & Dep. Ex. 1, at 2, ¶ 2.)

[4] Mr. Faison and Ms. Garretson were notified of Mr. Ford's interview, but chose not to attend. (Id. at 99:20-22; Weatherman Dep. 70:9-22.)

the charges were false.  (Ford Dep. 101:4-103:6, 108:2-110:8; Ford Aff. ¶ 16.)  The complainant made the charges to retaliate against Mr. Ford because he had refused to renew her lease.  Mr. Ford denied any kind of relationship with her.  (Ford Aff. ¶ 16.)

8.     Mr. Ford asked William Ray Ford, his Maryland defense attorney, to speak with Mr. Carter about the case.  (Ford Dep. 108:2-9; W.R. Ford Dep. 30:14-32:13.)  William Ray Ford told Mr. Carter that Mr. Ford denied the allegations unequivocally.  (W.R. Ford Dep. 32:14-18.)

9.     Mr. Ford also asked William Ray Ford to speak with Mansfield.  (Ford Dep. 108:10-20; W.R. Ford Dep. 33:15-21.)  William Ray Ford told Mansfield that Mr. Ford denied the allegations.  (W.R. Ford Dep. 32:14-18.)  William Ray Ford also told Mansfield that Mr. Ford had not engaged in any sexual relationship with the complainant.  (Id. at 40:14-19.)

### E.     Mansfield Exceeded the Scope of Representation by Interjecting Himself in Mr. Ford's Hiring.

10.    Mr. Carter directed Mansfield to perform one limited task—to send a representative to observe Mr. Ford's trial on the pending charges.  (Carter Dep. 160:20-161:13.)  In his 16 years as Horizon House counsel, Mansfield had never inserted himself in the hiring of any of the other building managers, all of whom had been Caucasian.  (Mansfield Dep. 61:6-16.)

11.    Mansfield also told William Ray Ford that he wanted Mr. Ford to take a polygraph test.  (W.R. Ford Dep. 41:2-43:9.)  After speaking with Mr. Ford, William Ray Ford told Mansfield that Mr. Ford would take a polygraph.  (Id. at 53:20-55:5.)  William Ray Ford was very confident that Mr. Ford would not incriminate himself and thus did not dissuade him from taking the polygraph.  (Id. at 68:20-71:6.)

12.    Mr. Ford also spoke with Mansfield and agreed to the polygraph test.  He explained that the complainant's allegations were totally false, and confirmed he had no sexual relationship with the complainant.  (Ford Dep. at 114:3-116:21.)  During a subsequent conversation, Mr. Ford

reiterated to Mansfield that he was willing to take a polygraph, but would not pay the $500 cost.

(Id. at 116:22-120:6; Mansfield Resp. to Interrog. No. 14.)  Although Mansfield later claimed in

a January 2006 letter to Mr. Carter that he had "strongly recommended that [Mr. Ford] undergo a

lie-detector test," he now has no memory of ever asking the Board to pay for the polygraph.

(Mansfield Dep. 275:3-7 & Ex. 16.)

13.     In late-November 2005, the Board, in a 3-2 vote, voted to ask Zalco to hire Mr. Ford on a

probationary basis as the building manager, pending resolution of the Maryland charges.  (Carter

Dep. 125:4-13, 130:8-131:12, 133:12-134:8, 234:7-14; Weatherman Dep. 74:9-75:6.)

14.     Mr. Ford began working as Horizon House's building manager on December 5, 2005.

(Ford Dep. 123:2-5.)  He was the first African-American building manager at Horizon House,

(Carter Dep. 91), and proved to be a good manager—efficient and disciplined, with excellent

accounting skills.  (Weatherman Dep. 280-82.)  Mr. Ford impressed Board members with his

substantial accomplishments as building manager.  (Carter Aff. ¶ 6.)

15.     After the decision was made to hire Mr. Ford on a probationary basis, Zalco terminated

Ms. O'Keefe, who is Caucasian.  (Carter Dep. 82:16-21.)  Upon learning of her termination,

Mansfield repeatedly telephoned Messrs. Carter and Constant and threatened to pursue a

wrongful termination action on behalf of Ms. O'Keefe on the basis of reverse discrimination.

(Id. at 358:9-16; 398:1-402:7.)[5]  Mansfield made these threats even though he knew Ms.

O'Keefe had performance problems.  (Id. at 51.)  Although Mansfield denied that he threatened

to sue Zalco on Ms. O'Keefe's behalf, he admitted that he told Zalco that Ms. O'Keefe might

---

[5] Mr. Carter was taken aback by the strength of Mansfield's approach regarding possible legal action on behalf of Ms. O'Keefe.  (Id. at 401:10-402:3.)  Mr. DiMuro testified that Mansfield acted improperly and beyond the scope of his representation when he threatened to take legal action on behalf of Ms. O'Keefe, since the Board had not directed him to do so.  (DiMuro Dep. 117:10-20 & Dep. Ex. 1, at 3, Dep. Ex. 17, at 640).

have a reverse discrimination claim because they had allegedly excluded her from the hiring process.  (Mansfield Dep. 222.)  Mansfield, at various times in his deposition, claimed that he did not know Mr. Ford was African American until January 2006.  (Mansfield Dep. 123-24, 225-27.)  However, from the time Mr. Ford was about to be hired, Mansfield was trying to retain Ms. O'Keefe, the poorly performing Caucasian building manager, and exclude Mr. Ford, an African American.  Mansfield would have no basis to conclude that Ms. O'Keefe might have a "reverse discrimination" case unless he knew that Mr. Ford was African American.  The Board had not authorized Mansfield to act with regard to her termination.  (Id. at 358:17-22.)

### F. Without Board Authorization, Mansfield Threatened to Sue Zalco on Behalf of Ms. Garretson To Get Zalco's Background Check on Mr. Ford.

16.     In January, Mr. Mansfield also threatened to sue Zalco on behalf of Ms. Garretson for not releasing Mr. Ford's salary information, despite Ms. Garretson's multiple requests.  (Mansfield Dep. 180:11-181:5, 184 & Ex. 11.)  When Zalco responded that it gave Ms. Garretson the same information that all other Board members received, Mansfield threatened to sue Zalco.  (Id. at 184 & Ex. 11.)  Mansfield admitted that the Board did not authorize him to threaten to sue Zalco on behalf of Ms. Garretson.  (Id. at 182:15-183:18.)  In fact, they were attempting to get the results of Zalco's background investigation on Mr. Ford.  (Mucklow Dep. 67-69.)

### G. Without Board Authorization, Mansfield Investigated Board Members.

17.     Again acting without Board authorization, Mansfield pursued an investigation of some "link" connecting Mr. Ford and Mr. Carter.  All surviving Board members testified that they never authorized Mansfield to conduct these investigations.  (Carter Dep. 359:17-360:17; Weatherman Dep. 35:6-36:12; 43:21-45:21; Faison Dep. 97:14-98:18; Morris Dep. 126-27.)

18.     Mr. Faison found the investigations "creepy."  (Faison Dep. 97:14-99:13.)  Even Mansfield's law partner, Alex Morgan, thought it was "a little bit odd that [Mansfield] was

getting involved" with the hiring of Mr. Ford.  (Morgan Dep. 128:22-130:22.)  Nevertheless, on

December 14, 2005, Mr. Morgan hired Discreet Investigations of Virginia to investigate Mr.

Ford, Mr. Carter, and Ms. Morris, Mr. Carter's wife.  (Mansfield Dep. 72 & Ex. 2.)  The only

basis for an investigation of these "links" was because both men were African American.

19.     Mr. Mansfield and his two partners testified in a conflicting manner about how the

investigation came to be initiated.  Mr. Morgan testified that he hired the investigator after

Mansfield said that Mr. Carter wanted to keep secret a confession that Mr. Ford engaged in

consensual sexual contact with the complainant.  (Morgan Dep. 132:10-135:2, 137:3-8.)

Mansfield has no recollection of this conversation with Mr. Carter.  (Mansfield Dep. 79:13-

80:7.)  Mansfield contradicted Mr. Morgan's testimony by insisting that he "must have received

direction either from the [property] manager or one of the board members."  (Mansfield Dep.

71:7-16.)  In contrast, Mr. Hartsoe, Mansfield's other law partner, thought that Ms. Garretson

had authorized the investigation.[6]  (Hartsoe Dep. 48-49.)

## H.     Ms. Garretson's Racist Comments to Mr. Ford.

20.     Shortly after Mr. Ford began at Horizon House, Ms. Garretson made openly racist

remarks to him.  After receiving a complaint about Ms. Garretson taking her dog out through the

lobby doors, in violation of the bylaws, Mr. Ford brought the relevant rule to her attention.  (Ford

Aff. ¶ 5.)  She immediately became angry, raised her voice, and told Mr. Ford he "needed to get

some education.  You need to get educated . . . ."  (Id.)  When she continued to berate Mr. Ford

in what he believed to be a racist tone, he told her that he would talk to Mr. Carter and go

---

[6] Mr. DiMuro testified that it was "highly unreasonable" for Mansfield to do a background check
on Mr. Carter, particularly "coupled with the fact that he's investigating the Board president
without telling him."  (DiMuro Dep. 57:18-20 & Ex. 1, at 3.)  Mr. DiMuro also testified that
since the Board had not authorized these background checks, Mansfield did not have the
authority to do them.  (Id. at 64:10-15, 66:7-12 & Ex. 1, at 3.)

through the Board to resolve the matter, and asked her to leave.  (Id.)

21.     Later that day, when Ms. Garretson asked questions of the front desk resident agent in a belittling manner, Mr. Ford said that her questions would be better directed to Mr. Carter or Mr. Constant.  (Id. ¶ 16.)  Ms. Garretson responded, "Boy, I'm not talking to you."  (Id.)  Ms. Garretson's use of the term "boy" to refer to Mr. Ford was a racial slur.  (Id.)

22.     In this same week that Ms. Garretson made these racist remarks, and on other occasions, Mr. Ford saw Mansfield check in at the front desk to visit Ms. Garretson.  (Id. ¶ 3.)

## I.     An Anonymous Letter Accused Mr. Ford of Being Violent and Abusive.

23.     On December 17, 2005, an anonymous letter was circulated that accused Mr. Ford of having a violent history and abusive character and criticized the Board for hiring him. (Weatherman Dep. 88 & Ex. 8.)  The letter read further, "We do not need violence, or abusive conduct, in Horizon House.  If something happens you would be liable."  (Id.)

24.     The note appeared to refer to Mr. Ford's 1995 guilty plea to an assault charge in Ohio, an incident which Mr. Ford disclosed on his Zalco application.  (Ford Dep. 79 & Ex. 3.)  This conviction stemmed from Mr. Ford's confrontation with his uncle at his mother's funeral.[7]  (Ford Aff. ¶ 4.)  During his interview, Mr. Ford explained these circumstances to the Board members. (Carter Dep. 160:12-19.)

25.     Rather than approach Mr. Ford for an explanation of this 10-year old conviction, Mr. Mucklow and other Horizon House residents spread rumors that Mr. Ford's conviction resulted from his attack on a "little old lady" named Eulis.  (Weatherman Dep. 91:18-92:12.)  In fact, Mr. Ford's uncle's first name was Eulis, a name used for both males and females.  (Id. at 93:6-13.)

---

[7] Although Mr. Ford's uncle struck Mr. Ford first, when Mr. Ford fought back, his uncle suffered injuries that required him to be hospitalized.  (Ford Aff. ¶ 4.)  Mr. Ford plead guilty to a misdemeanor assault and served 45 days in prison.  (Id.)

### J.      Mr. Ford Received an Anonymous Racist Death Threat.

26.      One week later, at the same time that Mansfield was conducting unauthorized investigations, a racist written death threat was sent to Mr. Ford at his Horizon House workplace. On December 24, 2005, a letter containing an anonymous death threat to Mr. Ford and his family was delivered by first class mail to Mr. Ford at Horizon House.  (Ford Dep. 209:19-210:13 & Ex. 5.)  The envelope had the correct address and zip code of Horizon House, but it was written in disguised handwriting.  (Id.)  The letter was written in printed block letters that appear to have been cut out from magazines.  (Id. at 209, 211:10-16 & Ex. 5.)  The letter read: "U R DED [sic] NIGGER UR FAMLY [sic] TOO."  (Id. at 209:19-210:13 & Ex. 5.)

27.      On the day Mr. Ford received and opened the envelope containing the threatening letter, his eight-year-old son had accompanied him to work.  (Id. at 212:7-21.)  Immediately upon reading the letter, Mr. Ford dropped the letter to the floor in shock.  (Id. at 212:7-13.)  The front desk manager saw Mr. Ford's facial expression change, and retrieved the letter from the floor and read it.  (Id. at 212:8-14.)  Because he feared for his son's safety, Mr. Ford pulled him into his office immediately.  (Id. at 212:15-16.)  Mr. Ford then called Mr. Constant and Mr. Carter to tell them about the note.  (Id. at 212:17-19.)  Although both told him to call the police immediately, he decided to get his son out of the building first, because whoever wrote the note appeared to know that Mr. Ford brought his son to Horizon House.  (Id. at 212:18-213:1.)  When Mr. Ford returned to work, he reported the death threat to the Arlington County Police Department.  (Id. at 213:2-6.)  The FBI also investigated.  (Id. at 217:21-218:2.)

### K.      The Racially-Hostile Work Atmosphere at Horizon House Intensified.

28.      The racially-charged atmosphere at Horizon House was evident in residents' reactions to news of the racist death threat against Mr. Ford.  A group of Horizon House residents seeking to

oust Mr. Carter and fire Mr. Ford began to meet, calling themselves the Concerned Citizens for

Horizon House ("Concerned Citizens").  (Mucklow Dep. 149-50.)  Several members of the

Concerned Citizens group, including Mr. Mucklow,  Paula Garner, and Wendy Schacht, publicly

suggested that Mr. Carter, or even Mr. Ford, had written the anonymous racist death threat.

(Weatherman Dep. 100:9-101:5;  Mucklow Dep. 272 & Ex. 15;  Morris Dep. 145:11-15;

Mansfield Dep. 234 & Ex. 15.)  Mr. Mucklow even gave the police a sample of Mr. Carter's

handwriting.  (Mucklow Dep. 264:14-20.)

29.     The Concerned Citizens met several times between January 1, 2006 and February 2,

2006.  (Mucklow Dep. 67-69.)  They met secretly to strategize about how to oust Mr. Carter and

the other two Board members who voted with him.  (Id. at 141-43 & Ex. 7.)  Leonard Conrad, a

Concerned Citizen, made repeated suggestions that the group hire Mansfield to sue the Board led

by Mr. Carter.  (MacAdam Dep. 31.)  The Concerned Citizens also performed their own

investigations into Mr. Ford's background after Ms. Garretson unsuccessfully tried to get Zalco

to provide her with Mr. Ford's background check.  (Mucklow Dep. at 67-69.)  Ms. Garretson and

Marie Eckes traveled to Maryland to examine the court records pertaining to Mr. Ford.  (Id. at

143 & Ex. 7.)

30.     With Mansfield's significant assistance, the Concerned Citizens organized a public

meeting for January 19, 2006, at which Mansfield argued for the ouster of Mr. Carter and his

allied Board members by encouraging residents' racially-charged fear of Mr. Ford.  (Id.  at 65-

67, 110-11, 118-20.)

### L.     Mansfield Distributed a Racially-Charged, Defamatory Letter.

31.     In the midst of this racially-charged atmosphere, on January 17, 2006, Mansfield wrote

and distributed, without Board authorization, a letter to the Board marked "Confidential Attorney

Client Privileged."  (Mansfield Dep. 265 & Ex. 16.)  In this letter, Mansfield called for the

removal of Mr. Carter, Ms. Morris, and Mr. Weatherman, and falsely described the charges

against Mr. Ford.  (Id.)  Mansfield deliberately misrepresented what Mr. Ford and his attorney

had stated about those charges to defame Mr. Ford, frighten Horizon House residents, and

suggest that Mr. Ford was dangerous.  (Id.)

32.     Among the false statements Mansfield made in the letter were that "Mr. Ford was fired

by his previous employer for cause," and that Mr. Ford "admitted wrongdoings" with regard to

the pending charges in Maryland.  (Id.; Ford Dep. 269:2-270:3, 279:14-280:2.)  He also falsely

stated that Mr. Ford had admitted had he had "consensual sexual relations with a tenant on two

occasions."  (Mansfield Dep. 265 & Ex. 16; Ford Dep. 269:8-270:14.)

33.     In fact, the pending charges against Mr. Ford were for assault and not for rape.  (W.R.

Ford Dep. 108:2-9.)  More importantly, Mr. Ford and his attorney both told Mansfield that

nothing sexual had happened.  (W.R. Ford Dep. 32:14-18, 40:14-19; Ford Aff. ¶ 16; Ford Dep.

269:8-270:14.)  Mr. Ford made clear that the reason that the complainant had brought the

charges was in retaliation for his starting the process of eviction against her, as required by his

job.  (Ford Dep. 269:8-270:14.)

34.     Finally, Mansfield said he confronted Mr. Ford with the request to take the lie detector

test, but omitted the fact that Mr. Ford had agreed to take the test if the Association paid its cost.

(Mansfield Dep. 265 & Ex. 16; Ford Dep. 116:22-120:6.)  Virginia Smith, another member of

the Concerned Citizens group, testified that she learned about Mr. Ford's pending charges for the

first time from Mansfield's letter, and felt that Mr. Ford's status as building manager was

"threatening."  (Smith Dep. 28-30.)  Mansfield's false descriptions of Mr. Ford's supposed

admissions and the charges against him were based on stereotypes of black men raping white

women.  (Carter Dep. 185; Ford Dep. 158; MacAdam Dep. 114-17; Goldman Dep. 57.)

35.    After Mansfield sent this letter to the Board, Mansfield, Garretson, and Mucklow ensured that it was distributed to all residents at Horizon House.  (Mucklow Dep. 114, 179 & Ex. 10.) Mr. MacAdam was so upset about the letter being distributed, that he called Mansfield's law firm, which confirmed that they did not object to its dissemination.[8]  (MacAdam Dep. 78-85; Mucklow Dep. 179 & Ex. 10.)

36.    Concerned Citizens members seeking Mr. Carter's ouster and Mr. Ford's termination found more credible the statements when they came from Mansfield, the Association's attorney, rather than gossiping residents.  (Mucklow Dep. 206-11, 218; Faison Dep. 168.)

### M.      The Board's First Termination of Mansfield.

37.     After Mansfield sent out his letter of January 17, 2006, the Board voted by email on January 18 and January 19, 2006, to terminate Mansfield as attorney for the Association.  Mr. Carter wrote Mansfield a letter terminating his services.  (Mansfield Dep. 314 & Ex. 22.) Mansfield, immediately before the Concerned Citizens meeting on January 19, 2006, wrote back to Mr. Carter stating that he did not consider himself to be terminated because the action did not take place at a formal Board meeting.  (Id. at 317 & Ex. 23.)

38.    Ms. Garretson asked Mr. Mucklow to coordinate with Mansfield to develop a strategy to oust Mr. Carter and the two other board members.  (Mucklow Dep. 47-48; 65-67.)  Mr. Mucklow asked Mansfield about the procedures to oust Mr. Carter, Ms. Morris, and Mr. Weatherman from

---

[8] Mr. DiMuro testified that it would be the Board, not Mansfield, who would have the authority to provide information to the residents about Mr. Ford's background.  (DiMuro Dep. at 72:5-10 & Dep. Ex. 1, at 2.)  He further testified that only the Board, not the attorney, could authorize the disclosure of the January 17 letter to the residents, since only the Board can waive the privilege. (DiMuro Dep. 119:14-17, 119:21-120:2 & Ex. 18.)  His professional opinion was that, by writing the letter and facilitating its distribution beyond the Board, Mansfield was acting in derogation of confidentiality he owed to the Association as its attorney."  (DiMuro Ex. 1, at 4.)

the Board.  (Mucklow Dep. 341:6-342:3.)  Mr. Mucklow also sought Mansfield's advice on the

proper wording of a petition to call for a election and the procedures for holding the special

election.  (<u>Id.</u> at 341:6-342:3; Mansfield Dep. 116 & Ex. 6.)

       **N.**      **Mansfield Inflamed Racial Tensions at Concerned Citizens Meeting on**
              **January 19, 2006 and Escalated His Attacks on Mr. Ford.**

39.      After learning that the Board had fired him, Mansfield became a featured speaker at the

Concerned Citizens meeting on January 19, 2006.  (Mucklow Dep. 110-11.)  Mansfield  orally

presented all the false allegations against Mr. Ford that he had written in his January 17, 2006

letter, but with dramatic emphasis on the false facts about the pending criminal charges, which

created alarm among those in attendance.  (MacAdam Dep. 105-07.)

40.      Fred MacAdam, an Association member at the meeting, described the meeting as a

"borderline angry mob" or "borderline lynch mob" that was trying to get rid of Messrs. Carter

and Ford.  (<u>Id.</u> at 126.)  Ms. Fisher confirmed that this meeting became an "angry-like mob

crowd," with screaming, and that Mr. Mansfield "incited this crowd," doing "everything but call

him a rapist."  (Fisher Dep. 22:12-22, 27:8-16, 37:4-5.)  As a result, several residents at the

meeting said that they did not want a rapist in their building.  (<u>Id.</u> at 41:6-21, 42:11-12.)

41.      Mr. Carter, who also attended the meeting, characterized Mansfield's comments as

"demoniz[ing]" Mr. Ford, in what he called a "rousing presentation."  (Carter Dep. 147.)  Mr.

Carter said that Mansfield's presentation "attacked Michael Ford" and "was playing upon the

stereotypes of race in terms of a black male having access to . . . this condominium and the. . .

many white women who lived there . . ."  (<u>Id.</u> at 148-49.)  Mr. Carter also stated Mansfield's

presentation was "completely out of place . . . for a counsel . . . it incited the group of people to .

. . a mob kind of mentality . . . to which they reacted predictably. . . . race was - was an integral

part of it explicitly or implicitly . . . ."  (<u>Id.</u> at 150.)

42.     In his presentation, Mansfield repeated the numerous misrepresentations contained in his January 17, 2006 letter, including that Mr. Ford had a consensual sexual relationship with the complainant; that the charges stemmed from alleged coercive intercourse rather than alleged touching; and that Mr. Ford refused to take a polygraph test.  (Id. at 159; MacAdam Dep. 105-11, 122-23; Carter Dep. 209-10.)  Finally, Mansfield stated falsely that Mr. Ford was fired from his previous employer for cause.  (Carter Dep. at 173-74.)  In fact, Mr. Carter had verified from Zalco and from the Lerner Corporation, that Mr. Ford was eligible for rehire.  (Id. at 173-75.)

43.     Mr. Carter, as had Mr. MacAdam, found that Mansfield's "inaccuracies" were presented so as "to play upon the traditional and . . . discriminatory historical stereotypes . . . as it pertains to the presence of this black manager . . . having access . . . to apartments that are predominantly occupied by white women . . . "  (Id. at 185, 194-95.)  Mansfield talked about Mr. Ford's Ohio conviction "in such a manner as to evoke the kind of reaction . . . that was desired and . . . focused upon Michael Ford and upon myself as the president."  (Id. at 210-11.)

44.     The Board did not authorize Mansfield to attend the meeting.  (Carter Dep. 150; Faison Dep. 187.)  Mr. Mucklow, a Concerned Citizen member, called Mansfield a "hero" for his central role in getting Mr. Carter removed.  (Mucklow Dep. 30:9-22.)  Marie Eckes, another Concerned Citizens member, highlighted Mansfield's importance by instructing Mr. Mucklow "to do what Mr. Mansfield dictated."  (Id. 309 & Ex. 19.)

## O.     On January 23, 2006, the Board Ratified Its Decision to Fire Mansfield.

45.     On January 23, 2006, by a 3-2 vote, the Board terminated Mansfield at a formal Board meeting.  (Carter Aff. ¶ 7-8 & Attachment C; Faison Dep. 229-30.)[9]  Knowing that the Board

---

[9] Mr. Faison, who voted against the termination, conceded that after that meeting, Mansfield was no longer the attorney for the Association and should not have been billing the Association or acting on behalf of the Association.  (Faison Dep. at 210-11, 246, 275.)

had fired him, Mansfield entered into retainer agreements with individual members of the

Association so that he could continue to represent them and work for the removal of Mr. Carter

and Mr. Ford. (Mucklow Dep. 234-38 & Ex. 12.)

### P.   Despite Mr. Ford's Acquittal, Mansfield Continued His Campaign.

46.     On January 25, 2006, Mr. Ford was acquitted of the pending charges in Maryland.

(Mansfield Dep. 130-31.)  Mr. Ford's criminal record was expunged.  (W.R. Ford Dep. 68.)

Mansfield did not report the acquittal to the Association membership.  (Mansfield Dep. 382.)

47.     After the Board's ratification of its decision to dismiss him as Association counsel, and

notwithstanding Mr. Ford's acquittal, Mansfield and his law firm prepared and distributed a

packet of materials for the February 2, 2006 meeting, which focused, in large part, on Mr. Ford.[10]

(Mucklow Dep. 220-21 & Ex. 11.)  The Board did not authorize Mansfield to send out that

package.  (Mucklow Dep. 222.)  In the package were court documents about the criminal sexual

assault charges of which Mr. Ford was acquitted on January 25, 2006, without mention of the

acquittal.  (Faison 242-44 & Ex. 17.)  Mansfield's January 17, 2006 letter was also included in

the package.  (Id.)

48.     At the February 2, 2006 meeting, pursuant to a petition from members of the Association

organized by Mansfield, Ms. Garretson and Mr. Mucklow, the members voted to remove Mr.

Carter, Ms. Morris, and Mr. Weatherman and elect new directors, including Mr. Mucklow.[11]

(Mucklow Dep. 336.)  The new Board's first action was to terminate the services of Mr. Ford.

---

[10] Mansfield and other members of his firm billed the Association approximately 64.3 hours for
the time from January 24 to February 2, 2006, after the Association has already terminated them
as attorneys.  (Hartsoe Dep. 52, 102 & Ex. 4, 14.)

[11] Mr. DiMuro testified as to his expert opinion that once Mansfield was no longer "the lawyer
for the association," his acts from January 23, 2006 to February 2, 2006, "to the extent he was
acting against the interests of certain Board members and with . . . bad intent planning to have
them removed," was acting outside the scope of his representation.  (DiMuro Dep. 83:18-84:14.)

(Id. at 336-37.)  Mr. Mucklow's stated justification for firing Mr. Ford demonstrates the

discriminatory animus he and the others held against Mr. Carter and Mr. Ford (and not the other

Board members) based on their race.[12]

49.    After the new Board told Mr. Ford that it had terminated him, Zalco insisted that he

return to work.  On or about February 3, when Mr. Ford returned to Horizon House, Mr. Conrad

screamed at Mr. Ford, "We don't want your kind in here!" in a lobby full of people.  Others

gasped at Mr. Conrad's racist remarks.  (Ford Dec. ¶ 25; Ford Dep. 149-51.)

**Q.    Mansfield Disqualified by Arlington Circuit Court Judge and Admonished
for Continuing Representation Despite Clear Conflict of Interest.**

50.    On February 15, 2006, Mansfield, on behalf of the Association, filed a Complaint in the

Arlington County Circuit Court against Mr. Carter, Ms. Morris, and Mr. Weatherman, Case No.

06-200.  (Def. Summ. J. Ex. 41.)  These three former Board members then filed a Complaint in

the same court against the new board.  Case No. 06-225.  (Def. Summ. J. Ex. 42.)

51.    The three former Board members moved to disqualify Mansfield from representing the

Association in No. 06-200, arguing that he was a witness to the events.  At the motions hearing,

Judge Alper disqualified Mansfield, because he "had a conflict of interest in representing the

parties" caused by his "consecutive representation of the two boards."  (DiMuro Dep. 103:11-13,

106:6-8 & Ex. 11, at 71-72.)  Judge Alper also found that Mansfield and members of his firm

were witnesses in the cases, another basis to disqualify him.  (Id. at 108:7-11 & Ex. 11, at 72-74)

The court concluded, in strong language, "I think that I've never seen a case where counsel's

actions in a matter have been so central to the issues that are the decisive issues in this case."

(DiMuro Ex. 11, at 73:21-74:1.)

---

[12] Mr. Carter testified that his letter of recommendation for Mr. Ford used "political conflict" as a
euphemism for his termination, and that he did not mention race and racial stereotyping, which
would be inappropriate for a recommendation.  (Carter Dep. 335-36, 382-83 & Ex. 9.)

### R. Mansfield's Actions Caused Mr. Ford to Suffer Severe Emotional Distress.

52.     Mr. Ford experienced severe emotional distress as a result of the harassment by the Concerned Citizens group and Mansfield, and the false, racially stereotyped statements widely disseminated by Mansfield.  After the death threat and false postings on the Horizon House website, Mr. Ford's work environment changed significantly.  He believed the death threat was sent by someone in the building, because an anonymous letter and postings were already circulating about the Ohio charge – about which only a few residents knew.  (Ford Dec. ¶ 16.)

53.     After Mansfield sent his January 17, 2006 letter, Mr. Ford's work environment further deteriorated.  Mr. Ford was no longer excited about his job, or eager to make changes at Horizon House.  Mr. Constant encouraged him to stay.  (Ford Dep. 275-77.)  Mr. Constant agreed that Mansfield's letter was racist, but told him, "Michael, we can get past this."  (Id. at 293-95.)  Mr. Ford was also upset because the residents did not know the circumstances of his Ohio conviction that Mansfield distributed to the entire building, and that Mansfield was making false statements about him to frighten residents of a building "full of . . . single white ladies" (id. at 185), to make them think he was violent.  (Id. at 182-87).  He was also upset that certain residents were saying that he was a rapist, based on Mansfield's statements.  (Id. at 223-27.)

54.     Dr. Goldman diagnosed Mr. Ford as having suffered a Major Depressive Disorder after his termination, as a result of the actions taken against him by Mansfield and other members of the Concerned Citizens.  Dr. Goldman found that the racial tensions, a racial epithet and death threat sent to Mr. Ford, Mansfield's dissemination of false and racially stereotyped statements about Mr. Ford, and his termination, all led him to suffer significant depression.  Among his symptoms were sleep problems, significant weight gain, and feelings that he was a failure.  He withdrew from those closest to him, and suffered feelings of abandonment.  He also had suicidal

ideation.  (Goldman Dep. 19-20, 121-123, 126, 136-137 & Goldman Ex. 5 (Expert Report).)

55.     Dr. Goldman also found that the evidence that he examined indicated that some of the attacks on Mr. Ford by Mansfield played on people's "racial fears, that they are stereotypical, that they . . . appeal to the paranoia or irrational fear that some people have about minority groups, particularly African-Americans."  (Goldman Dep. 142.)  Specifically, Dr. Goldman believed that the statements made by Mansfield and others in the Concerned Citizens group played on fears that African Americans "are sexually promiscuous, that they are sexually violent."  Dr. Goldman also found that the net effect of these stereotypes was "to suggest that Mr. Ford was sexually violent,  . . . capable of serious physical violence and possibly serious violence against a woman."  (Id. at 143.)

### III.    Procedural Background.

Mr. Ford timely filed a charge of discrimination with the EEOC on April 10, 2006.  See Am. Compl. ¶ 90 (Doc. No. 10).  The EEOC issued its probable cause determination, finding that the hiring of Mr. Ford "resulted in the development of a racially hostile work environment which eventually led to his discharge from employment."  Id. at ¶ 92.  Mr. Ford filed his complaint in this Court on Dec. 19, 2008 (Doc. No. 1), and an Amended Complaint on April 21, 2009 (Doc. No. 10).  This Court denied Mr. Mansfield's motion to dismiss the Section 1981 claim on the grounds that:  "Plaintiff has stated a claim upon which relief can be granted, and because there may be material facts in dispute."  See Order (Doc. No. 25) (June 10, 2009).

### IV.    Standard of Review.

If this Court, after reviewing the record as a whole, finds that "a reasonable jury could return a verdict for" Mr. Ford, then "a genuine factual dispute exists and summary judgment is improper."  Evans v. Tech. Apps. & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).  A material fact

is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

This Court must view all facts, and inferences drawn from those facts, in the light most favorable to the non-moving party. Price v. Sasser, 65 F.3d 342, 345 (4th Cir. 1995). The plaintiff "is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc). A court may not decide questions of credibility in ruling on a motion for summary judgment. Anderson, 477 U.S. at 249.

Courts "must take special care" when considering summary judgment in a discrimination case, "because motive is often the critical issue." Evans, 80 F.3d at 958. Thus, "[r]esolution of questions of intent often depends on the credibility of the witnesses, which can best be determined by the trier-of-fact after observation of the witnesses during direct and cross examination." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364-65 (4th Cir. 1985).

## V.   **Legal Argument.**

### A.   **As a Matter of Law, Mansfield May be Held Liable for Race Discrimination under Section 1981 without a Contractual Relationship with Mr. Ford.**

This Court must find that Mansfield can be held liable under Section 1981, even though he was not Mr. Ford's employer, and did not supervise him. (Def.'s Mem. at 24, 25.) Defendant misrepresents Section 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts" without regard to race, 42 U.S.C. § 1981(a),[13] but does not require an employment relationship. Id. § 1981(b).

---

[13] When Congress amended the statute (the "1991 Amendments"), the term "make and enforce contracts" was expanded to include "the making, performance modification, and termination of contracts, and conditions of the contractual relationship," and does not require an employment relationship. 42 U.S.C. § 1981(b).

Mansfield cites to Mitchell v. RJK of Gloucester, Inc., 899 F. Supp. 246, 248 (E.D. Va. 1995) (citing Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir. 1989)).  (Def.'s Mem. at 25.)  Both cases are inapposite because neither was brought under Section 1981, but instead dealt with the definition of "employer" under Title VII.  Section 1981's coverage and remedies are broader than that of Title VII.  Rivers v. Roadway Express, Inc., 511 U.S. 298, 304 (1994) ("a substantial part of [Section 1981's] sweep does not overlap with Title VII").[14]

Mansfield also relies on Jordan v. Campbell-Taggart, Inc., 902 F.2d 28, 1990 WL 51819, *3 (4th Cir. 1990) (Def.'s Mem. at 25-26.), which is inapposite since that plaintiff claimed that discrimination interfered with a third-party's contract.  Jordan, 1990 WL 51819, at *2.  In contrast, Mr. Ford's claim is for race-based interference with *his* contractual rights.[15]

Contrary to Mansfield's argument, the weight of authority supports Mr. Ford's contention that, even if no contractual relationship exists between plaintiff and defendant, individuals such as Mansfield, who interfere with a plaintiff's contractual rights because of race, can be liable under Section 1981.[16]  If Mansfield's discriminatory animus created a hostile work environment or led to Mr. Ford's termination, he can be held liable under Section 1981.

---

[14] Mansfield also cited Alford v. Gass, 2009 WL 497581 (E.D. Va. 2009).  The court's analysis in Alford focused on Title VII's requirement that the defendant be an employer, and incorrectly required a contractual relationship with the defendant for the Section 1981 claim.

[15] Jordan was also pre-1991 Amendments, and relied on the now-abrogated decision in Patterson v. McLean Credit Union, 491 U.S. 164 (1989).  Section 1981 was amended in 1991, "enlarging the category of conduct that is subject to [Section] 1981 liability."  Rivers, 511 U.S. at 303.

[16] See Spriggs, 165 F.3d at 1020 (plaintiff stated Section 1981 claim against employer, company president, and supervisor); Phillips v. Mabe, 367 F. Supp. 2d 861, 870 (M.D.N.C. 2005) (Section 1981 does not require contractual relationship between plaintiff and defendant) (citing Collin v. Rector & Bd. of Visitors of the Univ. of Va., 873 F. Supp. 1008, 1015 (W.D. Va. 1995) (allowing Section 1981 claim against dean and faculty members who influenced tenure decision) and Kolb v. Ohio, 721 F. Supp. 885, 891-92 (N.D. Ohio 1989) ("[N]o contractual relationship or expectation of employment is required between a defendant and the plaintiff to support the individual liability under section 1981 of that defendant for discriminatory interference with the plaintiff's contractual relationship with the defendant employer)).

**B.      This Court Should Deny Mansfield's Motion Because the Record Evidence Shows He Interfered with Mr. Ford's Employment Because of Race.**

To prove a Section 1981 claim, a plaintiff must establish that: (1) "the defendant intended to discriminate on the basis of race," and (2) "the discrimination interfered with a contractual interest." Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006).  Mansfield erroneously argues that Mr. Ford must present direct evidence,[17] contrary to well-established Supreme Court precedent.  Claims of discrimination supported by circumstantial evidence[18] are governed by the familiar burden-shifting analysis.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[19]  "The shifting burdens of proof set forth in McDonnell Douglas are designed to assure that the plaintiff has his day in court *despite the unavailability of direct evidence*."[20]

**1)      Mr. Ford Has Presented Sufficient Evidence to Satisfy a *Prima Facie* Case of Race Discrimination with Regard to His Termination.**

To establish a *prima facie* case of race discrimination for termination, a plaintiff must show that:  "(1) he is a member of a protected class; (2) he suffered adverse employment action;

---

[17] See, e.g., Def.'s Mem. at 10 ("Mansfield… did not make and [sic] racially derogatory comments"); id. at 13 ("Nowhere in that paragraph (or elsewhere in the letter) is there any mention of Plaintiff's race.  Nor does that paragraph contain any racial epithet or racially derogatory statement."); id. at 14 ("no one (including Mansfield) expressed the view that Plaintiff should be removed as building manager because of his race, and Mansfield never made such a statement."); id. at 15 ("Mansfield did not make a racial epithet on [sic] racially derogatory statement."); id. at 24 ("Mansfield never made any reference to Plaintiff's race or made any racially derogatory statement about Plaintiff.").

[18] Direct, "smoking gun" evidence of discrimination can be difficult to uncover.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("the entire purpose of the McDonnell Douglas *prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by"); U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) ("All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult . . . There will seldom be 'eyewitness' testimony as to the employer's mental processes.").

[19] See Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

[20] Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) (emphasis added); see also EEOC v. Sears Roebuck and Co., 243 F.3d 846, 855 (4th Cir. 2001) (A "lack of direct evidence of ... animus" does not compel summary judgment for an employer).

(3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir.2007); accord Mansell v. Toys 'R Us, Inc., 2009 WL 4755671 (D. Md. 2009) (Section 1981 claim against non-employer defendant).[21]

Mr. Ford is African-American, and a member of a protected class.  It is undisputed that he suffered an adverse employment action when the new Board terminated him.  Mansfield asserts that he cannot be held liable for Mr. Ford's termination because the new Board, not Mansfield, fired him.  (Def.'s Mem. at 26.)  There is, however, more than sufficient evidence for a factfinder to conclude that Mansfield's actions led to the Board's termination of Mr. Ford.

Mansfield first tried to prevent the hiring of Mr. Ford, and threatened to sue Zalco if the white manager were replaced, on the basis of reverse discrimination.  (SOF ¶¶ 10, 12, 15.)[22] Mansfield ordered investigations of Mr. Ford and Mr. Carter, both African Americans, to find derogatory information to terminate Mr. Ford and oust Mr. Carter as President.  (Id. ¶¶ 17-19.)

Mansfield then wrote a January 17, 2006 letter that contained false and racially stereotyped statements that "Mr. Ford was fired by his previous employer for cause," that Mr. Ford "admitted wrongdoings," that he had "consensual sexual relations with a tenant on two occasions," including at work. (Id. ¶¶ 31-36.)  His racially stereotyped statements were intended to, and had the effect of, frightening the women who lived alone in the building.  (Id. ¶ 34.) Members of the Concerned Citizens group seeking Mr. Ford's termination stated it was

---

[21] See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 870 (6th Cir. 2001) ("[T]o the extent that *any formulation of the elements of the prima facie case includes a requirement that the plaintiff show that the defendant had an intent to discriminate on the basis of race, such a formulation is inappropriate* because the very point of the prima facie case requirement is to prove a basis for inferring the existence of a discriminatory motive.") (emphasis added).
[22] Citations to "SOF" refer to the Statement of Genuine Issues of Facts in Dispute, supra Part II.

important to them that these statements were coming from the Association attorney.  (Id. ¶ 36.) Mansfield then worked with Garretson and Mucklow to ensure that Mansfield's January 17, 2006 letter was widely distributed to all residents at Horizon House.  (Id. ¶¶ 31-35, 47.)

Mansfield then became the main speaker at the Concerned Citizens meeting on January 19, 2006, where he repeated the false and racially stereotyped allegations in his letter, which incited the residents to a mob mentality, calling for Mr. Ford's termination and Mr. Carter's removal.  (Id. ¶¶ 39-44.)  Mansfield also prepared the packet of materials for the February 2, 2006 meeting, focusing in large part on Mr. Ford.  (Id. ¶ 47.)  He included in the packet court documents about the Maryland charges, and the January 17, 2006 letter.  (Id.)  Mansfield's own actions interfered with Mr. Ford's employment, leading to his termination.

The record evidence further shows that Mr. Ford's job performance readily met his employer's expectations (Id. ¶ 12), and that a white building manager replaced Mr. Ford.  See Am. Compl. ¶ 86 (Doc. No. 10).  As such, all four elements of the *prima facie* case are satisfied.

Under the McDonnell Douglas framework, if unrebutted, the *prima facie* case allows a fact finder to infer intent.  The burden of productions shifts to the defendant to show a legitimate nondiscriminatory reason for the challenged action.  If the defendant proffers such a reason, the plaintiff must show that the proffered reason was a mere pretext for unlawful discrimination.

> **2)    Even if Mansfield Articulated a Legitimate Non-Discriminatory Reason for His Actions, the Record Evidence Demonstrates that His Actions Were Racially Motivated.**

Even if Mansfield attempted to justify his discriminatory actions to drive Mr. Ford out, by claiming that he was simply acting as the Association's counsel, Mr. Ford has presented sufficient evidence for a factfinder to find that this is a pretext for discrimination.  A plaintiff may show pretext either by showing that the defendant's proffered explanation is unworthy of

credence, or by persuading the court that a prohibited reason more likely motivated the decision.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); St. Mary's Honor Center

v. Hicks, 509 U.S. 502, 511 (1993).  Especially relevant would be evidence of a "general pattern

of discrimination."  See McDonnell Douglas, 411 U.S. at 804.  That the defendant "has offered

different justifications at different times" for its actions "is, in and of itself, probative of pretext."

Sears Roebuck, 243 F.3d at 853-54.  As the Fourth Circuit explained:

> Under *Reeves,* this showing is sufficient to permit a trier of fact to "infer the
> ultimate fact of discrimination from the falsity of the employer's explanation."
> Indeed, *Reeves* teaches that when "the employer's justification has been
> eliminated, discrimination may well be the most likely alternative explanation,
> especially since the employer is in the best position to put forth the actual reason
> for its decision."

Id. at 854 (quoting Reeves, 530 U.S. at 147).

The record evidence shows that Mansfield's interference with Mr. Ford's employment

was motivated by racial animus, not Mansfield's role as the Association's counsel.  Prior to Mr.

Carter's election as Board President, Mansfield acted only at the direction of the Board President

– all Caucasian.  (SOF ¶¶ 3-4.)  However, after the Board elected Mr. Carter as the first African-

American President, Mansfield acted on his own direction, or at the direction of individual Board

members and residents.  (Id. ¶¶ 15-19, 31, 44, 47.)

The record evidence also shows that upon learning that the Board hired Mr. Ford as

building manager, and terminated Ms. O'Keefe, a white building manager with performance

issues, Mansfield repeatedly, and without Board approval, threatened to pursue a wrongful

termination action on behalf of Ms. O'Keefe.  (Id. ¶ 15.)  Mansfield admitted that he told Zalco

that Ms. O'Keefe might have a "reverse discrimination" claim against Zalco.  (Id.)  Moreover,

because the Board had not directed him to take legal action, Mansfield's actions were beyond the

scope of his representation and motivated by his own agenda.  (Id. & n.5.)

The record evidence also demonstrates that Mansfield worked on his own, and with Mucklow and Garretson, to remove Mr. Carter as Board President, and Mr. Ford as building manager.  (Id. ¶¶ 17-19, 31-36, 39-44, 46-49.)  Mansfield unilaterally pursued an investigation of some familial or social "link" connecting Mr. Ford, the African-American building manager and Mr. Carter, the African-American Board President.  (Id. ¶¶ 17-19.)   The only connection between the two is their race.[23]

The most obvious racially motivated action of Mansfield was his dissemination of his January 17, 2006 letter to all residents of Horizon House.  (Id. ¶¶ 31-36.)  In that letter, he deliberately made misrepresentations about Mr. Ford based on racial stereotypes of African Americans.  (Id. ¶¶ 31-36, 39-44.)  Mansfield made the false representation that Mr. Ford admitted that he had "consensual sexual relations with a tenant on two occasions," including at work, and that the Maryland complainant "alleges these 'encounters' were against her will."  (Id. ¶ 32.)  The pending charges against Mr. Ford were for assault, not rape.  (Id. ¶ 33.)  Neither Mr. Ford nor his attorney ever stated that he had consensual sexual relations with the complainant; instead they both told Mansfield that nothing had happened.  (Id.)  Mansfield omitted the important fact that the reason that the complainant brought the charges was in retaliation for being evicted.  (Id.)  Mansfield also insinuated that Mr. Ford had refused to take a lie detector test.  (Id. ¶ 42.)  Mansfield repeated all the false allegations at the January 19 Concerned Citizens' meeting, in a manner that incited the residents.  (Id. ¶¶ 39-43.)  Mansfield's statements, based on racial stereotypes of African Americans, were intended to, and had the effect of, frightening the female residents.  (Id. ¶¶ 41-43.)  Mansfield's false description of Mr. Ford's

_____

[23] Mr. Faison, a Board member, found this investigation to be "creepy," (SOF ¶ 18), while Mansfield's own law partner, Mr. Morgan, even thought it was "a little bit odd that [Mansfield] was getting involved" with the hiring of Mr. Ford  (Id.).

admissions and the charges played on stereotypes of black men raping white women, which incited the residents into an angry mob.  (Id.)  Stereotyping on the basis of race can be powerful evidence of discriminatory animus.[24]

Because the record evidence shows that Mansfield worked directly with Mr. Mucklow, Ms. Garretson, and others in the Concerned Citizens group to remove both Mr. Carter and Mr. Ford, evidence of Mr. Mucklow's, Ms. Garretson's, and Mr. Conrad's racially discriminatory animus can show that Mansfield has similar racial animus.[25]  (Id. ¶ 38.)  Ms. Garretson's reference to Mr. Ford as "Boy," and her statement that he needed to "get some education," also evince Mansfield's discriminatory animus, as the two were working in concert to push Mr. Ford out.  (Id. ¶¶ 20-22, 28-30, 38.)  The same is true for Mr. Conrad's statement to Mr. Ford that "we don't want your kind in here" (Id. ¶¶ 28-30, 38, 49), as well as Mr. Mucklow's and Mr. Faison's claims that Mr. Carter or Mr. Ford wrote the racist death threat.  (Id. ¶¶ 28, 38.)

The record evidence also demonstrates that most of Mansfield's actions during Mr. Ford's employment were not authorized by the Board, and, thus, were beyond the scope of Mansfield's representation.  The Board did not authorize Mansfield (1) to sue Zalco to prevent Ms. O'Keefe's termination (Id. ¶ 15); (2) to sue Zalco on behalf of Ms. Garretson for not

---

[24] Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (factors such as "context, inflection, tone of voice, local custom, and historical usage" should be considered in assessing whether a particular statement constitutes evidence of racial animus); Holland v. First Virginia Banks, Inc., 744 F. Supp. 722, 723 (E.D. Va. 1990) (statements "evidencing stereotyped concepts of the eating habits of black people" and the employer's conduct "was demeaning and humiliating to the plaintiff," who "felt he was being put down as an individual and as a black man"); Shorter v. Hartford Fin. Servs., 2005 WL 3536122 at *4 (D. Conn. Dec. 6, 2005) (the "jury could have reasonably inferred that [the] aggressive investigation of Ms. Rhodes' complaints about plaintiff was precipitated by . . . gender-based and racial stereotyping of Ms. Rhodes as the innocent white, female victim, and plaintiff as the black, male aggressor").

[25] See Sprint/United Management Co. v. Mendelsohn, 128 S. Ct. 1140 (2008) (when plaintiff's theory is predicated on a general policy of discrimination, evidence of other individuals' discriminatory animus may be admissible to show the defendant's discriminatory animus).

releasing information on Mr. Ford (Id. ¶ 16);  (3) to pursue an investigation of some "link"

connecting Mr. Ford and Mr. Carter, both African-American (Id. ¶¶ 17-19);  (4) to distribute the

January 17 letter, even though it was the Board, not Mansfield, who had the authority to provide

information to the residents about Mr. Ford's background and waive the attorney-client privilege

(Id. ¶¶ 31-36); (5) to present the case for removing Mr. Carter and firing Mr. Ford at the January

19 meeting, or to repeat the false allegations against Mr. Ford (Id. ¶¶ 39-44); or (6) to work with

Mucklow and Garretson to remove sitting Board members, and replace them with individuals

who wanted to terminate Mr. Ford  (Id. ¶¶ 47-49).

The record evidence shows Mansfield's motivation was racially based, and not to

represent the Association – from his initial attempts to keep Mr. Ford out of the position, to his

later public attacks on Mr. Ford based on false statements and racial stereotypes.

The trier of fact can easily infer the ultimate fact of discrimination from the falsity of the

reason presented by defendant – that Mansfield acted only as Association counsel.  Sears

Roebuck, 243 F.3d at 854.  The evidence shows that Mansfield acted without authority, and was

centrally involved in the race-based actions taken against Mr. Ford.  Therefore, because of the

abundant record evidence to show that Mansfield's interference with his employment was

motivated by racial animus, this Court must deny defendant's motion for summary judgment.

**C.  This Court Should Deny Mansfield's Motion on the Hostile Work
Environment Claim Because the Record Evidence Demonstrates Mansfield
Contributed to a Racially Hostile Work Environment.**

Mansfield incorrectly argues that he cannot be held liable for a Section 1981 hostile work

environment claim.  (Def.'s Mem. at 24.)  Mr. Ford has presented evidence sufficient to

demonstrate that a reasonable jury could find Mansfield's harassment (1) unwelcome; (2) based

on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.[26]  See Spriggs, 242 F.3d at 183-84.[27]

Mansfield's argument – that a reasonable jury could not find that the harassment was race-based, or sufficiently severe and pervasive (Def.'s Mem. at 24.) – misses the mark.  As discussed in Part V.B. supra, there is sufficient evidence to show that "but for" Mr. Ford's race, he would not have been the victim of Mansfield's harassment.

Mr. Ford has also presented sufficient evidence such that a factfinder could find that Mansfield's harassment was sufficiently severe and pervasive.  Shortly after Mr. Ford began his employment at Horizon House, rumors began to circulate that he had a violent past.  On his employment application, Mr. Ford disclosed his 1995 Ohio conviction related to the altercation with his uncle (SOF ¶ 24); thus, a reasonable inference is that whoever spread these rumors had access to this information.  It is reasonable to infer that Mansfield had access to this information, since he was a friend of Ms. Garretson, and worked closely with her to oust Mr. Carter and fire Mr. Ford.  (Id. ¶ 38.)  As such, there is at least a genuine issue as to whether Mansfield spread these rumors about Mr. Ford.  On December 24, 2005, Mr. Ford received an anonymous death threat that said "U R DED NIGGER UR FAMLY TOO."  (Id. ¶ 26.)  After receiving these notes, Mr. Ford's work environment changed significantly.  (Id. ¶¶ 25, 27-28, 52-55.)

---

[26] Mansfield stated an additional element, i.e., some basis for imputing liability to the employer (Def.'s Mem. at 23); however, this is only required to impute liability onto the employer for the actions of its agents.  Because Mansfield acted outside the scope of his representation, there is no principal-agent relationship with the Association, making this element inapplicable.

[27] Mansfield first claims that he can escape liability because he was not Mr. Ford's employer.  (Def.'s Mem. at 24.)  This is an incorrect statement of Section 1981 law.  See Part V.A, supra.  His next argument is that he is not liable because he did not reference Mr. Ford's race or make any derogatory statement about Mr. Ford.  (Def.'s Mem. at 24.)  A racial harassment claim does not require that the defendant's comments refer to the plaintiff's race.  Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).  The plaintiff must simply present evidence that "but for" his race, he would not have been the victim of the discrimination.  Id.

Most importantly, Mansfield's widespread distribution of his January 17, 2006 letter, with its blatant misrepresentations about the charges, based on racial stereotypes, also caused a drastic deterioration in Mr. Ford's work environment.  (Id. ¶¶ 31-36, 52-55.)  Mansfield repeated these false and racially stereotyped statements about Mr. Ford in the Concerned Citizens meeting, which whipped up the residents to believe that Mr. Ford was a rapist.[28]  (Id. ¶¶ 39-44.)  As a result of the harassment he suffered, and his termination, Mr. Ford suffered a Major Depressive Episode.  (Id. ¶¶ 52-55.)  The record evidence clearly demonstrates that Mansfield's racially motivated actions created a severe or pervasive racially hostile work environment, such that this Court must deny defendant's motion for summary judgment on this claim.[29]

## VI.    Conclusion.

For the foregoing reasons, this Court must find that numerous material issues of disputed fact exist as to Mr. Ford's race discrimination and hostile work environment claims, so that defendant's motion for summary judgment must be denied.

---

[28] Because of the effect that rumors have on the work environment, spreading slanderous statements or rumors can be evidence that the conduct is sufficiently severe and pervasive.  See Thomas v. BET Soundstage Rest., 104 F. Supp. 2d 558, 562 (D. Md. 2000).

[29] This Court must find that Mr. Ford's claims are not a collateral attack on the Arlington Circuit Court proceedings involving Horizon House.  The Rooker-Feldman doctrine does not apply because Mr. Ford was not a party in the state court case.  Holliday Amusement Co. of Charleston, Inc. v. South Carolina, 401 F.3d 534, 537-38 (4th Cir. 2005) (this doctrine "is inapplicable in instances in which the person asserting the claim in federal court was not a party to the state proceeding") (citing Johnson v. De Grandy, 513 U.S. 997 (1994)).  The cases cited by Mansfield (Def. Mem. at 26-27), are inapposite since each involved a federal court plaintiff who was also a party in the state court proceeding.

Respectfully submitted,

/s/ Alan R. Kabat

_____
Alan R. Kabat
Virginia Bar # 76898
Peter Whelan
Virginia Bar # 76224
Lynne Bernabei
Andrea Loveless
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942 (Tel)
(202) 745-2627 (Fax)
Kabat@bernabeipllc.com
PWhelan@bernabeipllc.com
Bernabei@bernabeipllc.com
Loveless@bernabeipllc.com
*Attorneys for Plaintiff Michael Ford*

DATED:  December 18, 2009

**<u>Certificate of Service</u>**

I hereby certify that on this <u>18th</u> day of December, 2009, a copy of the foregoing

Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary

Judgment was served on counsel of record by this Court's ECF system, to:

> David D. Hudgins, Esquire
> Robert Draim, Esquire
> Reese Pearson, Esquire
> Hudgins Law Firm, P.C.
> 515 King Street, Suite 400
> Alexandria, VA 22314
> *Counsel for Defendant James Mansfield*

/s/ Alan R. Kabat

_____

Alan R. Kabat
Virginia Bar # 76898
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942 (Tel)
(202) 745-2627 (Fax)
Kabat@bernabeipllc.com
*Attorney for Plaintiff Michael Ford*