Plaintiff's Opposition to Defendant's Motion for Summary Judgment

**Exhibit 1**

Deposition of Vondell Carter
(Oct. 23, 2009 & Dec. 4, 2009) (excerpts)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

----------------------------x
MICHAEL FORD,            :
                       :
        Plaintiff,    :
                       :
        v.             : No. 1:08CV1318
                       :
ZALCO REALTY, INC., et al., :
                       :
        Defendants.   :
----------------------------x

Alexandria, Virginia

Friday, October 23, 2009

Deposition of

VONDELL CARTER

a witness, called for examination by counsel for

Defendant Mansfield, pursuant to notice and

agreement of counsel, beginning at approximately

9:37 a.m., at the law offices of Hudgins Law Firm,

515 King Street, Alexandria, Virginia, before

Stephan K. Garland of Anderson Court Reporting,

notary public in and for the Commonwealth of

Virginia, when were present on behalf of the

respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190
www.andersonreporting.net

15

1       Q     I'm sorry.  In July 1999 when you moved

2    to Horizon House, you and your wife Susan Morris

3    both moved into that unit.  Correct?

4       A     Officially we moved there -- actually

5    she was still working in New Jersey for a while,

6    so we had a commuting marriage or relationship.

7       Q     Was the unit that you purchased in about

8    July 1999 the same Penthouse Number 1 unit that

9    you live in now or a different unit?

10      A     Correct.  The same unit.

11      Q     And by penthouse, that's the top floor?

12      A     Correct.

13      Q     What number?

14      A     That's the eleventh floor of the

15   building.  Sometimes the real estate records refer

16   to it as 1101.  There are two other units on that

17   floor.

18      Q     You served on the board of directors of

19   Horizon House.  Correct?

20      A     Correct.

21      Q     From what time period did you actually

22   serve on the board?

16

1      A    It was two terms of 2 years each, so it

2    was 4 years prior to -- so -- so it must have been

3    from 2001 to 2005 I would say.

4      Q    When you were first elected to the board

5    in about 2001, would it have been at an August

6    meeting?

7      A    Yes, the regular annual meeting is in

8    August.

9      Q    To put it into context to help you

10   remember when it would have been, would your

11   memory be that you were first elected about a

12   month before September 11 then?  Does that sound

13   like the right year?

14     A    I didn't connect the two, but --

15     Q    Obviously there's no connection.

16     A    No, no, but I'd never thought of it in

17   that way and one of the reasons is I happened to

18   be in the Pentagon on that day and experienced

19   that -- that catastrophe certainly not in serious

20   a way as many other people did, but I hadn't

21   thought of it that way.  That's why I referred to

22   the -- going backwards from that August '05 date.

1      basis to believe that Mr. Mansfield was treating

2      you differently as the result of your race?

3              MS. BERNABEI:  Objection, lack of

4      foundation; calls for a legal conclusion.

5              BY MR. DRAIM:

6         Q    Let me rephrase the question.  Mr.

7      Carter, you indicated that you had some

8      interaction with Mr. Mansfield during your first

9      term on the board of directors.  During those

10     interactions did you at any time experience any

11     conduct by Mr. Mansfield which was in any way

12     discriminatory against you or derogatory on a

13     racial level?

14             MS. BERNABEI:  Same objection, lack of

15     foundation and asks for a legal conclusion.

16             BY MR. DRAIM:

17        Q    To your knowledge?

18        A    I don't think my involvement was

19     significantly different from any other board

20     member.  Traditionally the primary and -- and

21     predominant communications between the board and

22     the counsel to the board typically takes place

30

1    through the president as the conduit and/or point

2    of contact if you will.  So I have really no

3    experience that -- from which I could draw any

4    conclusion of that sort.

5         Q    Do you recall who during your first term

6    on the board of directors was the on-site resident

7    manager for Horizon House?

8              MS. BERNABEI:  I'm sorry, Mr. Draim.

9    Could you repeat that question?

10             BY MR. DRAIM:

11        Q    Who was the on-site resident manager at

12   Horizon House during your first term on the board

13   of directors?

14        A    I can visualize her.  The name doesn't

15   come.  It's -- it's in the recesses of my memory

16   here because she -- she lives in the unit and --

17   and she had a -- has a slight physical handicap or

18   did at the time because she had a hip operation.

19   I can't bring up her name right now.

20        Q    If I may suggest, was her first name

21   Janet?

22        A    Yes, probably.  What's her last name?

75

```
 1              BY MR. DRAIM:

 2         Q    Did you have any reason to believe that

 3    Jennifer O'Keefe's selection as property manager

 4    was the result of any racial discrimination?

 5              MS. BERNABEI:  Objection, lack of

 6    foundation, calling for a legal conclusion.

 7              THE WITNESS:  I don't know how that

 8    could be an issue.  As I said, she was recommended

 9    to us by Zalco and so, you know, there was --

10    again, there was not the more traditional

11    selection process so there wasn't -- that issue

12    didn't arise as a consideration.

13              BY MR. DRAIM:

14         Q    Was there any understanding to your

15    knowledge that Jennifer O'Keefe was serving as

16    property manager only on an interim basis?

17         A    Yeah, it was a temporary situation or

18    interim being that it was not a permanent job.

19         Q    What did that mean?  What was the

20    understanding as to how temporary her position

21    would be?

22         A    I don't know if a time limit was placed
```

82

1    of the year when there might not be a board

2    meeting.

3        A    That -- that was the case when I

4    initially became a board member.  Somewhere along

5    the way we decided or it was decided that that was

6    no longer necessary.  Now, whether it was the Iowa

7    person was no longer on the board, I'm not sure,

8    but the point is by that time we were having

9    meetings 12 months a year for the most part.

10       Q    So by August 2005?

11       A    Yeah.  And again, perhaps being an

12   exception because of the Christmas party, and --

13   and that kind of took the place of the meeting as

14   I recall so that we weren't essentially burdening

15   people with two events in the same month.

16       Q    What was your understanding as to

17   whether Jennifer O'Keefe's departure as resident

18   manager was the result of resignation or some

19   action by the board?

20       A    No, it was not resignation.  She was

21   terminated, and the basis for that termination,

22   though perhaps not required by -- because of her

85

1     interview was scheduled for a Saturday when she

2     indicated she was not available?

3         A    The interviews or the dates for an

4     interview with Jennifer were scheduled on more

5     than one occasion and -- and those occasions

6     included evening interviews whereby she would not

7     have to leave work and could have the interview

8     there at the building before going to her home out

9     in I think Silver Spring.  So I believe that every

10    effort was made to make it as convenient as

11    possible for her to participate in an interview.

12        Q    The search for a replacement to Jennifer

13    O'Keefe, when did that actually begin?  Do you

14    recall which month?

15             MS. BERNABEI:  I'm going to object to

16    the form of the question.  He hasn't testified

17    that it was a replacement for her.  He's testified

18    that it was a permanent position.

19             BY MR. DRAIM:

20        Q    Let me rephrase it.  The search for a

21    building manager to serve as building manager

22    after Jennifer O'Keefe, when did that begin?

86

1       A    Well, I guess you wouldn't say after

2   Jennifer O'Keefe.  It was during the time that she

3   was, you know, serving as the interim or temporary

4   manager.  The most recent one began as I recall in

5   about August of that year.  Now, that was not the

6   only time at which a search had been made.  A

7   search had been initiated by Adrian as the board

8   president and -- and there had been searches prior

9   to that.  And the one just prior to ours, the one

10   that Adrian initiated, as I recall, Zalco had

11   indicated that no qualified applicants applied.

12       Q    That was previously?

13       A    Yeah, that had been maybe November or

14   December the previous year or whatever.

15       Q    2004?

16       A    Yeah.

17       Q    Did Jennifer O'Keefe apply for a

18   permanent position?

19       A    She did not apply.  At first she did not

20   apply.  After some encouragement by me personally

21   she did not apply.  At the eleventh hour or almost

22   the twelfth hour she did apply and it appeared

91

1     would be noted.

2              BY MR. DRAIM:

3     Q    Was there any discussion between you or

4     any other board member to your knowledge on the

5     one hand and Mr.  Constant or anyone at Zalco on

6     the other hand as to referring candidates who were

7     African American because of the fact that no

8     African American had yet served as building

9     manager at Horizon House?

10             MS. BERNABEI:  Objection as to form and

11    lack of foundation.

12             THE WITNESS:  We had no discussion.

13    There were no preferences stated with regard to

14    the applicants.  We were looking for the

15    most-qualified people that we could find.

16             BY MR. DRAIM:

17    Q    So that there was no discussion between

18    you and Zalco one way or the other with respect to

19    race as it related to the building manager

20    position.  Is that correct?

21             MS. BERNABEI:  Same objection.  I'm

22    going to object as to form and it's been asked and

92

1    answered, and also that there's no foundation that

2    there would be any such discussion.

3           THE WITNESS:  And we're referring to the

4    recruitment process here?

5           BY MR. DRAIM:

6       Q    Yes.  Is that correct?

7       A    No.

8       Q    That's correct.

9       A    That there was no such discussion with

10   regard to the recruitment process to my knowledge.

11      Q    How many candidates for the building

12   manager position in the summer of 2006 did Zalco

13   refer to Horizon House?

14      A    I think it was the summer of 2005.

15      Q    I'm sorry.  Let me rephrase.  How many

16   candidates for the building manager position did

17   Zalco refer to Horizon House in the summer of

18   2005?

19      A    The -- the solicitation began in around

20   August as I recall.  We actually started receiving

21   candidates for interviews in I guess the October

22   or November timeframe.  There could have been some

93

1    in September, but I think it was mostly October

2    and November.  And as I recall, I think we had a

3    total of four interviews and at least two were

4    African Americans.

5         Q    There were four candidates actually

6    interviewed?

7         A    As I -- as I recall, there -- there were

8    four.  Now, not -- not all four may have showed up

9    for an interview.  I think we had four, maybe even

10   five referrals, but --

11        Q    Four or five referrals from Zalco?

12        A    Yes, and two of those that showed up for

13   interviews were African Americans, Michael Ford

14   and one other person.

15        Q    Do you know the other person's name?

16        A    Not offhand, but it happened to be the

17   person who -- who had a good background and who

18   was the manager of a property in D.C. at the time.

19        Q    Of the four or five candidates that

20   Zalco referred during this process, did any have

21   any pending criminal charges at the time other

22   than Michael Ford?

98

1     in the middle of the day and the board members

2     were people who had jobs as well, so it wasn't the

3     greatest thing to have them in the middle of the

4     day.  So they were either in the evening or on

5     Saturday mornings.  We had them both.  So I don't

6     -- I don't recall exactly when -- when he was

7     interviewed.  If I were to guess, it may have been

8     a Saturday morning, but that's a guess.

9          Q    Who was present during the interview of

10    Michael Ford?

11         A    As -- as I recall it was Greg

12    Weatherman, Susan Morris and myself as board

13    members, and Michael Constant as the property

14    manager.

15         Q    Your recollection is that Michael

16    Constant was actually present during the interview

17    of Michael Ford?

18         A    Yeah, of -- of him as well as some of

19    the others as I recall.  We tried to arrange it in

20    such a way that he could be present and that all

21    the board members could be present.  That was the

22    idea.  The idea was that the board members and the

99

1    property manager were there because the property

2    manager is in a unique position to advise us with

3    regard to the professional background of the

4    applicants.  I mean, he's the property management

5    expert as far as we are concerned, and so the

6    intent was to have interviews designed in terms of

7    date, time and place to have every board member

8    there as well as the property manager.

9        Q    Why were David Faison and Adrian

10   Garretson  not at the interview of Michael Ford?

11            MS. BERNABEI:  Objection.  Lack of

12   foundation.

13            BY MR. DRAIM:

14       Q    Let me back up.  Were David Faison and

15   Adrian Garretson at the interview of Michael Ford?

16       A    They were not, nor were they at some of

17   the others for various reasons that they offered

18   which as far as I know had to do with personal

19   reasons.  I think on one occasion David suddenly

20   had to go out of town.  They were all notified and

21   requested to be there, scheduled at reasonable

22   times and if they were there, they were there

103

1    know why Michael Ford as opposed to any of the

2    other candidates.

3        Q    Are you aware of any written notice by

4    email or otherwise that provided a specific date

5    and time for the interview that included the

6    interview of Michael Ford?

7        A    Email from whom to whom?

8        Q    From you or whoever was scheduling the

9    interview.

10       A    As I recall, the process involved the --

11   the assistant to -- to Michael Constant calling

12   board members and arranging interview dates

13   because it's not just a matter of the board

14   members being there, the candidates themselves

15   must know what the time and date and place is and

16   be able to get there.  So it's -- you know, it's

17   not a unilateral sort of thing and -- and it's not

18   just at the convenience of any one person.  We're

19   trying to bring together times and dates that are

20   compatible with five different people on the

21   board, a sixth person as the property manager, and

22   one, two or even three candidates.  We tried to

125

1    I think it was some response to his inquiries or

2    efforts where the courthouse acknowledged that it

3    had now been expunged from his records.

4         Q    You stated that Mr. Ford was hired on

5    what you called an interim basis subject to the

6    outcome of the pending sexual-assault charges in

7    Maryland.  Is that correct?

8         A    Yes, it was.  In fact, temporary isn't

9    exactly the right term.  It was really a

10   probationary sort of thing with the understanding

11   that less than a satisfactory outcome would --

12   would mean that he would not be hired on a

13   permanent basis.

14        Q    As building manager did Michael Ford

15   have a master key to the units of Horizon House?

16        A    I think at the beginning we restricted

17   his access to the building and to office kinds of

18   things or facility activities until his permanent

19   status as I recall.

20        Q    The previous building manager or interim

21   building manager, Jennifer O'Keefe, did she have

22   keys that would allow her access to units?

130

```
 1        A    I do not have firsthand knowledge of the
 2   key exchange or lack thereof.
 3        Q    Was there any written document that
 4   reflected the hiring of Michael Ford on a
 5   probationary basis?
 6        A    I'm -- I'm certain that it's contained
 7   somewhere in emails and it's reflected in the fact
 8   that -- that Michael was put onto the rolls of a
 9   subsidiary of -- of Zalco in a temporary status
10   and -- and not on the rolls as a permanent
11   employee of -- of Horizon House.
12        Q    To your understanding, who was the
13   statutory employer of Michael Ford for purposes of
14   federal tax purposes?
15             MS. BERNABEI:  Objection.  Compound
16   question, asks for a legal conclusion.
17             THE WITNESS:  I don't think that I'm
18   qualified to answer that.  The payroll of the
19   subsidiary organization I would assume is
20   responsible for paying appropriate employment
21   taxes, the FICA and so forth.
22             BY MR. DRAIM:
```

131

1      Q   Do you recall having a discussion with

2   Michael Constant about having Zalco or its

3   subsidiary MDV serve as the actual employer of

4   Michael Ford in order to potentially limit any

5   liability to Horizon House because of the sexual-

6   assault charges in Maryland?

7      A   Yes, I said I did not -- I would like

8   for -- for Michael to be in a probationary status

9   not directly affiliated with Horizon House because

10   I did not want to have that image until we were

11   certain of what the circumstance was and therefore

12   you're in a defensible position.

13      Q   And you knew as president of the board

14   of directors that hiring as building manager an

15   individual with pending sexual criminal assault

16   charges could raise liability concerns in the

17   event that something were to happen at Horizon

18   House.  Correct?

19      MS. BERNABEI:  I'm going to object.  It

20   calls for a legal conclusion and it's also vague

21   as to what liability you're talking about.  I

22   think there's also lack of foundation as to what

133

1            MR. DRAIM:  In a moment we can do that.

2            BY MR. DRAIM:

3      Q    The three members of the board who voted

4   to hire Michael Ford, namely yourself, your wife

5   Susan Morris and Greg Weatherman did so before

6   knowing what the outcome of that case would be.

7   Correct?

8      A    That is incorrect.

9            MS. BERNABEI:  I'm going to object to

10   form.

11           MR. DRAIM:  Let me rephrase it then.

12           BY MR. DRAIM:

13     Q    Before hiring Michael Ford on what you

14   call a probationary period, the three members who

15   voted in that regard did so before finding out the

16   outcome of the case.  Correct?

17           MS. BERNABEI:  I'm going to object as to

18   form ands object as to the assumption as to who

19   hired Michael Ford.

20           THE WITNESS:  The whole point was to

21   pursue the probationary hiring process until it

22   was determined.  It wasn't in spite of.  It was

134

```
 1    because that was known and that was the risk

 2    reduction precautionary steps taken, and it was a

 3    board vote by the majority of the board.  It

 4    wasn't just the three individuals voting.  The --

 5    the -- the only reason others were not present at

 6    the time is because they chose not to be present.

 7    But it was a board action.  It wasn't the action

 8    of three individuals.

 9            BY MR. DRAIM:

10       Q    When was the actual vote taken to hire

11    Michael Ford on what you called a probationary

12    period?

13       A    I don't recall the exact date.

14       Q    Was it the same date as the interview or

15    later?

16       A    No, it had to be after the interview

17    because we discussed it with Michael Ford and

18    that's the -- I mean Michael Constant and that's

19    how the information about the pending charge came

20    up so that it couldn't have been -- well, we

21    wouldn't have done it anyway on the interview

22    date.
```

147

1      to Michael Ford's race?

2            A      At any time?

3            Q      At any time.

4            A      Yes.

5            Q      When was that?

6            A      That was when he made his -- well, not

7      the only time, but certainly as a part of -- of

8      his rousing presentation to the concerned citizens

9      when -- when Michael Ford was in my opinion

10     demonized and -- and so was I for that matter with

11     regard to that process, but that was I think

12     either close to or after we had made the decision

13     to -- to terminate Mr. Mansfield.

14           Q      First, before the special meeting,

15     you're referring to the meeting on January 19,

16     2006?

17           A      Yeah.

18           Q      Before the meeting on January 19, 2006,

19     did Mr.  Mansfield ever make any statement to your

20     knowledge referring to Michael Ford's race?

21           A      I don't know what you mean by a

22     statement, but I -- but I had discussions with him

148

1    during the process of considering Michael Ford and

2    I can't imagine that his race or ethnicity was not

3    a part of that discussion in simply describing who

4    the person was.  So I don't -- I don't know that

5    it was something that was never mentioned or

6    couldn't be mentioned.

7         Q    So one or both of you you're saying may

8    have mentioned it, but not in a racially

9    derogatory fashion.  Is that fair?

10        A    I don't recall any derogatory mention at

11   that point.

12        Q    Then with respect to the January 19,

13   2006 meeting, what if any statement do you recall

14   Mr. Mansfield himself making that you considered

15   to be in any way racially derogatory at the

16   January 19 meeting?

17        A    Some things do not have to be stated

18   explicitly to -- to -- to connote the -- the

19   essence of what anyone intends.  The -- the whole

20   presentation that was made was far outside of the

21   purview of the person acting as the counsel to a

22   -- to a board and as a consultant or a legal

149

```
 1     consultant to -- to the president of that board.

 2     It attacked Michael Ford and it attacked decisions

 3     that were attributed to me even though they were

 4     board decisions that made it clear that -- that it

 5     was playing upon the stereotypes of race in terms

 6     of a black male having access to -- to this --

 7     this condominium and the implications of the -- of

 8     the many white women who live there and -- and

 9     especially older women, and it was an inciteful

10     presentation which -- which greatly disappointed

11     me actually.  I really couldn't -- couldn't

12     believe that it was being done.

13             MS. BERNABEI:  If you have more to your

14     answer, you can answer.

15             BY MR. DRAIM:

16     Q    Mr. Carter, I want to ask you --

17             MS. BERNABEI:  No, Mr. Draim, I think

18     you should let him finish.  You interrupted him.

19             MR. DRAIM:  He's been silent.  I think

20     he's through.  I thought he was through.

21             MS. BERNABEI:  Mr. Carter, do you have

22     anything more to your answer?
```

150

```
1              THE WITNESS:  Well, the -- I made the

2      point that -- that -- at least I think I made the

3      point that -- that this was a -- a presentation --

4      that it -- that it was completely out of place for

5      -- for a counsel.  It -- it took charge of the

6      meeting in terms of making it -- it in essence it

7      incited the group of people to -- to -- to a mob

8      kind of mentality to -- to which they reacted

9      predictably.  And -- and -- and race was -- was an

10     integral part of it explicitly or implicitly, and

11     I regret to say that, but that's what it was.

12              BY MR. DRAIM:

13        Q    At any time during the January 19, 2006

14     special meeting, did Mr. Mansfield refer to Mr.

15     Ford as either black of African American?

16        A    I don't recall what terms were used, but

17     it was obvious in referring to -- to -- to Mr.

18     Ford whom everybody knew was in fact who he was,

19     and so --

20              MS. BERNABEI:  Excuse me.  Let me finish

21     the answer.

22              THE WITNESS:  There was no need to state
```

155

1     -- with an image of authority, the -- the attorney

2     to the association, telling them how terrible this

3     decision was of the president which of course was

4     inaccurate because it wasn't the decision of the

5     president.  It also mischaracterized the whole

6     situation and -- and -- and would naturally cause

7     and they were intimidated by -- by the -- the

8     circumstances that were -- were described.  So I

9     don't know what was in the mind of the people who

10    responded, but I know how they responded and that

11    response was to a large degree if not entirely in

12    response to the -- to the environment created by

13    -- by what I would call a harangue on the part of

14    Mr. Mansfield.

15              BY MR. DRAIM:

16        Q    Did any of the residents at that meeting

17    refer to Mr. Ford as black or African American

18    expressly?

19        A    I don't recall who said what because

20    there were a whole number of people who were

21    pretty vocal and -- and somewhat chaotic in -- in

22    what they had to say.  But an example of -- of

1          A     I think one of the points that he made

2     was something about a consensual sexual

3     relationship between Michael Ford and -- and the

4     -- the women who was being evicted, and perhaps

5     much of the damage is what he did not mention and

6     that was that the person was being evicted and --

7     and her actions were -- were in all likelihood and

8     -- and -- and supported by her lack of appearance

9     in -- in -- in her first court session retaliation

10     for the fact that -- that Michael Ford was

11     enforcing the rules and -- and -- and asked her to

12     vacate her unit because she was occupying it under

13     false pretenses.  Her -- her uncle was by virtue

14     of his I guess age and income eligible for the

15     unit and she was not.  He was simply enforcing the

16     -- the rules of the property.

17          Q     Was that your understanding of Michael

18     Ford's defense on January 19?

19          A     That was indeed part of it as I

20     understand it.

21          MS. BERNABEI:  I'm sorry.  Michael Ford

22     wasn't at this meeting.

160

```
 1            MR. DRAIM:  No, I didn't say that.

 2            MS. BERNABEI:  You said his defense on

 3    January 19.

 4            THE WITNESS:  It was in court that that

 5    took place.  I don't recall the date, but I think

 6    it was in February, I believe.

 7            BY MR. DRAIM:

 8       Q    By the time of the January 19 meeting,

 9    you had learned about the pending charges

10    yourself.  Correct?

11       A    Yes.

12       Q    Had you spoken with Michael Ford about

13    those charges?

14       A    Yes.  As I mentioned previously, the

15    board had spoken to him, not just I, but the board

16    had spoken to him.  He had explained fully the

17    circumstances of that situation and fully the

18    circumstances of the event that took place in Ohio

19    or the Midwest.

20       Q    After you learned of the pending

21    charges, did you ask Mr. Mansfield to check into

22    it?
```

161

```
 1          A    Yes, I did.  I mentioned that to him,

 2    and what I asked him to do was to have

 3    representation in the courthouse when that came up

 4    because I wanted to get third- party information.

 5          Q    Did you understand that he was going to

 6    attempt to speak with Mr. Ford's defense counsel

 7    and Mr. Ford himself?

 8          A    I don't recall the specifics of speaking

 9    his defense counsel.  I -- I do recall that there

10    was someone from his office as I recall that

11    attended the hearing.

12          Q    Prior to the actual hearing --

13          A    Or trial.

14          Q    -- did you direct that Mr. Mansfield

15    look into it and try to determine some of the

16    facts?

17               MS. BERNABEI:  Objection.  Misstates the

18    testimony, lack of foundation and objection as to

19    form.

20               THE WITNESS:  I asked for his opinion on

21    the matter.

22               BY MR. DRAIM:
```

173

1    person.  You should read what it states here.

2              MR. DRAIM:  I have been reading it.  I

3    read it just a minute ago.  I'll read it again.

4              MS. BERNABEI:  My objection is that it

5    misstates the letter.

6              BY MR. DRAIM:

7         Q    The fourth sentence says, "For the

8    record, I specifically counseled you that these

9    cases should be favorably resolved before Mr. Ford

10   would be eligible to hire."  Do you see that?  And

11   my question to you was whether you had responded

12   back to Mr. Mansfield taking issue with that

13   sentence.

14        A    As I said, I don't recall responding to

15   it in writing.  I -- I can imagine that I did talk

16   with him because there are other things in here

17   that are blatantly erroneous in that he says that

18   Mr. Ford was fired for -- for cause from his

19   previous employer and -- and as a result of him,

20   you know, making that representation, I called the

21   previous employer, talked to that person directly

22   to get their firsthand statement as to under what

174

1    circumstances he left the organization and it was

2    voluntary.  And I asked would you rehire this

3    person and they said absolutely yes.  So I didn't

4    know where that was coming from.  I don't know

5    that erroneous information was generated.

6         Q    What was the name of the previous

7    employer?

8         A    I think it was Lerner, I believe.

9         Q    Was that Lerner Corporation,

10   L-e-r-n-e-r?

11        A    No, is it -- I don't know what the

12   spelling is, but anyway, that's -- that's what I

13   recall.

14        Q    Who at Lerner did you speak with?

15        A    I don't recall, but it's immediate

16   supervisor.  I mean, I'm sure that's in the record

17   somewhere of our records of having talked to that

18   person.

19        Q    Do you have notes of your conversation

20   with that person?

21        A    Probably, but I don't know where they

22   are right now.  It's -- I mean --

1    Q    Have you looked for any notes from your

2    conversation with that person?

3    A    Not for this particular reason.  I mean,

4    I have, you know, some materials which I think you

5    have copies of that we recovered, you know, from

6    that timeframe.  I don't know if that particular

7    one is in there.

8    Q    Do you know when you spoke with that

9    person at Lerner?

10   A    Well, it was right during this -- this

11   timeframe because I wanted to clarify that point.

12   Michael Ford said he was not fired for cause,

13   Michael Constant verified that he was not fired

14   for cause because that would have been a matter of

15   -- of falsifying on -- on his application or that

16   process, and I checked on it personally.  And

17   unless the person was lying, then, you know,

18   that's -- I have to take their word for it.

19   Q    Did you check on that before the special

20   meeting of January 19, 2006?

21   A    I don't know because the timeframe here

22   is such that if -- if I received this on or about

185

1    made by Mr. Mansfield during the course of the

2    January 19 meeting that you considered to be false

3    or inflammatory in which you took up correct?

4        A    I think I just said that I didn't want

5    to be a party to raising the level or to be

6    confrontational in this situation.  I did not as I

7    recall rise up and say, no, that's not right and

8    have a big brouhaha there.  But as to the -- the

9    manner in which it was presented, I -- there were

10   inaccuracies and -- and it was presented in -- in

11   such a manner as to -- to play upon the

12   traditional and unfortunately discriminatory

13   historical stereotypes of -- of people as it

14   pertains to the presence of this black manager of

15   -- of large stature having access, and some of

16   those words are used, to apartments that are

17   predominantly occupied by white women and many by

18   elderly white women.  And -- and that was the --

19   the -- unfortunately the -- the -- the nature of

20   the -- of what was gotten across to the audience.

21       Q    But it's not what Mr. Mansfield said

22   though was it?

194

1                THE WITNESS:  Words without context can

2        be subject to all sorts of interpretation.  The

3        words that were mentioned in Mr. Mansfield's oral

4        presentation are very similar to if not identical

5        to words mentioned in this letter, but they were

6        presented in -- in such a forceful manner, in a --

7        in a manner of -- of expressing almost outrage

8        that these things have taken place as he describes

9        them and conveying to the audience there that --

10       that these things constitute imminent danger to

11       the residents of the -- of the -- of the building,

12       all done with the background of knowing exactly

13       who Michael Ford is and knowing who I am as the

14       president of the board and the actions associated

15       with what I have done and what -- and Michael

16       Ford, these two African American men.  And

17       especially this one who has some involvement with

18       law enforcement in his background which certainly

19       meets and conforms with the stereotypical idea

20       that beware of these black men with -- with

21       law-enforcement involvement or some kind of

22       criminal activity or alleged criminal activity in

195

```
 1    their background, especially when they have the

 2    keys to your apartment or your unit.  That's the

 3    context in which this was presented.  So -- so --

 4    so the derogatory words per se need not be

 5    mentioned, but the impact is equally as

 6    detrimental.

 7              BY MR. DRAIM:

 8         Q    Are you saying, Mr. Carter, that there

 9    is some known stereotype that African American men

10    who formerly worked in law enforcement who have

11    keys to apartments --

12         A    Not worked in law enforcement.

13         Q    -- are predators?

14         A    Not worked in law enforcement.  It's the

15    -- it's the historical social situation in -- in

16    this country where if some people are walking down

17    the street and they see a black youth, especially

18    a male, well, exclusively a male I should say,

19    coming down the street, they -- they might have

20    reservations about whether they want to stay on

21    the same sidewalk or cross the street or -- or --

22    or have hesitancy about, well, I'd better be
```

209

1    fact a rapist or -- or -- or a potential rapist

2    associated with these charges or -- or that kind

3    of thing, but that the term was thrown around

4    there and -- and it was of course inappropriate

5    because none of the -- the charges -- there was no

6    basis for that.

7         Q    Did you indicate that that was actually

8    corrected by someone who indicated that the charge

9    did not include the actual charge of rape?

10        A    I don't know if corrected is the right

11   term, but there -- there was at least one or two

12   people who knew better and said as much.  Call it

13   different points of view, if you will.

14        Q    The discussion as to whether the charges

15   in Maryland included rape ended with someone

16   noting that they did not actually include rape?

17             MS. BERNABEI:  Objection.  Misstates the

18   testimony.

19             THE WITNESS:  I didn't say they referred

20   specifically to the Prince George's because all of

21   it was lumped together and unfortunately Mr.

22   Mansfield contributed to that with his

1    presentation.

2         BY MR. DRAIM:

3    Q    Mr. Mansfield never said that the

4    charges included rape did he?

5    A    I don't know what he said specifically

6    on that point.  I said contributed to this in that

7    all this negative background was, you know,

8    brought into this for lack of a term motivational

9    but probably inciteful -- inciting presentation

10    that was made to the group.

11    Q    Didn't Mr. Mansfield accurately report

12    that the charges were sexual assault?

13    A    I think -- I guess we're going over this

14    again, but I think the point was they were

15    presented with -- with totally the negative aspect

16    of it, not -- not the -- there was nothing said

17    about the fact that this -- that it was thought

18    that this woman was retaliating for being evicted

19    from the -- from the place.  There was no context

20    to -- to the -- the conviction in -- in Ohio that

21    had to do with the funeral of -- of Michael Ford's

22    mother and the behavior of -- of the uncle that

211

1    led to the incident and all those sorts of things.

2    It -- it was presented in such a manner as to

3    evoke the kind of reaction and results that was

4    desired and -- and -- and focused upon Michael

5    Ford and upon myself as the president of the

6    board.

7        Q    As president of the board did you get up

8    and say that --

9        A    I thought I addressed that.  I said I

10   did not get up and say that because I didn't want

11   to contribute to -- to what I considered a chaotic

12   situation with people yelling and -- and -- and --

13   and shouting and saying, oh this and that, I don't

14   want this guy to have the keys to my apartment, I

15   blah, blah, blah and on and on. and I responded to

16   this in -- in my correspondence.

17       Q    If you thought, Mr. Carter, that Mr.

18   Ford's potential defense or explanation of

19   retaliation was something that the residents

20   didn't know about and should know about, why did

21   you not get up and say that she was the subject of

22   eviction and she was maybe retaliating?

215

1    Mansfield at the February 2 meeting that you

2    consider to be racially derogatory?

3            MS. BERNABEI:  Are you talking about

4    verbatim or you're talking about substance?

5    Either one?

6            BY MR. DRAIM:

7        Q    Verbatim or as close a paraphrase as you

8    can, that Mr. Mansfield made any statement.

9        A    I do not -- I do not recall specific

10   words expect that in -- one must then question

11   what do you consider racially derogatory, but I do

12   not recall specific words that -- that I would

13   personally say, well, that was a racially

14   derogatory word.  That was not my description

15   of -- of what took place.  Do I need to describe

16   that again?

17           MS. BERNABEI:  His question was all

18   words or substance that he said were racially

19   derogatory.

20           BY MR. DRAIM:

21       Q    I've asked you if you could identify any

22   expressed words.

216

```
 1        A     I think the entire -- that the entire

 2    presentation I considered to be racially

 3    derogatory because you must consider the context

 4    in which it was presented.  It was presented in a

 5    very specific way to address Michael Ford who is

 6    what he is, a black male of dark complexion, of

 7    large statue, which conveys certain ominous

 8    presence to come people, and to me as a black male

 9    as the president of -- of a board which had never

10    had an African American or a black American as the

11    president of the board.

12        Q     In other words, you were assuming that

13    because Michael Ford was black that the concern

14    raised by Mr.  Mansfield and residents at Horizon

15    House over the hiring of Michael Ford while they

16    were pending sexual-assault charges in Maryland,

17    that that concern must have been racially

18    motivated?

19             MS. BERNABEI:  Objection as to form,

20    misstates the testimony of this witness.

21             THE WITNESS:  I -- I think it's best

22    described by what was mentioned earlier.  Would
```

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
----------------------------x
MICHAEL FORD,                :
                             :
          Plaintiff,         :
                             :
          v.                 : No. 1:08CV1318
                             :
ZALCO REALTY, INC., et al., :
                             :
          Defendants.        : Volume 2
----------------------------x
```

Alexandria, Virginia

Friday, December 4, 2009

Continued Deposition of

VONDELL CARTER

a witness, recalled for further examination by

counsel for Defendant Mansfield, pursuant to

notice and agreement of counsel, continuing at

approximately 11:42 a.m., at the law offices of

Hudgins Law Firm, 515 King Street, Alexandria,

Virginia, before Stephan K. Garland of Anderson

Court Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190
www.andersonreporting.net

234

1          A    Yes.  Counsel for Michael Ford, the

2     Wachtel firm, in terms of scheduling.

3          Q    Did you discuss with any attorneys or

4     staff of Mr. Kabat's law firm, the substance of

5     any of your testimony?

6          A    No.

7          Q    Was there a meeting of the Board of

8     Directors at which the determination was made to

9     ask Zalco to place Michael Ford at Horizon House?

10         A    To employ him there as the building

11    manager?

12         Q    Yes, either -- on whatever basis.

13         A    Yes.

14         Q    And do you recall what the date of that

15    meeting was?

16         A    No.  You mentioned the meeting of the

17    Board.  It was initially probably at a meeting of

18    the Interview Committee where that was explored as

19    a possibility.

20         Q    And you mentioned "Interview Committee."

21    Was there a formal Interview Committee?

22         A    Well, they were the Board members.

335

1    which ones they were.

2         Q    If you look at the last paragraph of

3    this letter, which is Exhibit 9, you stated, "The

4    termination of Mr. Ford's employment at Horizon

5    House was solely the result of political conflict

6    within the community, and is in no way related to

7    Mr. Ford's performance as building manager."  Do

8    you see that sentence?

9         A    Yes.

10        Q    And by reference to the term "political

11   conflict within the community," you're referring

12   to what?

13        A    I used that as a general term of

14   referring to all of the turmoil associated with

15   his termination.  I was not attempting to

16   accurately categorize it as discrimination or any

17   other such thing at that point because I didn't

18   feel it was appropriate.  One of the major issues

19   that arises with the employment of an individual,

20   particularly in this career field, is why did the

21   person leave the previous employment.  And I chose

22   to address that by saying that his performance was

336

1    highly successful or certainly excellent or

2    whatever description you might wish to use.  But

3    it was positive and not related to performance or

4    lack of performance.

5        Q    Was that a true characterization that

6    Mr. Ford's employment at Horizon House was solely

7    the result of political conflict within the

8    community?

9        A    Political conflict was an euphemism for

10   the environment.  The purpose of the letter was

11   not to describe the environment, but was simply to

12   say it was not a result of his performance.  I

13   could have just as easily left that out altogether

14   and said his departure was not related to

15   performance to be succinct and direct, which it

16   was not.

17       Q    Did you make a conscious determination

18   not to state in the letter that you understood

19   that Michael Ford had been convicted in 1995 of a

20   criminal assault?

21       A    Say that again.

22       Q    Did you -- in drafting the letter, did

358

1        Q     Directing your attention to the time

2     when Jennifer O'Keefe was notified that she would

3     no longer be the interim building manager, do you

4     recall what, if anything, Mr. Mansfield did at

5     that time?

6                MR. DRAIM:  Objection to the form;

7     foundation.

8                THE WITNESS:  What I recall is that when

9     we -- shortly after Jennifer O'Keefe was notified

10     of her termination as the temporary or interim

11     manager, there were a number of phone calls

12     involving Mr. Mansfield interceding on behalf of

13     Jennifer O'Keefe in conjunction with efforts by

14     Adrienne Garretson and Marie Eckes, all

15     essentially threatening some sort of action with

16     regard to her termination.

17                BY MR. KABAT:

18        Q     Had the Board authorized Mr. Mansfield

19     to (inaudible) some sort of action regarding

20     Jennifer O'Keefe's termination?

21        A     He was not authorized to take any action

22     with regard to that process.

359

1        Q    And just to clarify, who did Mansfield

2    report to at Horizon House?

3             MR. DRAIM:  Object to the form.

4             THE WITNESS:  Mansfield -- Mr. Mansfield

5    as the attorney advisor to the Board should

6    normally report to the president of the Board.

7    However, the liaison between him and Adrienne

8    Garretson had taken place for at least several

9    months prior to this incident, unauthorized or

10   supported by me as the Board president.

11            MR. KABAT:  You mentioned something

12   about a background check.  I'd like to have this

13   marked as Exhibit Number --

14            MR. DRAIM:  It'd be 10, I believe.

15            (Deposition Exhibit No. 10 was

16             marked for identification.)

17            BY MR. KABAT:

18       Q    Mr. Carter, Exhibit 10 is a document

19   produced by Mr. Mansfield.  It's a letter from

20   Alex Morgan, an attorney at the Hartsoe, Mansfield

21   (inaudible) of this investigation and let me just

22   read the part of the paragraph in the record.

1              "This is the case we previously spoke

2     about regarding hiring of a property manager

3     pending sexual battery charges.  We are looking

4     for a link between the president of the

5     (inaudible) Association, Vondell Carter, and the

6     newly hired employee, Michael Ford."

7              Now, has the Board of Directors

8     authorized Mr. Mansfield to look for a "link"

9     between you and Mr. Ford?

10        A    Well, frankly, the answer is absolutely

11    not.

12        Q    Has the Board of Directors authorized

13    Mr. Mansfield to retain a private investigator or

14    some other investigator to do any sort of

15    background check with respect to the hiring of Mr.

16    Ford?

17        A    No.

18        Q    Now, in your previous deposition, you

19    testified on pages 160 to 161 regarding Mr.

20    Mansfield, "What I asked him to do was to

21    (inaudible) in the courthouse when (inaudible)

22    came up because I wanted to get third party

382

1    Mr. Mansfield to "dictate" to Ms. Garretson and

2    Mr. Mucklow what should go on the website?

3        A    No, we had not.  And the fact that

4    people who were not even on the Board should be

5    communicating with him.  It's absolutely

6    outstanding.

7        Q    Mr. Draim asked you about the letter of

8    recommendation that you wrote on behalf of Mr.

9    Ford in 2006.  And in your testimony, I believe

10   then that he would not put in the (inaudible)

11   personnel issue into a letter of recommendation,

12   is that correct?

13       A    Yes.

14       Q    And would you have put in a letter of

15   recommendation, a statement that you (inaudible),

16   Mr. Ford worked hard because of racial

17   discrimination or racial stereotype thing?

18            MR. KABAT:  Objection to form.

19            THE WITNESS:  No, I probably would not

20   have put that in.

21            BY MR. KABAT:

22       Q    Would you characterize your statement

383

```
 1    that Mr. Ford (inaudible) termination when solely

 2    given to (inaudible) political conflict and sort

 3    of a (inaudible) order, but a gentle way of

 4    describing a much more contentious situation?

 5              MR. DRAIM:  Object to the form.

 6              THE WITNESS:  Yes.  It was, in fact,

 7    exactly that.  I felt -- to use the vernacular of

 8    the day, I didn't feel it was appropriate to air

 9    the laundry of the Association because it wasn't

10    germane to the issue of his employment or

11    qualifications for employment or his history of

12    performance.

13              BY MR. KABAT:

14         Q    If Mr. Ford were to actually (inaudible)

15    letter of recommendation today with you,

16    (inaudible) submit that letter or an updated

17    version?

18         A    I have no reason to do otherwise.

19              MR. KABAT:  I have no further questions.

20    Thank you.

21              MR. DRAIM:  Just a few follow-up.

22
```

398

1      Q    Okay.  This doesn't relate to any threat

2  to take action as to Jennifer O'Keefe, does it?

3      A    No, that's correct.  So it must have

4  been, you know, either another document, but

5  certainly the telephone conversations that we had

6  with him that day, he interceded on the part of

7  Jennifer.  And I thought there was a document here

8  that also reflected that.

9      Q    So you don't specifically recall an

10  actual document relating to any threat by Mr.

11  Mansfield as to Jennifer O'Keefe?

12      A    I can't point to one here at this

13  moment.  I thought it was this one, but there is

14  no doubt but that he did, in fact, threaten to

15  take action on her behalf because of her

16  termination.

17      Q    And did he?

18      A    I'm not aware of any because it was

19  obvious that we were perfectly within our rights

20  and the management company was within their rights

21  to terminate her.

22      Q    And who was on the phone on December 4th

399

1    when you discussed Jennifer O'Keefe with James

2    Mansfield?

3         A    I'm assuming that date is correct, but

4    it was that --

5         Q    On or about that date.

6         A    Yeah, on or about that date.  There were

7    a number of people -- and I say "a number of

8    people" because for part of the period, the door

9    was closed and Jennifer and Adrienne Garretson and

10   Marie Eckes were behind that closed door

11   ostensibly having a conversation with Mansfield.

12   And I say "ostensibly" because later in the

13   discussions with Mansfield, it was obvious that

14   they had, in fact, contacted him to intercede in

15   this matter.  And his conversations both with me

16   and with Michael Constant were of the nature quite

17   clearly that he was acting as an attorney for, as

18   a representative for Jennifer and acting in the

19   interests of Garretson and Eckes.

20        Q    Okay.  I'd like to know what he actually

21   said.  In the telephone conversation -- and my

22   question actually was who was on the phone when

400

1    Mr. Mansfield spoke to you concerning Jennifer

2    O'Keefe on or about December 4th?

3        A    Well, he and I were on the phone at that

4    time.

5        Q    It was not a speakerphone with other

6    people?

7        A    No, I don't recall (inaudible).

8        Q    And what exactly did Mr. Mansfield say

9    as to any action that he might take with respect

10   to Jennifer O'Keefe?

11       A    Well, he would pursue an improper

12   termination procedure on her behalf.

13       Q    And did Mr. Mansfield state what would

14   be the basis for any procedure?

15       A    I don't recall that he mentioned the

16   specifics.  It was simply the fact that he as an

17   attorney would pursue her improper termination.

18       Q    Did Mr. Mansfield say that he would

19   pursue a claim on her behalf or that he was

20   concerned that if she were let go, she could file

21   a claim against Horizon House for improper

22   termination?

401

1          A     It was clear to me that he was

2     initiating the action, not that she was initiating

3     the action or that she had requested him to

4     initiate the action.  To the contrary, his

5     involvement had been initiated by Adrienne

6     Garretson and Marie Eckes.

7          Q     Can you quote specific --

8          A     Otherwise, he wouldn't have even known

9     about it at that point in time.

10         Q     Can you quote specifically what Mr.

11    Mansfield said that led you to believe that he was

12    saying that he was going to be considering

13    initiating action on behalf of Jennifer O'Keefe

14    rather than being concerned that she might file

15    something?

16         A     No, he was very direct.  It was not that

17    he was concerned.  He was going to take action and

18    felt that we should cease doing what was being

19    done.

20         Q     And --

21         A     He was adamant about it.  It wasn't a

22    polite kind of piece of advice that you might have

402

1    difficulty or she might have a right to file a

2    complaint or any such thing.  I was taken aback by

3    the strength of his approach to the matter.

4        Q    But what exactly did he say?  What words

5    did he use?

6        A    I can't quote him, I'm afraid.  But it

7    was clear to me what his intention was.

8        Q    Referring to Exhibit 12, was it your

9    understanding that Ms. Garretson as a Board member

10   and the treasurer or Horizon House was not

11   entitled to see documents concerning the

12   Association's finances and operations that were

13   held by Zalco?

14       A    Certainly she was entitled to as

15   treasurer.  She was entitled to same documents

16   that were sent to the Board members on a regular

17   basis.  One of the reasons this issue came up is

18   because there was a period during which the -- her

19   letter of resignation was being considered for

20   after which she had submitted it.  And, therefore,

21   she was, until we reversed the situation, was not

22   a member of the Board.  So, therefore, she

Penthouse I
Horizon House
1300 Army Navy Drive
Arlington, VA 22202

April 8, 2006

<u>PERSONAL</u>

To Whom It May Concern

SUBJECT: Letter of Recommendation for Mr. Michael A. Ford

I have known Mr. Ford in his capacity as Building (Site) Manager at The Horizon House Condominium while I served as President of the Board of Directors, Horizon House Condominium Unit Owners Association. Having been elected to three terms on the Horizon House Board, serving for many years on other community boards and public commissions, and making many hiring decisions in the military and Federal civilian workforce, my experience serves me well in identifying high-quality management talent. I was quite impressed with Mr. Ford's employment history, his record of accomplishments, and--very importantly--his professional demeanor and sincerity during the in-person interview process for the Horizon House Building Manager position.

While employed as the Horizon House Building Manager, Mr. Ford performed in a truly spectacular manner. He immediately took charge of a situation that was suffering from the lack of leadership and initiative over an extended period. In the first month, he completed remedial actions that would have taken the average manager much longer. By the end of the second month, he had made a significant and visible positive impact on the community, including financial transactions favorable to the community that involved tens of thousands of dollars.

Mr. Ford clearly demonstrated an ability to work very effectively in a team relationship with the Property Manager and the President of the Board of Directors. His "people skills" as it pertains to owners/residents were especially impressive and admired by all. There is absolutely no doubt in my judgement that Mr. Ford has the capacity to establish and maintain the superior quality of building management that this community has been seeking for several years.

The termination of Mr. Fords employment at Horizon House was solely the result of political conflict within the community, and is in no way related to Mr. Ford's performance as Building Manager. I would re-employ him without hesitation, and hereby give my strongest recommendation for his employment as a manager at any comparable property.

Sincerely,

Vondell Carter
Colonel, US Air Force (Ret.)

**Carter Ex. 9**

Bonaventure0037

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

**Exhibit 2**

Declaration of Vondell Carter
(Dec. 17, 2009)

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| MICHAEL FORD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-cv-1318 (LO/TRJ) |
| | ) | |
| ZALCO REALTY, INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF VONDELL CARTER

I, Vondell Carter, this /7th/ day of December 2009, declare and state as follows:

1.     I am a witness in this action. I am submitting this declaration in support of Plaintiff Michael Ford's Opposition to Defendant James Mansfield's Motion for Summary Judgment.

2.     I am an adult and am competent to testify based on personal knowledge to the facts set forth herein.

3.     I served as Horizon House Condominium Unit Owners' Association ("Association") Board President from August 2005 to February 2, 2006. As Board President, I worked directly with Michael Ford on most, if not all, of his projects and assignments when he served as Horizon House's Building Manager.

4.     I provide this affidavit in connection with the above-captioned action brought against Defendant James Mansfield by Plaintiff Michael Ford.

5.     On January 3, 2006, I sent an email to James Mansfield, in which I asked him to write a letter regarding the website and Internet chatroom that was being used to make

disparaging comments about individual Board members and about Horizon House generally. See V. Carter email to J. Mansfield (Jan. 3, 2006) (attached hereto as Attachment A); V. Carter memorandum to Horizon House Owners, at MF 105-06 & MF 115 (Jan. 30, 2006) (excerpts attached hereto as Attachment B). I wrote this email because I was concerned that there were postings on the website and chatroom about both Michael Ford and myself, which were disparaging, and potentially racist. However, Mr. Mansfield never responded to my request.

6.       On January 23, 2006 at 7:30 p.m., I attended an Association Board Meeting in the Horizon House Community Room. At that time, Susan Morris, Adrienne Garretson, David Faison, Greg Weatherman, and I comprised the Association's Board of Directors. At the meeting, Mr. Ford gave a detailed report about his substantial accomplishments and ongoing projects at Horizon House. At that time, Mr. Ford had been in the position of Horizon House's Building Manager for less than two months. I was and continue to be impressed with all that he was able to achieve in such a short period of time.

7.       At that meeting, the Association's Board voted in Executive session on a motion to remove James Mansfield as the Association's attorney. I voted to remove Mr. Mansfield, as did Susan Morris and Greg Weatherman. Adrienne Garretson and David Faison either voted not to remove Mr. Mansfield or abstained from voting altogether. As such, the motion was carried and Mr. Mansfield was removed as the Association's attorney, effective immediately.

8.       I have read the document entitled "Transcript of Board Meeting Held on January 23rd, 2006." See Board Meeting Minutes (Jan. 23, 2006) (Mansfield 1283-1306) (attached hereto as Attachment C). Specifically, I have read the sections entitled "President Calls for Building Manager's Report," see Attachment C at 2-5, and "Vote to Remove Mr. Mansfield as Our Attorney," see Attachment C at 6-8. Although these sections are not a complete transcript of

2

those portions of the meeting, they do substantially comport with my recollection of those portions of the meeting.

I declare under penalty of perjury, under 18 U.S.C. § 1621, that the foregoing is a true and correct statement.

Vondell Carter       17 Dec 09

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| MICHAEL FORD | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:08-cv-1318 (LO/TRJ) |
| ZALCO REALTY, INC., *et al.*, | ) ) | |
| Defendants | ) ) | |

## <u>DECLARATION OF VONDELL CARTER</u>

ATTACHMENT A

*Mansfield*
*Website*

Jim:

Please prepare a letter in the strongest language possible to make it clear to all concerned that we will not permit the website, http://www.HorizonHouseCondo.org. to represent the Horizon House Condominium Owners Association.  If you go to the site, you will note that it is not only being used to make disparaging comments about individual Board members, but is misleading new residents to think that this is an official site for answering questions that should be directed to either the building management or Board.  A notice appears regularly on all the HH Bulletin Boards in our building about this Website and recently it was changed from HorizonHouseCondo.org to a world-wide web at: http://www.horizonhousecondo.com.

This Website was initiated by Eric Mucklow as a gratuitous effort and was not an official action of the BOD.  Later, without approval of the BOD, Adrienne Garretson expended association funds to extend the "Yahoo" subscription.  The majority of the Board, during Adrienne's Presidency, stated unequivocally the presence of this site was and is detrimental to the community.  But more importantly, it gives the impressin to residents and the public that this is the official voice of HH.  It is not!

As an absolute minimum, they must identify themselves as nothing more than a "chat room" for a very limited number of HH residents (perhaps 40 or so out of several hundred resident units).  It is important that this be done expeditiously.  As you know, a few spoiled apples can ruin the entire barrel.

I would appreciate a draft of what you propose by Friday.  Thanks for your prompt attention to this matter.

Vondell

*Never Received*

MF 0115

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| MICHAEL FORD ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:08-cv-1318 (LO/TRJ) |
| ) | |
| ZALCO REALTY, INC., *et al.*, ) | |
| ) | |
| Defendants ) | |
| ) | |

## <u>DECLARATION OF VONDELL CARTER</u>

ATTACHMENT B

January 30, 2006

<u>MEMORANDUM</u>

TO:        Horizon House Owners

FROM:      **Vondell Carter, President, Board of Directors**
           **Susan M. Morris, Vice President for Policy**
           **Greg Weatherman, Vice President for Facilities**

SUBJECT:   **REBUTTAL TO THE FALSE ACCUSATIONS**

As you know, there have been unfounded rumors, gossip and allegations of wrongdoing by us as Board members of the Association and a petition for our removal. We are providing you with facts and documentation in an effort to set the record straight. We believe that after you read this, you will feel confident that there have been no violations by us, we have been working tirelessly on your behalf, and the move for our removal is politically motivated and based on fear and smear tactics and untruths.

We have been working together as a Team on behalf of the residents since Vondell Carter, a long-term member of the Board, became the President six months ago. In that short time, there has been significant progress on established goals, which we will share with you in a forthcoming communication.

If you feel that, based on the information and documentation provided (and you signed the petition on January 19th presented by the "Concerned Citizens"), please sign the "Petition Withdrawal and Support Form," previously sent to you or the one we have enclosed for your convenience. Return it to the Front Desk to the attention of PH 1

Following are topics and areas that will be covered. While there is much more information, in the interest of time, we have addressed only the major issues.

**A. HH Building Managers**
    1. Jennifer O'Keefe
    2. George Eichenger
    3. Michael Ford

**B. Representation by James Mansfield, Esq**

**C. Engineering Services by Amtek**

**D. Monthly Board Meetings and Two Members of Same Household on Board**

MF 0088

2

E. Alleged Violations of the Bylaws by Carter, Morris and Weatherman

F. Actual Violations by Other Board Members and Other Abuses
   1. Adrienne Garretson
   2. Marie Eckes
   3. David Faison
   4. Eric Mucklow

## G. Seven Board Members & Call for New Board because of Dissension

We believe that the "**Removal for Cause**" and this entire episode has been politically motivated and orchestrated. It has already caused considerable damage to the reputations of upstanding individuals – who are now working to mitigate the damages to various individuals and our community to date  Any reasonable person accused falsely of illegal activities will not stand by and allow this to happen.  What if this were done to you – what would you do?  However, we cannot continue to do this alone and ask for your support in alleviating this situation with your voice.  Please take into consideration that any further damage can result in serious problems for our community.  In that light, we are asking that you request an immediate cease and desist of all actions being taken and rumors/fear being propagated and incited by Mr. Mansfield; Ms. Garretson; Mr. Faison; Mr. Mucklow; Mr Jerry Garner and his wife, Paula; Ms. Marie Eckes; Lenny Conrad; and others.

Your support will be evident by asking that your name be removed from the petition or by indicating your opposition to the petition.  Several individuals have already asked that their names be removed.  We are also asking that you allow our community to take a stand for the basic principles of our in-house democracy:  our rights to answer our accusers; innocence until proven guilty; the right to vote without interference; the right to serve openly without threat; the right to work for a living and care for our family; the right to defend ourselves against violence and abuse; and the right to live in our homes without fear for our physical and mental well-being.

Thank you for your consideration.

Sincerely,

Vondell Carter, President          Susan M. Morris          Greg Weatherman
HH Board of Directors              VP for Policy            VP for Facilities

Enclosed:  Attachments  1 – 7
           Appendix A – HH Bylaws and VA Condo Law Cites

Copies to:  Juan Cardenas, Esq.
            Rees, Broome & Diaz,

**MF 0089**

## ATTACHMENT 2

### B. Representation by James Mansfield, Esq. as HH Attorney

**a.** As Mr. Mansfield stated at the recent meeting, he has been the HH attorney for 16 years. We only know of him since we have been involved with the Board. Attached are emails written to Mr. Mansfield regarding concerns of violations by Adrienne, Julia, and Marie on the Board (see Attachments).

    **1)** On April 3, 2005, Susan Morris wrote an email saying that she would appreciate a response, which Mr. Mansfield continued to ignore. This specific email was one about Adrienne removing the Emergency Procedures for the residents Susan wrote.

    **2)** On June 10, 2005, she again wrote to him and told him there were violations occurring with respect to the conduct of the BOD and the bylaws were not being followed by Adrienne. Susan cited problems occurring, including her reversal of Marie Eckes' resignation and the affect on the residents who applied, including the perception of discrimination.

    **3)** On July 21, 2005, Ms. Morris wrote to him again stating that the Horizon House Website was carrying information against her and her husband. She said that Lenny Conrad told a resident that Adrienne <u>Garretson is involved in a smear campaign against her and her husband.</u> and asked that he take action to caution "Ms. Garretson and the other Board members.......they do not have the right to sway the owners with false and negative information." Based on his reply, he did nothing and may be the only person who can't find Eric Mucklow's HorizonHouseCondo.org in Yahoo.

    **4)** On July 22, 2005, she wrote to him about the elections and the fact that Adrienne was the President and operating as the Treasurer at the same time, which is a clear violation of anyone's bylaws. Susan discussed the fact that the Treasurer (Vondell) asked that the Budget meeting be postponed so that Zalco could be included – since they are responsible for preparing the budget, but it was held anyway. They were not only ignored, but the budget was discussed without the management company, HH Treasurer and they ended up recommending a 10% increase in condo fees.

    **5)** Vondell and Susan both rejected that amount because of the money being spent on landscaping and Engineering services, as just two concerns. The boilers still needed to be maintained and fixed and a new HH engineer needed to be hired. Therefore, a 7.6% increase in the fees was the final amount. Unfortunately, Vondell and Susan proposed that there be less of an increase or an offset by increasing parking space and laundry fees, which ended up on top of the increase. Therefore, the Treasurer was not the Treasurer since Adrienne was both the President and Treasurer – with no checks and balances, which are basic to accounting procedures.

    **6)** On January 3, 2006, Vondell wrote to Mr. Mansfield requesting that he make it clear to all concerned that the Website was not official site but was a chatroom being used for disparaging remarks about HH and the Board. The website was continued with the approval of Adrienne, without a discussion with the full Board. We believe in the rights to communicate and that a Website would be appropriate; however, a person

12

should know if individuals are speaking officially or if it is a chatroom, because it may affect the property values of HH and incur liability.

7) On January 13, 2006, Susan wrote again and told Mr. Mansfield that she took exception to what he was doing as the Association attorney and questioned a number of his actions on behalf of Ms. Garretson. He had written via email and a formal letter that he would respond only through the President, Vondell Carter, which he said was standard HH policy but did not follow.   At the end of her letter, she stated that she had no confidence in him as the attorney for HH or in advising the Board (see attachments)

8) For your information, also attached is a letter (didacted) from a resident regarding the performance of Mr. Mansfield at the recent court case on the crown moldings.

MF 0106

*Mansfields,*
*Website*

Jim:

Please prepare a letter in the strongest language possible to make it clear to all concerned that we will not permit the website, http://www.HorizonHouseCondo.org. to represent the Horizon House Condominium Owners Association. If you go to the site, you will note that it is not only being used to make disparaging comments about individual Board members, but is misleading new residents to think that this is an official site for answering questions that should be directed to either the building management or Board. A notice appears regularly on all the HH Bulletin Boards in our building about this Website and recently it was changed from HorizonHouseCondo.org to a world-wide web at: http://www.horizonhousecondo.com.

This Website was initiated by Eric Mucklow as a gratuitous effort and was not an official action of the BOD. Later, without approval of the BOD, Adrienne Garretson expended association funds to extend the "Yahoo" subscription. The majority of the Board, during Adrienne's Presidency, stated unequivocally the presence of this site was and is detrimental to the community. But more importantly, it gives the impressin to residents and the public that this is the official voice of HH. It is not!

As an absolute minimum, they must identify themselves as nothing more than a "chat room" for a very limited number of HH residents (perhaps 40 or so out of several hundred resident units). It is important that this be done expeditiously. As you know, a few spoiled apples can ruin the entire barrel.

I would appreciate a draft of what you propose by Friday. Thanks for your prompt attention to this matter.

Vondell

*Never Received*

MF 0115

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|                                      |     |                                          |
| ------------------------------------ | --- | ---------------------------------------- |
| MICHAEL FORD                         | )   |                                          |
|                                      | )   |                                          |
| Plaintiff,                           | )   |                                          |
|                                      | )   |                                          |
| v.                                   | )   | Civil Action No. 1:08-cv-1318 (LO/TRJ)   |
|                                      | )   |                                          |
| ZALCO REALTY, INC., *et al.*,        | )   |                                          |
|                                      | )   |                                          |
| Defendants                           | )   |                                          |
|                                      | )   |                                          |

## DECLARATION OF VONDELL CARTER

ATTACHMENT C

Transcription of Board Meeting
Held on January 23rd, 2006

# Table of Contents

TABLE OF CONTENTS   1

MEETING OPENS   2

PRESIDENT CALLS FOR BUILDING MANAGER'S REPORT   2

VOTE TO RATIFY OF ACI CONTRACT   5

VOTE TO REMOVE MR. MANSFIELD AS OUR ATTORNEY   6

VOTE TO HIRE OF REES, BROOME AND DIAZ AS OUR ATTORNEY   8

VOTE TO HIRE NEW ENGINEER   10

OPEN FORUM   16

SUSAN RESPONDS TO ???   16

DISCUSSION OF WEBSITE   17

DISCUSSION, VARIOUS   19

WENDY ASKS GREG ABOUT "CUTTING CANCER"   20

DELLA ASKS ABOUT BEING CALLED A RACIST   21

BONNIE ASKS SUSAN ABOUT FIDUCIARY RESPONSIBILITY   21

VONDELL JUMPS IN ON QUESTION OF FIDUCIARY RESPONSIBILITY   22

MEETING ADJOURNED   24

Mansfield1292

Transcription of Board Meeting

Held on January 23rd, 2006

## Meeting opens

**Horizon House Board Meeting, opened to the Owners at 7:30 January 23, 2006**
Board: Vondell Carter, Susan Morris, Adrienne Garretson, David Faison, Greg
Weatherman. Also at the head table, Building Manager: Michael Ford.

## President calls for building manager's report

Carter: the first report will be from Michael Ford, the building manager.
Ford: Since arriving December 5th, the last 49 days, I actually did a building manager's
update and repot and it goes as following.  We organized and reviewed contracts for
landscaping, snow removal, telephone services, __ services, boiler room and electrical
work and electrical work in general that is need on the property. We also looked a
different signs we had that were needed of the property, as far as one way signs,)___
signs.

Carter: you might mention on this area of signage, we've had 3 people running into the
canopy out front, damaging the new lights, that had to be replaced, all of them. One of
them was the emergency medical truck that has been her a 100 times. ....One was
someone moving relatives. But they are going to be very clear signs out there. So that is
just one of the signage issues.

Ford:  We actually do have the signage here (for one way, for trucks for canopy). These
are signs that, just... We also have signage for if a standing vehicle, idling in the back of
the building, the fumes will go up into the apartments, so we decided to get more signs
that are visible to everyone that you will not wait here and let you car idle.
We also looked at, with the county, basically a contract for the hole in the rear. One this
is, when I got here the dirt was on the sidewalks and the site was not covered. What I
intended to do was actually remove the dirt, which we have done, and place metal plates
over the holes.  If anyone saw the memo I sent out, we are actually going in phases.
Phase 2 will start probably on Monday. We do now have the engineering specks. For
awhile the contract was worked out to the plumber, so we can actually get the hole
finished. There is a lot of work that's needed as far at the plumbing, the pipes need to be
replaced. Looking at a finished date of February 10th for that to be completed so that exit
can be used by everyone.

Another issue we have dealing with contracts was the Arthur Bruller (?) inspectors that
came on the property about 2 Fridays ago. Our boiler rooms were such a mess and in
such disarray from the piping, the plumbing, that he wanted to close us down. As IU
talked to the inspector, basically, talking with him, I reassured him that we would get all
the work taken care of in a timely manner. For this we put out a contract proposal for
ACI to come in and do the work. I'm going to pass this around. I went down into the

Mansfield1293

# Transcription of Board Meeting
## Held on January 23rd, 2006

boiler room with David Faison. We actually took pictures of the problems we had in the boiler room. And during this we went a head and actually go the work done, so that we are running efficiently. Both our boilers are running now. When I got here we were working off of one boiler. We still have some adjustments to be made with the boiler so we have to continue working on that.

One of the other contract problems we dealt with were with the cleaning services.

Question from Vondell: Since the boiler has been fixed has anyone had problems with hot water?

Audience: Yes, (Problems were identified in tiers 24, 25, 19 and 5.)

Ford. We are going to "Jet" the system to get the proper airflow because what we are finding is on one tier, one unit might have a problems but the others are fine. We are looking into that.

There is going to be a manager's report up here for everyone. This report is really lengthy so I won't go over everything, but I will go over the ones that are really important. Next point. When I got into the H. H. one of the problems I was dealing with the old manuals, working with Charles E. Smith enabled me to understand how the front desk should work. That's actually where I started. So we did a little changing of procedures, more --- that were needed to help everyone out. We did a brand new packet where the old package was so old you could barely read what was supposed to be on there. We did just a few basic minor things that helps the building and also helps the people that are coming in.

Carter: I might point out that I got a report on real estate activity in the area. Some others might have gotten it as well, but H.H. has had the largest number of sales of any property in this area in the last….. (Comment from someone in audience: "Everyone is moving." Laughter and coughing, couldn't hear it all). What I assume it means is the people who sold got a good price for selling and the people who moved in thought it was a great place to be in. I know that first hand because I have talked to a number of them and they said, we looked around a number of places and decided this is a good property. I hope we don't disappoint them.

Ford: I think another point with administration: I know we had an elevator fire here about a year  ... year and a half ago. My research showed that there was $8,000 sitting in an account with an insurance company that we should have, I mean H.H. should have collected. I have now collected it. It was sitting there for 15-18 months. All we had to do was to submit the paperwork. So we now have that money and we are finishing up paying elevator bills with that.

When I got here there were basically 139 bills that were not paid. That were given to me approximately 2 weeks after I got here form the previous staff. I ended up going through,

**Mansfield1294**

## Transcription of Board Meeting
### Held on January 23rd, 2006

researching, finding out why they weren't paid, and basically ended up paying the bills. They were dated back to May of '05.

I'm not going to go over all the things I actually have helped the building revamp and do, I just want to make sure that you know I am working for you and working in your best interests and try to get the building up to code and up to speed.

Carter: Well, there are some other things on here that I think are worth mentioning. Maybe you are somewhat bashful about mentioning. But one is seeing that the beauty shop is properly billed for their electrical usage. The fact that the laundry room tokens – and I'm sure no body realized this, but the laundry room tokens were such that you could use the cheaper tokens in the more expensive machines, and I know no one was aware of that, but Michael has taken dare of that and that has increased our income.

Another thing that has increased income is that there were many in-unit service bills that had not been collected. The person has been given a bill but there was no follow up action on collecting those3 bills and that hade now been corrected. If you have in-unit maintenance service performed, you will be expected to pay for it at the time it is performed and you will be expected to pay it at the time it is performed. In fact, a comment form the financial people at Zalco, saying they didn't know what had happened but we were taking in more money than we'd taken in years.

The Board started working on storage bins. Michael took that over and has been working on it. We probably now have more people who have bins than ever have. And at the very least now we know who has bins belong to whom and which are available. And it's not 100 percent but it's going to get there along with all the other things..

Someone had mentioned that they thought that the fire extinguishers were out of date and hadn't been inspected, and Michael checked on that and they were in compliance. He's going to pass this out, and the substance of this will also be an insert in the next newsletter.

(Audience member: "I had work done in December and received a bill. It was $15. I paid it the next day and got a note 7 days later than unless I paid it I would be cut off from all H.H. services. Now I take umbrage with that. I don't think this is a reform school. There should be a gentler way to do this.

Ford: He is absolutely right. The $15 was paid, but the prior management didn't show. We had to go back and do research on it, and I apologized at that time.
(Man in audience: "You did not apologize.")

Ford: Well I do now. I apologize to you at this point in time. But we also had a lot of bills that were not paid, and instead of me spending, well say, his $15, it would take 2-3 hours to track down would take quite a bit of time – so we decided to send out a mass mailing and just ask everyone to pay. What I found out later, was that he paid, but it was not

Mansfield1295

# Transcription of Board Meeting
## Held on January 23rd, 2006

recorded properly. So everyone who got back to me saying they had paid, I took them off that list. Matter of fact, basically everyone who owed paid, and everyone who had already paid nothing happened to them. If I have to apologize, I apologized, but the letter had to be sent out and we needed to be sure we collected the money and I don' think collecting $15 is something you want me to be doing as a building manager. There are other things I have to do besides that.

Carter: When you sent out the final notice had you already verified that the initial notices had gone out?

Ford: Yes sir. Several notices had already been sent out – 2nd and 3rd notices. That's why we sent out the final notices, to try to get all the money in starting in January. (Further discussion revealed that all seemed to have gotten 2 and d3rd notices except this person.)

## Vote to ratify of ACI contract

Carter: If there is nothing else we will move to the items that have come out of executive session. Now, someone mentioned earlier, asked the question about what is this special meeting or why a special meeting. Bylaws provide for special meetings to deal with special issues. There was a request by 2 board members to have a special meeting and other issues that were pressing. Needed to be addressed as well. So if you looked at the various bulleting boards you saw 3 categories of issues: management concerns and issues; contracts, and some personnel matters. So, the first issue has to do with a contract that we necessary to be done in response to the insurance inspector, regardless of the inspector it needed to be done, but that made it urgent. So that chair will entertain a motion to ratify the action that was necessary on that contract. The ACI contract $4,865. (Discussion took place on when the vote took place. Chair said the vote was taking place now.)

Carter: We had to proceed with the work on an emergency basis, based on an electronic vote on the issue.

Audience member: If the action has already been taken, why are you voting on it?

Carter: We are ratifying an action that was taken because it's required to do so in open session.

Board member: In closed session we can discuss things, but we can only vote in open session. This was in executive session.

Audience Member: Who signed the contract?

Mansfield1296

## Transcription of Board Meeting
### Held on January 23rd, 2006

Carter: Three of the five board members signed it. They signed it within the last week or so to get the work done.

Many in audience talking at once about fact that only 3 of the five signed the contract.
Cater: this is not an open forum.

Audience member: I want to know if all five Board members vote on signing the contract?

Carter: This was an emergency action that could have been done by the management.

Audience Member: Did they vote?

Carter: some voted. Some chose not to.

Audience member: How many voted?

Carter: Three voted. Three signed the contract.

Carter: The work needed to be done within the time the inspector indicated or we would have been perhaps without insurance or we would have shut down.

Morris: He said he would prefer. We discussed it here at the If it had been an emergency, The management company could have done it, but he said, considering what this going on what the Horizon House, why not just take it to your session.
It had been sent out. 3 people approved it, 2 people abstained.

Garretson: I never got the contract.

Morris:  Excuse me, Adrienne didn't get it.  We gave her the contract earlier today when it was found that I she didn't have it.  (Joking) Shall I adjourn like I used to do?

Garretson: I am abstaining. I never got the contract. I got home at 500 tonight (implied received the contract at that point 90 minutes before meeting.)

Carter: All those in favor of ratifying the contract say "Aye" 3 ayes and 2 abstentions.

## Vote to remove Mr. Mansfield as our Attorney

Cater: Next issue is ratification of a aboard action to discharge Mr. James Mansfield from Hartsoe Mansfield and Morgan as the attorney for the association of the Board.

**Mansfield1297**

# Transcription of Board Meeting
## Held on January 23rd, 2006

Audience ember: Once again, I'd like to know the number of people who voted on that, when they voted, and when these...... people who abstained were apprised of this issue.

Carter: The answer is yes, to the latter, yes they were apprised. Two: the first part, 3 people voted and two people did not respond to it.

Audience member: I'd like to know why you voted out our attorney of 16 years?

Carter: Partly because of the 16 years. (Elaborated on his question) (Applause, out of order calls, shouting, lots of talking.)

Faison (?): Before we vote I'd like to ask if there are any board members who would like to recuse themselves from this vote.

Since this vote to get rid of our attorney comes on the heels our attorney posting a letter to our entire board which has also been shared with our entire association, asking them to resign, that is a certain question. Secondly, Mr. Weatherman has had prior dealings with Mr. Mansfield professionally in an adversarial context  (to Weatherman: )You were an expert witness in a court case in which he as representing the other side and he disqualified you,...he did not.

Weatherman: There's nothing there, you are making things up.

Faison: I suggest there is cause for appearance of conflict of interest.

Weatherman: You can take it to court.

Carter:  You can voice your concern.

Garretson: I'd like to share my concern as well (to Weatherman): How can you vote in the best interests of the community when you have personal issues with Mr. Mansfield?

Carter:  Well, that guarantees that if someone writes a letter then that is nothing but a mechanism to raise a possible issue. I have no problem. I can be objective.

Weatherman: I have one statement to make. I have never been involved with any deposition or courtroom appearance that had anything to do with Mr. Mansfield's firm, period.

(?) I make a motion that we....

Weatherman: I say it freely and what he just said is the biggest convoluted mess I've ever heard.

**Mansfield1298**

Transcription of Board Meeting
Held on January 23rd, 2006

Morris:  I make a motion that we remove Mr., Mansfield as our attorney.

Yes votes recorded by Susan Morris, Greg motion and Vondell Carter.

## Vote to hire of Rees, Broome and Diaz as our Attorney

Morris: I make a motion to retain the firm of Rees Broom and Diaz on an interim basis until we send out advertisements for a new, permanent attorney.

Audience member:  This is retaliation.

Carter: First of all, it's on an interim basis, so there is no continuing relationship; there is no required continuing relationship. It's a firm that was recommended as one of the more outstanding forms on the east coast or in the country in terms of condominium law is concerned. So that's why we are using them for this interim basis. It's a firm that serves approximately 1,000 condominiums and is the largest on the East Coast.

Audience member: What relationship do you have with this firm?

Carter: Absolutely none.

Audience member: How did you find them?

Carter: They are in the telephone book.  It so happens that Zalco mentioned them as a very good firm.

Audience member: So, did you find them in the telephone book or did Zalco recommend them?

Carter: Both. Now, I also happen to have experience with real estate and with more than one management company, not to mention the CFM we had before and also know that they are well known in the industry, from personal knowledge, not personal involvement, but personal knowledge. And others have also recognized them as an outstanding firm.

Audience member: Can you tell us why you why our present attorney was unsatisfactory?

Carter: Because we needed a change (turmoil in the audience.)

Morris: If you like we will get into (a discussion about) Mr. Mansfield in the future, but tonight is not the time to do it.

(Some turmoil in audience)

Mansfield1299

# Transcription of Board Meeting
## Held on January 23rd, 2006

Carter: It's not appropriate to discuss that in this forum?

Morris: I have already told Mr. Mansfield why I have absolutely no confidence in him, as our attorney (turmoil.) Let's vote.

Carter: the motion on the floor is to retain Rees, Broome and Diaz pending a competitive process to choose a new attorney.

Garretson (speaking about new attorney): We met this individual this evening for the first time. He is not the person whose name you originally had in the email. Do we have a resume of this person? I have no idea what the rates are.

Faison: can you give us any information of why this is the best person, why he is better than Mr. Mansfield?

Carter: Because the competitive process will allow the board to select whom they think best represents us.

Audience member: What competitive process did you go through? Do you have any documentation of that process?

Carter: There will be a competitive process to determine who our attorney will be. What did you base your unilateral change of our attorney on?

Carter: You are just a loudmouth. You are speaking above everyone else's voice. You're interrupting all the processes. Now to answer your question… this is not the open forum.

Garretson: do we have a resume? Do we have rates? Do we have anything?

Carter: We have the reputation of the company, we have recommendations.

Garretson: Zalco's recommendation, their reputation and that's it.

Carter: At this point, and it's an interim process, so we don't have to retain them beyond next week if we don't want to.

Morris: Let me say something. Mr. Mansfield is our attorney and he charges a rate per hour that is specific. He does not have additional people. We will also have paralegal people, they charge less. I think they said there are 4 or 5 people in this particular division that work with condos who will charge us less, so we do not have to have everything pass by the highest paid attorney. So this is interim. And Mr. Mansfield can come back and bid again.

Mansfield1300

Transcription of Board Meeting
Held on January 23rd, 2006

Weatherman:  (too much confusion, couldn't understand what he said.)

Garretson: some people on the board seem to have a lot of information about these people and I have not.

Faison: I have a card (laughter).

Faison (?) We have not heard anything that explains the coincidence between this letter to you and the board, asking for you to resign, and you're immediate action to dismiss him.

Morris: No, no. I asked Mr. Mansfield to answer me four times and he refused. I then wrote him a final letter saying 'I have absolutely no confidence in you, Mr. Mansfield. You will find that prior to him asking for us to remove, I had already told him I had no confidence in him, so guess what, he's the conflict of interest because I already said he's the one with the problem, not me.

(Audience reaction, discussion, calls for order.)

Carter: we are voting on the interim retention of Rees Broom and Diaz.

(Audience disorder, disagreement that this is not)

Carter: Those in favor of retaining Rees Broom and Diaz say I.

Voted yes: Morris, Carter, Weatherman

Garretson: I have to abstain, I have not information.

Carter: 3 ayes, 2 abstentions.

Audience member: I can't believe that you people would simply ignore the general feeling about the people who live in this building. I am out of order, I am overly emotional and I am simply appalled.

## Vote to hire new engineer

Carter: On the hiring of…Order please! … of the Horizon House engineer. The interviews resulted in the person who was highly qualified and would appear to be an excellent choice as an engineering with good experience, this will allow us to save about 50 5 of what we are not spending for engineering services. We are now spending $140 k a year to Mantech to get engineering services.  This person will be hired if, and only if,

**Mansfield1301**

# Transcription of Board Meeting
## Held on January 23rd, 2006

the background investigation and so forth that Zalco will do (laughter). The salary of the individual is approximately $52,000.

Faison: The decision to hire versus the current contractor situation was never brought before the board. The context or authorization for interviews were held last Saturday, no notice was given except very late last Friday night or something with the odd warning that come Saturday, if you don't' show up Saturday, you wont' be a participant in further interviews.

Weatherman: I heard you Thursday, I heard you talk about it.

Faison: Okay right, so it was Thursday night -- still not 72 hours notice. (Garbled. Too many people talking)

Carter: Talking about all that stuff is not germane to the motion.

Faison: The man trivializes the attention I pay to the rules that govern the authority they have.

Carter: Greg, please you are out of order. Ladies and gentleman would you please!

Weatherman: I move we hire this engineer…

Morris: I second the motion.

Garretson: I'm sorry, again I have to abstain. We did not get the proper notice. We were told that if we didn't show up we would not be allowed to participate. We were told that we could not participate in this vote.

Carter: I assume that's an abstention.

Garretson: Excuse me.

Carter: It's a vote, discussion is over.

Garretson: Further, at this point in time, we are voting to hire and engineer, where the board has not had an open discussion about going from a contract to an employee.

Morris: We had that last year….. They made an $8,000 error. We said we would hire them for $100,000 on a month to month basis, but we will do it pending a replacement of Sonny because we cannot afford to pay these prices. And that was one year ago. And we can cut $100,000 out of our budget.

Mansfield1302

## Transcription of Board Meeting
### Held on January 23rd, 2006

Garretson:  Can I just finish?

Morris:  I'll give you a minute.

Garretson: This board has had no deliberation whatsoever about making that change. I'm not saying that it's a good idea or a bad idea, All I'm just saying that we've had no discussion and so I have to abstain.

Faison: Abstain

Carter: Let is show that Adrienne and David abstained.  The ayes are on the record. Since there were some comments made I'll make some summary comments.  The previous, I beg your pardon?  The issue of alternative ways of providing engineering services have been discussed ad infinitum.  At the budget meetings of the previous board, it does not mean that this board has to revisit the same issue and go over it.  Subsequent boards, unless they take actions to the contrary are bound….if it were possible to find a less expensive way of providing engineering service i.e. to hire our own engineer then that would be a viable option.  I don't think there's any justification for spending twice as much money to get inferior services.  So, that's a summary statement and isn't  open to further discussion.

Garretson: There is no justification, and it means we don't deliberate?

Carter:  I don't know what you mean.

Morris:  You choose not to come Saturday.

Faison:  Unintelligible.

Carter:  I have further comment with regard to correcting a statement that was made.  I'm aware of no one saying that because you did not come to the interview process, the fact gathering process that was an interview that you would have no further participation.  I don't recall anybody ever having said that.

Garretson:  You said it earlier in Executive Session.

Carter:  I don't recall saying that anyway in the Executive Session.  OK, let's move onto the next item.  Position of Secretary, the Chair will entertain a motion for the position of Secretary.

Weatherman:  I make a motion to make Susan Morris Secretary.

Carter:  On a permanent or acting basis?

Mansfield1303

# Transcription of Board Meeting
## Held on January 23rd, 2006

Weatherman: Acting.

Morris: I second it.

Faison: What's the difference between acting Secretary......

Carter: It's someone filling it on a temporary basis. It's getting the job being filled on a more permanent basis. I was acting Treasurer for approximately a year ......

Morris: I choose not to be the Secretary as you know, but because we need all the notices for the board I said well alright I might as well just say I'm acting Secretary.

Faison: As long as there is no functional difference between Secretary.....

Morris: No, I just do all the things that I really want to do.

Carter: Unintelligible. Second.

Morris: I seconded a long time ago.

Carter: It's not your motion. It's not appropriate......all those in favor will note by saying aye.

Weatherman: Aye

Morris: Aye

Carter: Aye

Garretson: No

Faison: No

Carter: Motion is passed. OK then the next issue is that of Treasurer of the Board. We are going to entertain a motion with regards to Treasurer's position.

Garretson/Faison: We have a Treasurer.

Morris: I make a motion that Adrienne Garretson be removed as the Treasurer of the Board.

Faison: You've just lost what little oversight we had.

Morris: I make a motion.

Mansfield1304

## Transcription of Board Meeting
## Held on January 23rd, 2006

Carter:  It's been properly seconded that Ms. Garretson will be removed from the position of Treasurer, but is of course still a Board member…..

Morris:  That Greg Weatherman be appointed acting Treasurer….

Audience:  Boo's from the community.

Morris:  Until we get a new Treasurer, (unintelligible comment from other Board member)……you're out of order, the only person that can't have a second position is the President.   So I will make a motion that you are the acting Treasurer till we can get a Treasurer.

Audience:  What qualifications does he have?

Faison:  He's their friend.

Audience:  Claps and laughs.

Carter:  Just let the record show that there were others who were asked if they would be interested in taking on the position of Treasurer.

Faison:  No one else was willing to take it away from Adrienne.

Morris:  Jerry Garner was asked if he would be our Treasurer.  Well….

Faison:  No one was willing to take it away from Adrienne.

Carter:  No, that's not the case.  We don't know what the answer is….

Weatherman:  For beating up the new manager in the office (speaking of Adrienne).

Faison:  She is so intimidating!

Carter:  There is no…..the bylaws….excuse me, the bylaws….

Morris:  You're a liar.  You're just making up things.  Adrienne you're a liar.

Garretson:  Unintelligible…

Carter:  This is not a forum for you to make disparaging remarks towards people….. my hearing is failing.   Now, those in favor of the motion signal by saying aye.

Morris/Weatherman/Carter:  Aye.

Mansfield1305

# Transcription of Board Meeting
## Held on January 23rd, 2006

Faison/Garretson: No

Carter: OK, ah….one item of information is Unit #212 which we have been trying to sell for over a year we finally have a valid contract and we will be going to settlement on the 6th of February and the sales price is $475,000.00. Back to Michael, there are some additional contracts for us to consider…..landscaping…..unintelligible….

Garretson: I was never given the opportunity to vote and David actually did not approve the contract with an email vote, and it's been signed and we just think that we should dot all the I's and cross all the T's and then it's ratified and I believe that the attorney that you hired thought so too.

Faison: Agreed.

Carter: Is there a motion to ratify Unit 212? Any further discussion? OK, those in favor of the contract on the sale of Apartment 212 for $475,000.00 communicate it by saying Aye.

Carter/Morris/Weatherman/Faison/Garretson: Aye.

Carter: Let the record show that it is a unanimous vote. OK Michael let's get to the other contracts. Landscaping is one.

Weatherman: unintelligible …..bad contractors who have said that.

Ford: We got three proposals for landscaping contracts at this point in time I have one proposal from PineRidge to do the landscaping for the property which we are currently using ….

Carter: Please, order please. Talk to us.

Ford: The current contract is with PineRidge. PineRidge is on a month to month basis. The current contract is for $22,000.00, we have two other proposals, we also have A L & L Landscaping contract proposal for the same work for $23,000.00. We have Brickman for $12,000.00 doing the same work as all three other proposals that we have.

Carter: We have a much lower cost with Brickman.

Ford: Based on comparison of the contract that started with PineRidge, they have the same services and there are some services that are much better than the other two proposals that I have.

Talk of contracts continues………..

Mansfield1306

Transcription of Board Meeting
Held on January 23rd, 2006

## Open Forum

Carter: We're going to have a forum, maximum one minute per person. Otherwise we'll be here till midnight. Any comments anyone has to make. Jerry?......

Garner: Just one, my name is Jerry Garner I'm from Unit #1009. Just a little sympathy deal here (maneuvering wheelchair). Unintelligible…..the other night, Thursday night, we had a concerned meeting of residents during which we discussed several items of concern to many of our association members, we also asked that petitions be signed for the purpose of declaring a special meeting we have the necessary petition votes of the requirements of our by-laws, to call for that meeting – we are calling for that meeting formally. The meeting will be held on Thursday, February 2nd, at 7:30 in this room. Each of the members will be sent a special mailing detailing the purpose of the meeting and so this is to serve as formal notice of that to the Board and to its members.

Morris: Now it's my understanding that you submit that to the President and then we have a right to review it….

Garner: Correct.

Carter: OK, thank you very much.

Morris: Although you don't decide the time or place.

Garner: We do. We do and we just did.

Morris: You do and I just did. Well we'll see. Shall I leave it ... unintelligible.

## Susan responds to ???

Person from Unit 430: (tape didn't get it all, these are some of her remarks) I think is very unfortunate. There is no trust. I don't know what's really going on. It makes it very difficult to come to a special meeting to make a decision when I don't know about the transparency. So how do I get that information?

Morris: There will be further information coming out to you because there have been some false allegations. There have been some things said that are totally untrue. Since I came to the building also, it appeared that the board and the residents have had serious

**Mansfield1283**

# Transcription of Board Meeting
## Held on January 23rd, 2006

problems, and one of the things I did was come on to do some work and see if I could help out for a one-term deal. I found that the disrespect some of the goings on here don't make people want to volunteer to improve this building. For example, someone was yelling the other night\t, Thursday, that I didn't have the furniture back in this room, when in fact I had the entire room, the curtains, the walls, the bathroom, the lights, in fact my husband went and brought back all the chairs, all the tables. I find it very hard to believe that someone would try to do that with respect to myself. And I think what has to happen is that the truth has to come out. As you've said, "who's telling the truth?" I think it comes to a point just like a judge, you and then you need to decide for yourself if this is a political move on the part of some people that are in this room tonight, such as our former board chairman, our former treasurer, Mr. Faison whose wife worked down at the desk, Della, who didn't want to sign the job description, Mr. Mansfield who refused to answer any letters I wrote to him, and only went through the board president when it was a white female, but not a black male (great uproar in audience.)

That's true. That's absolutely true. However, I will tell you about some more information that will be coming out.

And I ask you to leave your minds open, and don't be. These same people have been here ever since I came. This board has been put off. People have resigned in protest. We've been given the finger by Board members, we've been yelled at. It's a terrible situation in this very building. But if you look around at who's complaining, you've got Michael Schuechenzuber, here complaining he was on the board; you've got Jerry, Paula was involved. If you go in the back of the room you've got what's is…Chuck Self's friend, Gene Dorfler. You're looking at past board members who are disgruntled, when in fact they were ineffective.

(Audience member) I've lived here four years, and I haven't complained about anything this board has done or prior boards have done.

Morris: Did you sign the petition?

Same man: Yes I did. Because I want action, I want harmony. I want five board members that can work together. (Applause)

Morris: Then what I recommend you do is make the right vote. When the time comes, don't let yourself be bamboozled.

## Discussion of website

Audience member: I think this has become a very emotional issue instead of a fact-based issue. I think that people are being misled on both sides, to be honest. I work for the government accountability office and I deal with people who don't tell the truth, all the time. I know I should go to the board meetings, but I can't always go to those meetings.

**Mansfield1284**

## Transcription of Board Meeting
### Held on January 23rd, 2006

Those minutes are not available on the website. You can only get them if you go to the front desk and ask for them.

Carter: Let me clarify something there.

Woman in audience: So, is there an official website.
Carter: No.

Woman: Why?

Carter: Well, because it requires someone to, because it requires someone to, because it requires someone to, design a web site, establish and maintain it as a website and that takes time and the board had not decided to do that, so that what you see, that appears to be a H. H. official website, sis not an official web site, it is a chat room that uses the H., H, the name and the image, and there fore is confusing to people such as yourself, because you are expecting all this information that's in the board meetings, and in the minutes. Are at the desk for you to read, as well as information sent out monthly more or less with the newsletter, that's where the official information is. It's not the letters to the editor, its' not other stuff. The part there that that says from the Manager or the Board of directors is actual information from the minutes and it can be verified. Now there was one other person, at least one other person I remember who was writing the website to ask questions of the manager. It's not an official website.

Audience member: It's 2006, where everybody does everything on line.

Carter: Everybody in this building does not have a computer.

Woman: You know you are getting new residents who you are putting away because they cannot get any information

Carter: What you are saying is the only way to get information is through a website and that's not the case.

Woman: No I just have to go down there and get it, there's only one copy of it so I have to go there and get it.

Carter: If you want a copy of the minutes… (Woman interrupted.)

Morris: We are considering the fact that people want information from the website, and for example the newsletter should go on the website. We should have an official website and then we should have a chat room. So let me say, that that's something that we thought that David was going to be our person in charge of that. The only problem was that the chat room looked like an official sites. We should take the official site and put

**Mansfield1285**

## Transcription of Board Meeting
### Held on January 23rd, 2006

things up on it, such as what is happening here, what's here. You should have a right to go and use the Internet as opposed to hard copies and I think we should proceed with that.

Weatherman: If someone has time and wants to they could scan all the minutes
It's not hard to do; it's just a question of who has time. And you can download a PDF reader from the Internet for free.

Woman in Audience: I think you should get laptop and type the minutes in so you have an electronic copy.

Carter: That's what we do every meeting.

Woman: Then why are they in hard copy and not in electronic copy?

Carter: Because we don't have an official website.  If you want an electronic copy to be read, all you have to do is ask and we will give you an electronic copy.

Woman: I think this being a dinosaur has led to your lack of communications between the five board members and the residents. That's why there is a huge lack of trust. I'll be honest, as a new resident and for the other new residents I've talked to. There's a lack of trust between your residents and your board and they don't want to stay here.
Other: Well there is a lack of trust among board members.

Woman: … (Couldn't get it all)… so polarized we can't get anything done.

## Discussion, various

Carter: Thank you. I'm glad you decided to come out

Woman: You've done a lot.

Morris: The bins, the community room, the landscaping has been done. So let me say, these 5 people have done a lot.

Carter: Well let me say, there are a lot of things that have gotten done, there are a lot of things that are in the process of getting done. For people who just come home and go to their unit and then go out to work, they don't see it. But there are things. But there are things getting done and there are people who know about it. And we'll make it a point to try to let people know more about what is being done and what has been done and what is going to be done. All those contracts we talked about tonight amount to something, and…almost every meeting we've had over the last several years, contracts and contracts that we have to get done, if you don't read something about it you don't know about it.

Mansfield1286

## Transcription of Board Meeting
### Held on January 23rd, 2006

Hopefully we can get a website for people for whom that's their preferred means of communication.

Another woman in audience: I just thought (spoke to the idea of the value of having a board of 7 because it decrease the emotion. It's just how group dynamics work. If you have more people, more floors, it's actually more effective with 7 people than with 5 and you have to go more with swaying the majority that falling into voting blocks. I urge everyone to think about that. And I wonder if we could just pass that one vote to increase the size of the board to 7. And have the bylaws take effect immediately, or is there any delay?

Person in audience, and Lawyer: It takes a vote of 66.2/3 so change a bylaw.

Woman in Audience (?): Our bylaws already say that the board can be expanded to 7 people. That language is already in our bylaws.

Carter: Okay, does anyone remember reading an article I put in the newsletter about a year ago about the consideration of expanding the board? From 5 to 7. Did anyone here read that? It was based on my experiences, observations and interactions with another of communities, some of which were the same size as our s and had more board members, some of which were the same size as ours and had much larger boards. So it isn't a new idea and it isn't something that emanated from people who were dinosaurs, just as the telecommunications system that we tried to implement 2 or 3 years ago is not the result of thinking of people from the dinosaur age. Oh, and one other thing. There was mention by someone who has since left the meeting that there was something weird and unusual about 3 to 2 votes on the board. If you look at the previous couple of years I think you will note that there were a number of 2 to 3 votes and it didn't emanate from the present composition of the board.

Wendy S.: I am looking at a letter that Greg put on our website which you call an illegal website....

Carter: I didn't say it was illegal, I said it was a chat room.

## Wendy asks Greg about "cutting cancer"

Wendy: Greg, you said "just as soon as we cut the cancer from our association this Monday night..." Greg what is the cancer that you are cutting, please?

Weatherman: (pause) The inability to get stuff done. How's that for an answer? And I don't sing "Kumbaya" either.

Mansfield1287

Transcription of Board Meeting
Held on January 23rd, 2006

## Della asks about being called a racist

Della: I would like some clarification on an earlier comment. Are you calling me a racist specifically, or exactly what did you comments mean?

Morris: Well, as I mentioned to the other lady, I am going to make some information available to everyone very shortly, and then you can make your own…I didn't call you anything. However I do recall some conversations you had with me, and I will be happy to impart those to others and I think it's very surprising….

Carter: wait a minute, we don't need a back and forth. You made a comment, you asked for a reply, in essence and now she's done.

Della:  That's not a reply.

Morris: Well, no, I said wait a minute, I would make some information available, and I want to say one thing further about this husband and wife. I'm not a committee person, I don't particularly like going through all of this. However, but I'm not a quitter. I'll tell you, I came on to do this room, to do the bins and the bicycles, and to help the community. And I did the newsletter. But I want you to know that I probably did more work than many people in many years, although I found that all the Board members were hardworking. Now, when I write my letter I said, listen, I just want to do some things. If you don't want to vote for me because my husband's on here, don't do it. And I got voted in, and I have been busy ever since doing as much as I can do for this community. And I'm going to tell you I started going down all the things I'm doing, and I said, wait a minute, to the exception of us going on vacation, to the exception of many other things, so I find this totally offensive. My turn will up shortly, and if I choose to run then don't vote for me, and if I don't run, then, you know how I feel, your loss is far greater than any loss I will ever take. I don't have to finish the community room. I don't have to finish the bins, so let me say this to you.  This is no favor to me, as an individual. I mean this is a joke.

## Bonnie asks Susan about fiduciary responsibility

Bonnie W.: Can I just say, as an elected board member you have a fiduciary responsibility to protect and maintain the property and that is a far greater thing than choosing the projects that interest you. And we elected you to serve the interests, the fiduciary responsibility…. (Applause)

Morris:  I do that also. I do all the contracts. I look them over. I toured the boiler room. Did you? I went around the building. I took a checklist. I went out in the hallways. You have no idea the amount of work that goes on with all the stuff in this building. I am an

Mansfield1288

## Transcription of Board Meeting
### Held on January 23rd, 2006

old accountant. So don't think by my saying these "extra" things I am taking on these "extra" things. Why don't you come look over here? And why don't you say, what have you all done. And at the end we are supposed to tell you what we all did. I come to every meeting. It's 10:30. I interviewed from 9 in the morning, 10 'til 4 on Saturday for a new engineer. I was in interviews for half a day nobody showed up. I sat right here. And then I interviewed two more days. So, tell me what you have been doing. Tell me what you have been doing?

Bonnie: I haven't been elected to the board and I do appreciate all that you have done. (Cut off, lots of chatter)

Morris: Why don't you come and join the board and I'll change seats.

Carter: Okay, let me address one issue because I hear it, beg your pardon, chatter among board members.

Morris: I don't like being attacked by this woman.

## Vondell jumps in on question of fiduciary responsibility

Carter: could we have some order please? Can we have order? Please? Thank you very much. Okay, the idea of fiduciary responsibility, you know, sounds great, but (didn't finish thought.) Fiduciary responsibility includes, among other things, having a decent meeting room. This place a year ago was so lousy that no one would want to be in it, except they did, because there was no other place to meet. The vertical blinds were looking like a tenement house when you looked from the outside. The place was filthy. There was stuff on the walls that had been there for 20 years. The chairs that we sat in seemed like they wouldn't hold you. And on and on and on. And while they may seem cosmetic, even to the head-shakers, they still enjoy the benefits of it, you see. Other such things, whether it's the bicycles, whether it's the newsletter, whatever, they are not just projects people do because they like to do them, they are of very real benefit to the community. Just ass fixing the hole out back has a benefit, fixing the boiler room has a benefit to everybody. Most people don't see it, they just think do I get hot water or don't I. That's to be expected. And it seems…you know we just have to justify the high salaries we get.

Audience man: Has the entire board considered stepping down together.

Garretson: Yes, I have agreed to that.

Morris. Not me!

Mansfield1289

# Transcription of Board Meeting
## Held on January 23rd, 2006

Carter; Some have.

Weatherman: I considered it for about two seconds but there are just too many things to get done, but if you all want to drag things out further.

Carter: Part of the reason we are in the shape we are in right now, is because over the years, while we could tout the huge reserve we have, well there is one thing about reserves that people who know can tell you about reserves, if the reserve is too large it means you haven't been spending money on the things you should have been spending for over the years. And right now we have a $1.4 million reserve and we should have been spending that to do some things that are now almost to the crisis mode. There is preventive maintenance that should have been done and that's why we needed up with some of the problems we had in the boiler room. And then when we get somebody who is supposed to be doing it and they don't do it, we still have problems.  And that's why we are going to get an engineer, rather than continue with the contract we have now.

From Audience: So, all the other boards were completely ineffective?

Carter: No, I didn't say that. I didn't say that at all. What I said was there were some things that needed to be done, that we didn't get done. That's all I said.

Faison: You said that in response to the question why aren't you guys stepping down with us.

Carter: I didn't say that in response to anything.

Faison: That was the question on the table (lots of chatter and arguing).

Carter:  You didn't answer it did you not and other people did.  Answer it for yourself (to David).

Faison:  The answer wasn't you three ……unintelligible….did you do these things?

Morris:  If you want to step down.

Carter:  Did you not agree with some things to be done this night?

Cox:  Sir, isn't it time to adjourn.

Garretson:  Sounds like a plan to me Jack.

Carter:  Thank you very much.

Mansfield1290

Transcription of Board Meeting
Held on January 23rd, 2006

Cox:  Vondell, will this wait till Feb. 2$^{nd,}$ we will probably need injunctive relief before then, this is unacceptable, we cannot let … unintelligible.

Carter:  Sounds like a threat Jack.

Morris:  Wait a minute, wait a minute.  I'm out of here.

Carter:  Meeting is adjourned, thank you very much.

## Meeting Adjourned

Mansfield1291

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

**Exhibit 3**

Deposition of Michael Constant
(Oct. 20, 2009) (excerpts)

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - - - -x
                               :
MICHAEL FORD,                  :
                               :
        Plaintiff,             :
                               :
    vs.                        : Civil Action
                               :
ZALCO REALTY, INC., et al.     : No. 1:08cv1318
                               :
        Defendants.            :
                               :
- - - - - - - - - - - - - - -x


                        Washington, D.C.

                        Tuesday, October 20, 2009


        The deposition of MICHAEL CONSTANT, called

for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, in the

offices of Bernabei & Wachtel, 1775 T Street, N.W.,

Washington, D.C., convened at 1:05 p.m., before Cathy

Jardim, a notary public in and for the District of

Columbia, when were present on behalf of the parties:

5

1      P R O C E E D I N G S

2   Whereupon,

3               MICHAEL CONSTANT

4   was called for examination by counsel for Plaintiff

5   and, having been first duly sworn by the notary

6   public, was examined and testified as follows:

7          EXAMINATION BY COUNSEL FOR PLAINTIFF

8          BY MS. LOVELESS:

9      Q.    Mr. Constant, my name is Andrea Loveless and

10   I represent Michael Ford.  You understand that you

11   are under oath?

12     A.    Sure.

13     Q.    The court reporter is here, she is going to

14   take down everything we say.  For her benefit, before

15   responding, please wait for the end of my question

16   and I will wait for the end of your answer before I

17   ask the next question and as we just discussed, make

18   sure to answer audibly so she can record your answer

19   rather than a nod or a shake of the head.  Please

20   state your name?

21     A.    Michael Constant, C O N S T A N T.

22     Q.    I am going should show you what I will mark

1    as Exhibit 1.

2                         (Constant Exhibit No. 1

3                         was marked for identification.)

4         BY MS. LOVELESS:

5    Q.    Have you ever seen this document before?

6    A.    Yes, someone delivered it to me.

7    Q.    Is this the subpoena under which you are

8    here to testify?

9    A.    Looks like the same document.

10   Q.    Great.  Can you let me know, what is your

11   current employment?

12   A.    Zalco Realty.

13   Q.    What is there address?

14   A.    8701 Georgia Avenue, Silver Spring,

15   Maryland.

16   Q.    What position do you hold there?

17   A.    Portfolio manager.

18   Q.    How long have you held that position?

19   A.    Approximately ten years.

20   Q.    Have you held any other position at Zalco?

21   A.    No.

22   Q.    Where were you employed before that?

1   with the facilities?

2        A.    There were problems.  Our

3   engineering -- Michael Gilman in engineering

4   department got involved with facilities department.

5        Q.    Did you --

6        A.    I followed him to these problems, yes.

7        Q.    What time period is this?

8        A.    The entire time I was there.  Again, I don't

9   recall, during the time I was there.

10       Q.    And do you know how ongoing the problems --

11       A.    There were some facilities problems we ended

12  up -- two that I can recall.  One was a main break,

13  water main break and the other one was -- was the

14  boilers.  Those were the two I can recall, they were

15  kind of a major issue.

16       Q.    Those issues caused you to go actually on

17  site to Horizon House?

18       A.    Correct.  That was before Michael Ford got

19  there.  That caused me to be there Labor Day weekend,

20  the whole weekend.

21       Q.    And after Michael Ford was the building

22  manager at Horizon House, were there any problems

1      Q.    Let me ask you about the interview process

2   that resulted in hiring Michael Ford.  Do you

3   remember at what time either the board told

4   you -- let me rephrase.

5           Did you have any conversation with the board

6   about hiring a new manager?

7      A.    Absolutely.  That is one of the

8   things -- even with the old board, the one thing we

9   are talking about is basically -- I forgot the young

10  lady's name, but anyway, either get a permanent

11  manager at Horizon House, because that was the goal,

12  she was temporary in both boards' mind, the old and

13  the new.

14     Q.    What role did you have in hiring a

15  replacement?

16     A.    I advertised the position in the paper.  If

17  Vondell was the president, I passed it to him; if

18  not, Adrienne, if they liked the ad, I put it in The

19  Washington Post and gathered application.  I normally

20  pass applications to somebody unless somebody was a

21  plumber and they want to -- obviously I wouldn't pass

22  that on but anybody that had association experience,

1   related to associations or not, I would pass it to

2   them and let them decide who they want to interview.

3        Q.   Did you place an ad in the paper?

4        A.   Yes.

5        Q.   And then you collected resumes and did an

6   initial screening just for the basic stuff?

7        A.   Not even that.  I just wanted to see whether

8   they were property managers, some type of property

9   management experience at all.

10       Q.   And then you passed those on --

11       A.   To the board, yes.

12       Q.   And what information did you give to the

13  board about each candidate?

14       A.   I stayed out of it.  I managed apartments

15  for decades.  In association management our function

16  hiring and firing as managers is totally limited.  In

17  this the board of directors calls the shots so I try

18  to stay out of it.

19       Q.   More what I am asking is did you pass them

20  the list of names --

21       A.   No, I passed them the whole packet.

22       Q.   What is included?

1    A.    Whatever they give us, resume, normally it

2   is the resume, and if the board is interested, then

3   we have them fill out Zalco application, but

4   initially it is just resume, cover letter.

5        Q.    Do you remember how many applicants there

6   were, how many there were --

7        A.    We interviewed over a period of months.  It

8   wasn't just a one-time thing so I can't tell you

9   exactly and tell you how many applications I had.  It

10  wasn't just I remember going there Saturday and

11  Sunday -- it is not something I enjoy doing,

12  obviously.

13       Q.    Besides applicants, do you remember how many

14  candidates were interviewed?

15       A.    I can't answer.  I know we interviewed a

16  number of candidates.  Some wouldn't even show up.

17  There is no way to tell.

18       Q.    Of the candidates that were interviewed, do

19  you know how many, if at all, were African American?

20       A.    A lot, in the case of Horizon House, a lot.

21       Q.    Do you remember any type of -- how were the

22  interviews scheduled?

1  and reschedule, but the goal is to get the majority

2  there.

3          BY MS. LOVELESS:

4      Q.  I am going to show you what will be marked

5  as Exhibit 2.

6              (Constant Exhibit No. 2

7              was marked for identification.)

8          BY MS. LOVELESS:

9      Q.  Do you recognize this document?

10     A.  If it is by me, I guess I did write it.

11     Q.  I will give you a minute to review it.

12     A.  Yes, I remember it.

13     Q.  So did you -- this e-mail chain -- there is

14  a few e-mails in here, but did you write at least the

15  top portion of this e-mail on November 23, 2005?

16     A.  I must have.  My name is on it.

17     Q.  Is this a true and accurate copy of the

18  e-mail you sent and received on or about those dates?

19     A.  It makes sense.  Adrienne must have been the

20  board president.

21     Q.  Or she is the one asking you questions?

22     A.  She may have been the board president

1      MS. LOVELESS:   That is why I am asking.

2      MR. DRAIM:   MF 0021.  I don't have the next

3  page.  I guess you don't either.  I will object to

4  the exhibit to the extent that this portion of it

5  would obviously not be complete unless we had the

6  other page.

7      THE WITNESS:   Basically I am answering it

8  again, that is a legitimate complaint.  I am trying

9  to -- the complaint was legitimate from Adrienne,

10  they didn't get sufficient notice.

11      BY MS. LOVELESS:

12      Q.    In this first paragraph, it says in the

13  third sentence, over the past few weeks Ms. Hudson

14  tried on numerous occasions to schedule the board

15  members involved with no success.

16      A.    This whole thing didn't revolve around other

17  candidates.  It was just Jennifer.  That is correct,

18  she wouldn't turn in an application.  But these other

19  two board members didn't complain about Jennifer per

20  se, they complained about the rest of the candidates,

21  not getting involved in the interviews, period.  But

22  this is addressing Jennifer -- Jennifer frustrated

1   the day lights out of all of us because she wouldn't

2   turn in an application.

3       Q.    But it says that Ms. Hudson tried to

4   schedule --

5       A.    On Jennifer, correct.

6       Q.    Did she schedule the interviews with other

7   candidates?

8       A.    If Ms. Hudson scheduled any it would have

9   been through me.  I would have told her to call such

10  and such a candidate.

11      Q.    Then in the next paragraph, it says -- it

12  talks about in the sentence, trust me, we had our

13  share of no shows in the interview, and then to check

14  up on the no shows only to find they found a job.

15      A.    Yes.  I think I said I showed up and no one

16  showed up -- not no one showed up, one or two out of

17  the group we had.

18      Q.    Further delaying this process will be

19  detrimental for attracting candidates for Horizon

20  House?

21      A.    That was me myself talk to encourage them.

22      Q.    So you were trying to encourage them to

1    speed up the process?

2        A.    Right, and that is me.   And for personal

3    motive.   Without a manager there, I would have to be

4    there more often.

5        Q.    I will show you now what will be marked as

6    Exhibit 3.

7                      (Constant Exhibit No. 3

8                      was marked for identification.)

9            BY MS. LOVELESS:

10       Q.    So, then --

11       A.    David and Greg, now I have their names.

12       Q.    This e-mail again is a partial -- it appears

13   to be a partial e-mail chain and I am providing

14   everything I have of this e-mail chain, and I am just

15   asking if this looks familiar to you at all, whether

16   you ever received this e-mail or an e-mail like it?

17       A.    It looks like -- yes, these were the e-mails

18   from Vondell the day before.   There was complaint

19   even by Greg at the time, we are not getting

20   sufficient notice.   I have a problem with president

21   and vice president in any association being husband

22   and wife team.   There is inherent problem --

1   it.  I am not criticizing Vondell and Susan.  It is

2   difficult for a relationship like that not to

3   basically decide on the same thing together.

4        Q.    But as far as you know there was nothing in

5   the Horizon House bylaws prohibiting that?

6        A.    No, there was nothing prohibiting that,

7   correct.

8        Q.    So with this interview process --

9        A.    Keep in mind this all got there before

10  Michael got there.  So there were problems there --

11       Q.    Did you ever hear from the board of

12  directors who they decided to hire as a property

13  manager?

14       A.    I am trying to figure out how this went

15  about.  I am not 100 percent clear on what happened

16  because of the various interviews that were

17  conducted, but I believe at the end of the day, we

18  had three candidates, and, again -- the interviews

19  only took place either between Susan and Vondell or

20  Susan, Vondell and Greg.  At the end of the day, I

21  believe, they had decided on three candidates -- the

22  end of the day, after all the rest of the times we

1    interviewed people, during the time Michael Ford was

2    interviewed, and Michael was one of them.  There was

3    another gentleman, I believe, that they wanted at

4    Horizon House.  I can't remember his name either and

5    there was a third gentleman that they were high up on

6    that wanted Horizon House.  They were basically

7    talking among themselves, some liked Michael.  I

8    think Susan persevered in persuading Vondell that

9    Michael was a better candidate.

10        Q.    Were you at the meeting --

11        A.    Yes, I was at the meeting where -- I don't

12   know if they decided that day but I think that

13   meeting, I think pretty much there was some sort of

14   agreement at least, I don't know if it was final

15   decision, there was some sort of agreement and then

16   they didn't want Michael there after Susan convinced

17   Vondell, you have two out of three, that is why the

18   husband and wife team is a problem in community

19   association, they liked the second candidate -- there

20   was enough support for the second KAEBD date, that

21   they were bringing both in --

22        Q.    Did they eventually make a decision --

1     A.    I don't recall if it was done at that

2    meeting.  I assume they make the decision because

3    Michael Ford ended up at Horizon House.

4     Q.    So you don't recall when they --

5     A.    I don't recall the date.  Obviously they

6    made a decision.

7     Q.    And you were notified of that decision?

8     A.    I was notified that it was Michael and the

9    other candidate was supposed to come in, they were

10    supposed to be co-managing Horizon House and the

11    other one turned it down.

12     Q.    And the other candidate turned it down?

13     A.    He had a lot of experience.  He wasn't about

14    to co-manage with another manager.

15     Q.    After they had decided to hire Michael Ford,

16    was there a background check conducted?

17     A.    Yes, all candidates, all of ones they

18    picked, there was a background check, they picked

19    three.  That was before they hired him.

20     Q.    Before they hired him --

21     A.    On all three candidates they liked.

22     Q.    And did you provide all of the board of

1      BY MS. LOVELESS:

2      Q.     Yes or no.

3             MR. DRAIM:  He can answer it the way he

4  feels like.

5             THE WITNESS:  I don't recall.

6             BY MS. LOVELESS:

7      Q.     So you did -- do you remember the result of

8  the background check on Michael Ford?

9      A.     Yes.

10     Q.     Can you tell us what it produced?

11     A.     The one thing that stuck to my mind is there

12  was a sexual assault charge against him.

13     Q.     Did you have any discussions with the board

14  about this?

15     A.     Yes.

16     Q.     These charges.  What were the discussions?

17     A.     Just one board member, Vondell.  I talk with

18  the board liaison.  My advice was not to hire Michael

19  Ford.

20     Q.     In your experience, do you know whether or

21  not these types of allegations against a manager are

22  relatively common for a manager who is trying to

*Interviews*

Subj:   **RE: Interviews**
Date:   11/23/2005 2:23:52 PM Eastern Standard Time
From:   MCONSTANT@zalco.com
To:     hhagarre@comcast.net, lalift1@aol.com, dfaison@photon.com, VondellCar@aol.com,
        gw@aerobiological.com, Lalift1@aol.com, dfaison@photon.com

Hi Adrienne,

I saw numerous e-mails from Vondell pleading all Board members to schedule themselves for these interviews. Due to the lack of response and time lapse, most of the folks in the first group that was to be interviewed found other jobs.

Regarding Jennifer, to my knowledge, the Board changed one or two days, Shelley called her on multiple occasions trying to setup other days.

Thank you,

Michael

> ----Original Message----
> **From:** hhagarre@comcast.net [mailto:hhagarre@comcast.net]
> **Sent:** Tuesday, November 22, 2005 5:30 PM
> **To:** CONSTANT, MICHAEL; lalift1@aol.com; David Faison; VondellCar@aol.com; gw@aerobiological.com;
> Lalift1@aol.com; David Faison
> **Subject:** RE: Interviews

> I can't attend an interview that I don't know anything about!!  - I don't think anyone else in the world can either.

> As far as Jennifer is concerned it seems the problem is less setting up interviews with her as it is the board keeping those committments.

> Adrienne

Constant
EXHIBIT NO. 2
10-20-09
C. JARDIM

> ---------- Original message ----------
> Hi Adrienne,

> You are correct, Ms. Hudson is a Zalco Administrative Assistant. She's not my personal assistant, she helps more than one property manager. Over the past few weeks, Ms. Hudson tried, on numerous occasions, to schedule an interview between the Board members involved in the manager's interview process and Jennifer with no success. I have to manage multiple properties and the three Board members who are interviewing the prospective manager have regular jobs, but we all found the time to attend these interviews time and again, even during the weekend. I don't know how about other managers, but when I want to get a job, I will show up at the convenience of the Board, the management company, or both.

> There will be 47,000 additional condominium units added in the DC area within the next couple of years. This is in addition to the multitude of condominiums and Associations already in existence. We are already experiencing a severe shortage of qualified staff, both in terms of property and site managers. Good property managers looking for work don't last long. Trust me we had our share of "no shows" during the interview process. I checked up on the no shows, only to be told they found a job. I took it upon myself to give all prospective candidates a preliminary interview at Zalco, so I can impress them with what both Zalco and Horizon House has to offer. Once this was done, we had to move ASAP, so as not to loose these candidates to another site. The folks selected to be interviewed by the Board members conducting the interview would have landed a job in no time at all.

> Further delaying this process will be detrimental in attracting qualified candidates for Horizon

MF 0021

Plaintiff's Opposition to Defendant's Motion for Summary Judgment


**Exhibit 4**


Deposition of Bernard J. DiMuro, Esquire
(Dec. 2, 2009) (excerpts)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
----------------------------x
MICHAEL FORD,               :
                           :
          Plaintiff,        :
                           :
          v.                : No. 1:08CV1318
                           :
ZALCO REALTY, INC., et al., :
                           :
          Defendants.       :
----------------------------x
```

Alexandria, Virginia

Wednesday, December 2, 2009

Deposition of

BERNARD J. DIMURO

a witness, called for examination by counsel for

Defendant Mansfield, pursuant to notice and

agreement of counsel, beginning at approximately

10:10 a.m., at the law offices of Hudgins Law

Firm, 515 King Street, Alexandria, Virginia,

before Stephan K. Garland of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190
www.andersonreporting.net

24

1    question, but, no.

2         Q    Then number two, you note that Mr.

3    Mansfield was the attorney for an entity or

4    organization.  Do you agree that Mr. Mansfield was

5    the attorney for Horizon House Condominium Unit

6    Owner's Association during certain times?

7         A    At some points, yes.

8         Q    So is it your understanding that Mr.

9    Mansfield's client was the association?

10        A    Yes.

11        Q    Do you agree that his client was not the

12   board of directors as a group of then five

13   individuals serving in that capacity?

14        A    I think it's proper to say that the

15   client is the association, but since that is an

16   artificial entity, they have to act through

17   persons, so the board is -- are the people you

18   treat as the client.  Sort of a semantical issue I

19   guess.

20        Q    But the client to whom the association

21   attorney owes his duties is the association as an

22   entity?

57

1    from the interrogatory answers or maybe in the

2    transcripts was that he thought it curious that

3    Carter would be in favor of hiring Ford as a

4    property manager with all that that role entails

5    given the earlier assault conviction and the

6    pending charges.  I don't want to characterize how

7    serious either of those was, but that's generally

8    his -- his position.

9        Q    And you understand that?

10       A    I understand that to be his position.

11      Q    Do you agree that it was not an

12    unreasonable consideration that perhaps some past

13    affiliation including work or friendship between

14    Mr. Carter and Mr. Ford may have accounted for why

15    Mr. Carter wanted to hire him notwithstanding that

16    record?

17       A    No, I actually fail to see the logic

18    myself.  I think it's highly unreasonable, and

19    coupled with the fact that he's investigating his

20    board president without telling him.  I mean, just

21    ask the board president himself directly how do

22    you know Mr. Ford, so I fail to see the logic of

64

1    Segar or his company conducted any search beyond

2    publicly available information?

3         A    No.

4         Q    Would it be your opinion that Mr.

5    Mansfield would have exceeded the scope of his

6    authority if he simply on his computer did a

7    Google search of Michael Ford to see what

8    information he might see that's out there on the

9    internet?

10        A    And charge the client for it?  Arguably

11   so.  A lawyer doesn't have a general agency to do

12   the scope of work -- any scope of work they want

13   to do.  They have to be -- it has to be within

14   their scope of work so that they can then charge

15   the client.  Now, if he's told by the client

16   please -- please see what you can find out about

17   Mr. Ford, you know, in this day and age going to a

18   Google check would be a logical place to go.

19        Q    Is it your opinion that Mr. Mansfield

20   should not have charged for Jay Segar's

21   investigation?

22        A    It's my understanding this wasn't

66

```
 1          A     I don't know.  By this point in time the

 2     second -- what I guess you all have been calling

 3     the second board of directors is in place and so

 4     the ones who were being investigated, Mr. Carter,

 5     had already been asked not to be a board member

 6     anymore.  So I don't know who would have had the

 7     inclination to question that, but I'm quite

 8     confident that the board in the timeframe of

 9     December 14, 2005, did not authorize nor did they

10     indicate that it was in the scope of

11     representation to do -- put investigators on Mr.

12     Carter and his wife or Mr. Ford.

13          Q     Do you see the very first sentence of

14     Exhibit 4 which is Mr. Morgan's December 14, 2005

15     letter to Jay Segar?

16          A     Yes.

17          Q     That refers to the case being one

18     "regarding the hiring of a property manager with

19     pending sexual battery charges."  Do you see that?

20          A     Right.

21          Q     So you agree that the expressed concern

22     by Mr.  Morgan related to the fact that Mr. Ford
```

72

1    attorney for the association would not be

2    authorized to assist in providing notice of that

3    fact to the members who comprise the association

4    that he represents?

5        A    I don't think that's his job, and of

6    course it all depends on the circumstances of --

7    and his motivations which is again here for the

8    fact finder in this case.  I think he -- I think

9    that's up to the board of the -- of the

10   condominium.

11       Q    Let me give you a hypothetical.  What if

12   the board of the condominium association were to

13   hire as a building manager with access to all the

14   units someone who is the subject at the time of

15   pending sexual assault charges and the board

16   president does not notify the residents and

17   directs others not to notify the residents and

18   subsequently a resident is attacked in that

19   condominium?  Would the lawyer be questioned for

20   not having done anything?

21       A    Would he be questioned?

22       Q    Yes.

83

1     on Thursday, February 2, 2006?

2          A    I don't think it's the official notice.

3     I think it references the notice.  It's somebody's

4     -- somebody's discussion of issues.

5          Q    Is there any reference in this document

6     to Mr.  Ford's race?

7          A    I don't believe so.

8          Q    Is there any discussion in this document

9     of Mr.  Carter's race?

10         A    I don't believe so.

11         Q    In the middle of page 4 of your report

12    you state that Mr. Mansfield, and I'm

13    paraphrasing, participated in a number of meetings

14    with individual groups and groups of residents and

15    that he billed for the time in those meetings.  Do

16    you see that?

17         A    Yes.

18         Q    Is it your opinion that as attorney for

19    an association, Mr. Mansfield was not entitled to

20    speak with persons who were members of the

21    association and who helped comprise the

22    association that was his client?

84

1         A     At the point in time we're talking here,

2    it's my belief he wasn't the lawyer for the

3    association.

4         Q     You don't give a timeframe.  What

5    timeframe then are you referring to in your

6    paragraph?

7         A     January 23 to February 2, and to the

8    extent -- so in that timeframe, and then to the

9    extent that prior to that timeframe when he was --

10   he was counsel, to the extent he was acting

11   against the interests of certain board members and

12   with -- with bad intent planning to have them

13   removed, then he's outside the scope of his

14   representation.

15        Q     When you used the term planning to have

16   them removed, if the decision to remove the

17   directors, I know you've indicated you have not

18   actually reviewed the bylaws provisions as to the

19   procedures, but you don't have any reason to

20   understand do you that the decision was up to the

21   association counsel to decide whether to remove

22   the directors?

103

1    Mansfield in any of the underlying actions at

2    Horizon House prior to filing of the lawsuit

3    constituted a conflict of interest.  Do you agree?

4          A     The order does not state the finding

5    upon which the motion to disqualify is based.

6          Q     You don't have any understanding do you

7    that Judge Alper made any finding that Mr.

8    Mansfield had taken any actions in a conflict of

9    interest prior to filing the lawsuit in Arlington

10   Circuit Court do you?

11         A     That's the way I read her transcript,

12   that she found he had a conflict in representing

13   the parties that he attempted to represent.

14         Q     Do you agree that the rulings as

15   expressed at the hearing were to the effect that

16   he would have a conflict if he were to serve as

17   counsel in the suit and for that reason he was

18   disqualified from so acting?

19         A     I disagree.  I think the judge bases her

20   decision on -- on both his conflict in

21   representing -- attempting to represent

22   conflicting parties or parties with whom he has a

106

1          A     I think we're saying the same thing,

2     that she wasn't analyzing the conflict of his --

3     the potential conflict or the asserted conflict of

4     his prelitigation activity, but the -- because of

5     the dual representation of these two boards or

6     these concurrent representations or consecutive

7     representation of the two boards, he had a

8     conflict in filing and maintaining the litigation.

9     I think we're saying the same thing.

10         Q     Thank you.  You note that Judge Alper

11    uses the word "or" there on line 16 of page 22.

12         A     Twenty-two?

13         Q     Page 72, line 16.

14         A     Right.

15         Q     When she says having represented both

16    boards or been retained by both boards.  Do you

17    see that?  Do you agree that the first part of

18    that is actually perhaps inaccurate, that when the

19    judge indicates or suggests that he has

20    represented the boards, you agreed previously that

21    the representation would be of the association as

22    an entity and not the board?

108

1     that he's a witness later on and then have the

2     trial delayed, so she was referring to her control

3     of the trial docket.  A conflict as well as being

4     a witness can be of similar import, but she was a

5     little -- she was concerned about the trial date

6     being continued.  So I wouldn't agree with you.

7          Q    She certainly does express doesn't she

8     that she had a concern that Mr. Mansfield and

9     members of his firm would be witnesses in the

10    case.  Correct?

11         A    Yes, absolutely.

12         Q    You mentioned earlier that in addition

13    in the items outlined in your report as the

14    manners in which Mr.  Mansfield exceeded the scope

15    of his representation as association counsel that

16    there was also from Mr. Mucklow's testimony.

17         A    I'm happy to restate it.  Mr. Mucklow

18    testified as -- as I read it that at Ms.

19    Garretson's direction he was working with Mr.

20    Mansfield for -- to plan for or to implement the

21    removal of the three directors she was adverse to.

22    I'm sure it's embodied in my report, it's just

117

1     O'Keefe and Mr. Mansfield -- sue Zalco and you

2     indicated you were uncertain whether you had seen

3     any documents referenced that.  I would like to

4     refer you to Document Number 37 listed in your

5     report which I'll have introduced as Exhibit No.

6     17.

7                    (Deposition Exhibit No. 17 was

8                    marked for identification.)

9            BY MR. KABAT:

10     Q    On page 640, paragraph number nine, it

11     says, on December 5 Mr. Constant reported that he

12     and him, Ford, were accosted when he was

13     introducing him to the -- Adrienne contacted -- to

14     tell him that Jennifer was going to take legal

15     action -- threatening emails to Zalco regarding

16     the ultimate -- Mr. Mansfield contacted Zalco on

17     Jennifer's behalf for her reinstatement -- does

18     that refresh your recollection as to the basis?

19     A    Yes, I had -- I had this document as I

20     noted at the beginning of the deposition.

21     Q    Mr. Draim also asked you about the

22     disclosure of Mr. Mansfield's January 17, 2006

119

```
 1              THE WITNESS:  No.

 2              BY MR. KABAT:

 3         Q    If I understand your testimony -- that

 4    the board of directors is the one who have the

 5    authority to disclose the letter?

 6              MR. DRAIM:  Objection.  Asked and

 7    answered and foundation.

 8              THE WITNESS:  I'm sorry.  The question

 9    again?

10              BY MR. KABAT:

11         Q    Let me restate the question.

12         A    And you can have your objection, Mr.

13    Draim.

14         Q    Is it your testimony that only the board

15    of directors could authorize -- of the

16    attorney-client privilege letter to other people?

17         A    Yes.

18              MR. DRAIM:  Object to form, foundation

19    and asked and answered.

20              BY MR. KABAT:

21         Q    Can an attorney unilaterally waive the

22    privilege as to attorney-client communications?
```

120

1          MR. DRAIM:  Same objection.

2          THE WITNESS:  No.

3          MR. KABAT:  You were asked on page 4 of

4    your report with reference to Mr. Mansfield's role

5    with the concerned citizens' group and you

6    mentioned various preparatory efforts.  I'll like

7    to refer you to Mr.  Mansfield's invoice of

8    January 2006 which is Document Number 29 in your

9    report.  I'll have that marked as DiMuro Exhibit

10    19.

11              (Deposition Exhibit No. 19 was

12               marked for identification.)

13          BY MR. KABAT:

14     Q    I'd like to direct your attention to

15    page -- which is also marked as page 7 at the

16    bottom.  The very top entry says for January 19,

17    2006 -- revised slash -- do you think it's

18    appropriate for an attorney for the association to

19    be involved in revising, editing and finalizing

20    petitions for the removal of the directors?

21          MR. DRAIM:  Objection as to form.

22          THE WITNESS:  No, I don't think so.

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| MICHAEL FORD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08-cv-1318 (LO/TRJ) |
| | ) | |
| ZALCO REALTY, INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## Expert Report of Bernard DiMuro, Esquire

I am providing an expert opinion in rebuttal to the opinions or statements of Kenneth E.

Chadwick, Esquire, in his report dated October 14, 2009.

First of all, Mr. Chadwick's expert report does not state the factual basis, if any, for each

of his opinions or statements, as required by Fed. R. Civ. P. Rule 26(a)(2)(B)(i). Therefore, it is

difficult to determine what facts and information if any he considered or relied upon to render

these opinions.

Despite this limitation to his opinions or statements, I put forward below the expert

opinions he appears to be offering of relevance to this case. First of all, he appears to be stating

that Mr. Mansfield, in the actions of which Mr. Chadwick is aware, properly acted as counsel for

the Horizon House Condominium Unit Owners Association ("Association") in that he informed

the Board of Directors of the Association about information pertaining to plaintiff. Second, he

appears to be stating that because Mr. Mansfield was acting as an attorney for the Association,

who advised the Board of Directors of the Association, he was not taking actions that affected

Mr. Ford, and, therefore, could not be liable to Mr. Ford. He also offers an opinion that Mr.



Mansfield's actions were not racially motivated.

My expert opinions are as follow:

(1)     It is clear that Mr. Chadwick's expertise does not include (as a matter of law or fact) the expertise to express a legal opinion as to whether Mr. Mansfield acted in a discriminatory manner toward Mr. Ford. He also is not permitted to offer a legal opinion as to the ultimate issues to be decided by the jury.

(2)     As attorney for an entity or organization, Mr. Mansfield was retained by the entity to provide legal services, advice, and counsel to the entity, not to any particular member of the Association. Moreover, as attorney for the entity, Horizon House Condominium Unit Owners Association, Mr. Mansfield was legally required to take direction from the Board of Directors of the Association or the designee of the Board of Directors.

There has also been evidence introduced that indicates the particular practice of the Board of Directors of the Association, both when Adrienne Garretson was President and when Vondell Carter was President, was that all direction to Mr. Mansfield was transmitted through the President, and not any other individual board member.

Therefore, Mr. Mansfield's scope of representation was limited by the requests made of him by the Board of Directors, or the Board of Directors' designee, if any.

Moreover, Mr. Mansfield was required to maintain as confidential his communications with the Board of Directors, unless the Board of Directors agreed that those communications could be distributed beyond the Board of Directors.

(3)     From the materials that I have reviewed, Mr. Mansfield exceeded the scope of his representation on multiple occasions. Mr. Mansfield also acted as attorney for the Association even after the board of directors of the Association properly terminated his services as attorney

2

for the Association.

Therefore, Mr. Mansfield did not act as an attorney for the Association when he took many of the actions that I understand to be central to this case.

For example, Mr. Mansfield acted personally on behalf of Jennifer O'Keefe, the resident manager of Horizon House and an employee of the Association's management company, Zalco Realty, when he threatened to sue Zalco for Zalco's termination of her employment. Because the Association had retained Zalco to be its management company, and because the Board of Directors had not directed Mr. Mansfield to threaten this lawsuit, he was acting outside the scope of representation when he made these representations on behalf of Ms. O'Keefe.

Mr. Mansfield also acted on behalf of one of the board members who had indicated her intention to resign when he threatened to sue Zalco on behalf of that board member (Adrienne Garretson) to obtain some financial records from Zalco, including records about the plaintiff in this action. He was acting beyond the scope of representation as the Board of Directors had not directed him to take this action.

Mr. Mansfield engaged private investigators to conduct background checks on Michael Ford and Vondell Carter, the President of the Association, to see if they were related, as they were both African American. The Board of Directors did not authorize Mr. Mansfield to hire private investigators to conduct these background checks, or to charge the Association for the private investigators, and, therefore, he exceeded the scope of his representation by doing so.

Mr. Mansfield wrote a letter to the Board of Directors on January 17, 2006, in which he made representations about Mr. Ford, some of which the plaintiff contends were false, and in which he calls for the removal of three of the five members of the Board of Directors. This letter was clearly not an authorized action on behalf of the Association, and no board meeting had been

3

held to vote on whether Mr. Mansfield should write such a letter. Although he marked the letter as attorney-client privileged, he authorized one of the remaining two board members to distribute the letter throughout the building, to owners and renters in the building, including persons who were not members of the Association. His office subsequently facilitated distribution of this letter and other materials to all residents in the building to generate support for removal of three of the five directors on the Board of Directors. In writing this letter and facilitating its distribution beyond the board of directors, Mr. Mansfield was acting beyond the scope of his representation of the Association, and acting in derogation of confidentiality he owed to the Association as its attorney.

Mr. Mansfield then participated in a number of meetings with individual residents and groups of residents, such as the Concerned Citizens group, in which he made charges against Mr. Ford and Mr. Carter. He billed the Association for the time to prepare for and participate in those meetings. His participation in these meetings and the comments he made in these meetings were not authorized by the Board of Directors, and contrary to the interest of three members of the Board of Directors. Therefore, his participation exceeded the scope of representation and breached his duty of confidentiality to the board of directors, insofar as he revealed confidential information and allegedly false information to members of the Association outside the Board of Directors.

On or about January 18, 2009, through an email vote, and then on January 23, 2009, in a duly noticed meeting, the Board of Directors voted to terminate Mr. Mansfield's services and to retain another law firm to represent the Association. Mr. Mansfield continued to hold himself out as an attorney for the Association, and billed the Association, even though the Board of Directors had properly terminated him. Any actions he took after he had been properly

4

terminated, including his participation in meetings of the Concerned Citizens, and other meetings of the Association at which a vote was taken to remove three of the directors of the Board of Directors, were outside the scope of his representation.

At the same time that Mr. Mansfield held himself out to be attorney for the Association (even though the board had twice voted to terminate him as Association attorney), Mr. Mansfield's firm entered into a retainer agreement with three individual members of the Association who were not on the board and whose interests were adverse to three of the board members. In representing these three individuals, Mr. Mansfield had a clear conflict of interest, and therefore, exceeded any scope of representation of the Association.

Prior to the February 2, 2009 meeting, at a time when the Board of Directors had terminated his representation of the Association, Mr. Mansfield filed a suit against the Association to obtain a room for a group of residents to hold an Association meeting. At that time, Mr. Mansfield was no longer attorney for the Association, and could not file an action on its behalf.

(4)     Ms. Mansfield's actions and his representation and attempts to represent parties in Horizon House Condominium Unit Owner's Association ("HCUOA") v. Carter and The Board of Directors of HCUOA v. Garretson constituted a conflict of interest. Contrary to Mr. Chadwick's opinion that Judge Alper's rulings on April 12, 2006 were based solely because Mr. Mansfield was a witness in these cases, Judge Alper's rulings also reflect that she found Mr. Mansfield to have a conflict of interest.

(5)     In summary, Mr. Mansfield exceeded the scope of his representation of the entity, the Horizon House Condominium Unit Owners Association, as described above. Mr. Mansfield violated the duty of confidentiality he owed to the Horizon House Condominium Unit Owners

5

Association, in distributing information beyond the Board of Directors, without authorization, and in distributing information to members of the Association beyond the board and to renters in the building, without board authorization.

Mr. Mansfield also took actions when the Association Board of Directors had properly terminated his as the attorney for the Association, which actions were either on his own behalf, or on behalf of clients other than the Association. Mr. Mansfield also engaged in numerous conflicts of interest by purporting to represent the Association and at the same time representing individual members of the Association, individual members of the Board of Directors, or himself, in legal and other actions that were contrary to the interests of the majority of the Board of Directors of the Association.

**Data or Information Considered by the Witness:**

Pleadings and discovery documents. An asterisk indicates those items that were also listed in Mr. Chadwick's report.

1. J. Mansfield letter to Board (June 21, 2005) (Carter 0063-0064)

2. A. Garretson email to J. O'Keefe (Dec. 2, 2005) (Carter 0085-0089)

3. A. Morgan letter to J. Seegar (Dec. 14, 2005) (Mansfield 0713-0715).

4. A. Garretson email to A. Dubin, M. Falla, and J. Mansfield (Dec. 20, 2005) (Mansfield 0655-0656).

5. Background check on Susan Morris (Dec. 20, 2005) (Mansfield 0858-0871).

6. Background check on Vondell Carter (Dec. 20, 2005) (Mansfield 0887-0901 & 0928-0930).

7. Background check on Michael Ford (Dec. 21, 2005) (Mansfield 0736-0749).

8. J. Garner memo to J. Mansfield (undated) (Mansfield 1013-1018).

9. J. Mansfield letter to M. Constant (Jan. 12, 2006)

10. J. Mansfield letter to V. Carter, et al. (Jan. 17, 2006) (MF 0032-0034).

11. E. Mucklow email to A. MacAdam (Jan. 19, 2006) (Carter 0249-0251).

12. V. Carter letter to J. Mansfield (Jan. 19, 2006) (Mansfield 1118)

13. J. Mansfield letter to V. Carter (Jan. 19, 2006) (Mansfield 1055)

14. Concerned Citizens Meeting Agenda (Jan. 19, 2006) (Mansfield 1242)

15. Concerned Citizens Meeting Agenda (Jan. 19, 2006) (MF 0035-0036)

16. V. Carter letter to J. Mansfield (Jan. 20, 2006) (Mansfield 1196, 1211)

17. J. Garner email to J. Mansfield (Jan. 23, 2006) (Mansfield 1068-1070)

18. Retainer Agreement (Jan. 23, 2006) (Mansfield 1066).

19. Petition for Special Meeting on Feb. 2, 2006 (Jan. 23, 2006) (Mansfield 1229-1241)

20. J. Mansfield notes (Jan. 23-24, 2006) (Mansfield 1364-1366).

21.   Transcript of Jan. 23, 2006 Board Meeting (Jan. 23, 2006) (Mansfield 1283-1306)

22.   J. Segar letter to A. Morgan (Jan. 26, 2006) (Mansfield 1019-1021).

23.   Mansfield, December 2005 invoice to Horizon House (Jan. 27, 2006) (Carter 0297-0302).

24.   Agenda for Special Meeting on Feb. 2, 2006 (Feb. 2, 2006) (Mansfield 1308-1310)

25.   J. Mansfield letter to M. Ford (Feb. 2, 2006) (Mansfield 1039-1040)

26.   Transcript of Special Meeting on Feb. 2, 2006 (Feb. 2, 2006) (Mansfield 1311-1345)

27.   Complaint, Horizon House v. Carter, et al. (Feb. 10, 2006) (Mansfield 0036-0123).*

28.   Complaint, Board of Directors v. Garretson, et al. (Feb. 15, 2006) (Mansfield 0303-0325).*

29.   Mansfield, January 2006 invoice to Horizon House (Feb. 16, 2006) (Carter 0439-0449).

30.   Mansfield's Motion for Substitution of Counsel (Feb. 17, 2006) (Mansfield 0297-0298 & 0291-0292).

31.   Order (Feb. 17, 2006) (Mansfield 0281-0283).*

32.   Mansfield's Entry of Appearance (Mar. 10, 2006) (Mansfield 0241-0242).

33.   Order (Mar. 17, 2006) (Mansfield 0229-0230).

34.   Motion to Disqualify Counsel (Mar. 24, 2006) (Mansfield 0192-0198).*

35.   Response to Motion to Disqualify Counsel (Mar. 31, 2006) (Mansfield 0183-0187).*

36.   Retainer Agreement with Paula Garner, Wendy Schacht, and Marie Eckes (Jan. 23, 2006) (Mansfield 1066).

37.   J. Mansfield fax to B. Daly (Feb. 22, 2006) (Mansfield 0637-0643).

38.   Mansfield, February 2006 invoice to Horizon House (Mar. 16, 2006) (Mansfield 1426-1441).

39.   Order (Mar. 17, 2006) (Mansfield 0229-0230).

40.   Transcript (Apr. 12, 2006) (Mansfield 0432-0445).

8

41.  Order (Apr. 24, 2006) (Mansfield 0034-0035).*

42.  Plaintiff's First Amended Complaint (April 21, 2009).*

43.  Defendant's Motion to Dismiss and Memorandum in Support (May 5, 2009).*

44.  Plaintiff's Opposition to Defendant's Motion to Dismiss (May 19, 2009).*

45.  Reply to Plaintiff's Opposition (May 26, 2009).*

46.  Defendant's Answer to First Amended Complaint (June 25, 2009).*

47.  Plaintiff's Answers to Interrogatories (Sept. 11, 2009).*

48.  Defendant's Supplemental Answers to Interrogatories (Oct. 2, 2009).*

**Qualifications and Prior Expert Testimony within the last four years:**

My qualifications are set forth in the attached resume.  I believe that in the last four years I was an expert witness for the plaintiff in Spiegel v. Burgess, a case known to the defendant's counsel in this case, because they were the defense counsel in the Spiegel case and took my deposition.

**Statement of the Compensation to be Paid:**

My hourly rate for expert testimony is $450.00.

Dated: October 29, 2009

Bernard J. DiMuro, Esquire

9



# DiMuroGinsberg pc
### ATTORNEYS AT LAW

## CURRICULUM VITAE
### BERNARD J. DiMURO

Partner, DiMuroGinsberg, P.C.

Licensed in Virginia (1979), Illinois (1980) and District of Columbia (1985). Admitted before the U.S. Supreme Court and numerous federal courts

Professional emphasis: Civil Litigation and Professional Responsibility - "AV" Rated

Qualified as an expert witness in state and federal courts on matters relating to professional responsibility

## EDUCATION

George Washington University National Law Center, Juris Doctor, 1979
Northwestern University, Bachelor of Arts, Political Science, 1976

## PROFESSIONAL ACTIVITIES

Virginia State Bar
- President (2002-2003)
- Executive Committee (2000-present and 1995-1997)
- Council Member (1999-present; 1991-1997)
- Co-Chair, Advertising Task Force (2004-)
- Vice-Chair, Standing Committee on Budget and Finance (2004-)
- Member, Leadership Task Force (2004-)
- Council Liaison to Lawyers Helping Lawyers Committee (1999-present)
- Chair, Task Force on Public Access to the Disciplinary System (2000-2001)
- Member, Task Force on Corporate Counsel (present)
- Member, Budget and Finance Committee (2000-present)
- Member, Continuing Legal Education Committee (2000-present)
- Member, Committee to Study the Code of Professional Responsibility (1995-present)
- Member, Committee on Public Information and Public Relations (1996-present)
- Chair, Virginia Disciplinary Board (1993-1995)
- Member, Virginia Disciplinary Board (1988-1995)
- Faculty Member, Course on Professionalism (1996-1999)
- Member, Committee on Lawyers Serving as Fiduciaries (1994-1995)



# DiMuroGinsberg pc
### ATTORNEYS AT LAW

> - Member, Committee on Advertising and Solicitation (1991)

## PROFESSIONAL ACTIVITIES CONTINUED

- Member and Chairman, 8th District Grievance Committee (1985-1989)
- Chair and Member, Alexandria Bar Fee Arbitration Committee (1988-1990)
- Fellow, American Bar Association (Inducted 1998)
- Fellow, Virginia Law Foundation (Inducted 1995)
- Delegate, American Bar Association (1997-)
- Chair & Member, Merit Selection Panel for Magistrate Judges (E.D. Va.) (1993-1999)
- Member, Board of Governors, Virginia Trial Lawyers Association (1997-present) (1986)

## PROFESSIONAL ORGANIZATIONS AND CIVIC ACTIVITIES

- Virginia Bar Association
- Virginia Women Attorney's Association
- Local Government Attorneys' Association
- American Bar Association
- Virginia Trial Lawyers' Association
- Board of Directors, Virginia Special Olympics
- Chair, "Winner's Circle", Virginia Special Olympics
- Trial Lawyers for Public Justice (Recipient, Public Justice Award, 1995); Finalist, Trial Lawyer of the Year (2006)

## LECTURER
### EMPLOYMENT LAW

- Employment Law In Virginia: Age Discrimination, Virginia CLE
- Annual Employment Law, Fairfax Bar Association
- 6th Annual Employment Law Update, Virginia CLE
- Employment Law Update, Alexandria Bar Association
- Council on Education in Management 7th Annual Virginia Personnel Law Update
- "Defending Sexual Harassment Claims," National Business Institute
- "The Borderline Employee: Keep or Fire?" Council on Education in Management
- Annual District of Columbia Personnel Law Update

2

DG

DiMuroGinsberg pc
ATTORNEYS AT LAW

- "The Borderline Employee: Keep or Fire?" Council on Education in Management
- 6th Annual Virginia Conference Personnel Law Update
- Metropolitan Washington Employment Law Association Annual Seminar
- "Sexual Harassment in the Workplace:  The Law & Litigation Tactics," Alexandria Bar Association

## LECTURER CONTINUED

- "Defending Wrongful Discharge Claims Under Virginia Law," National Business Institute
- "Damages Issues In Jury Trials," Virginia Bar Association Annual Labor Conference
- Employment Law Update, Virginia State Bar CLE
- Council on Education in Management Personnel Law Update Conference
- Numerous private consultations and lectures as Founder and President, The Civil Workplace, Inc.

## PROFESSIONAL RESPONSIBILITY

- Virginia CLE: Annual Advanced Business Law
- Virginia CLE: 19th Annual Trusts & Estates Seminar
- Alexandria Bar Association: Ethics in the Information Age
- Virginia CLE: Ethics Update for Virginia Lawyers
- Virginia CLE: Ethics for Virginia Practitioners
- Fairfax Bar Association: 1999 Annual Convention-Ethics Update
- Virginia Bar Association: Professionalism and Civility
- No. Va. Bankruptcy Association: Ethics in Bankruptcy
- Virginia CLE: Ethics Update for Virginia Lawyers
- Virginia State Bar: Annual Ethics Seminar
- Virginia CLE: 1998 Ethics Course
- Virginia State Bar: Professionalism Course
- Virginia CLE: 29th Annual Advanced Business Law
- VTLA: Trial Now and Year 2000
- Virginia CLE: 18th Annual Construction Law & Public Contracts Seminar
- Virginia CLE: 28th Annual Advanced Business Law
- Virginia CLE: Ethics for Virginia Practitioners
- Arlington County Bar Association 1996; 6th Annual Ethics Seminar
- Virginia CLE: Ethics for Virginia Lawyers: A Potpourri of Hypotheticals

3

**DG**

# DiMuroGinsberg pc
ATTORNEYS AT LAW

- Virginia CLE: Ethics Update for Virginia Lawyers
- 17th Community Association Institute's Seminar: "Ethics and the Association Counsel"
- Virginia CLE 16th Annual Construction Law and Public Contracts Seminar
- Virginia CLE 26th Annual Advanced Business Law Seminar
- First Annual Lawyers Helping Lawyers Conference: "Ethical Considerations"
- Arlington County Bar Association 1995 Annual Ethics Seminar
- VTLA Family Law Seminar: "Ethics Traps for Unwary Practitioners"

## LECTURER CONTINUED

- Virginia State Bar Disciplinary Conference
- Prince William Bar Association: Annual Ethics Seminar
- Virginia Law Foundation CLE: "Disciplinary Process in Virginia-Practical Advice"
- VTLA Annual Ethics Seminar
- Alexandria Bar Association: "Nuts & Bolts of the State Bar Disciplinary Process"
- VTLA Annual Ethics Seminar
- VTLA 3rd Annual Paralegal Seminar: "Lawyers and Clients' Secrets and Confidences"
- Department of Justice Ethics Panel Seminar for U.S. Attorneys
- Arlington Bar Association Fourth Annual Ethics Seminar
- National Business Institute: "Bad Faith Litigation in Virginia"
- Arlington Bar Association: "Legal Ethics and Professional Responsibility"
- National Education Network: "Ethical Issues For Everyday Practice"
- VTLA: "Legal Ethics of Advocacy"
- Virginia Association of Defense Attorneys 18th Annual Meeting: "Ethics and Trial Advocacy"
- Alexandria Bar Association Open Forum on Ethics: "Ethics For The Trial Attorney"
- Virginia Law Foundation CLE: "Legal Ethics"
- Loudoun Bar Association: 'Lawyer and Client – The Perils of Practice"
- Fairfax County Bar Association: "Child Abuse and Ethics"
- Arlington County Bar Association: "Ethics and Professional Responsibility"
- VBA Young Lawyers Conference: "Practical Considerations In The Ethical Practice of Law"

4



**DiMuroGinsberg** PC
ATTORNEYS AT LAW

## PUBLICATIONS

- Co-Editor, <u>Virginia Employment Law Letter</u>, M. Lee Smith Publishers.
- <u>Rule Change Will Bolster Effective Disciplinary System</u>; "Virginia Lawyers Weekly", March 28, 1994.
- <u>Multiple Chemical Sensitivity: An Emerging Area of Law</u>; Trial Magazine, Association of Trial Lawyers of America, July, 1995.
- <u>To Speak or Not to Speak: Public Employment and the First Amendment</u>; The Journal of the Virginia Trial Lawyers Association, Spring, 1996.

5

VIRGINIA:

　　　　IN THE CIRCUIT COURT OF ARLINGTON COUNTY

- - - - - - - - - - - - - - - - - - - - x

　　　　　　　　　　　　　　　　　　　　　:

HORIZON HOUSE CONDOMINIUM UNIT OWNERS　　:

ASSOCIATION,　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　:

　　　　　Plaintiffs/Cross-Defendants,　:

　　　　　　　　　　　　　　　　　　　　　:

vs.　　　　　　　　　　　　　　　　　　: IN CH. NO.

　　　　　　　　　　　　　　　　　　　　　: 06-200

VONDELL CARTER, et al.,　　　　　　　　: 06-225

　　　　　　　　　　　　　　　　　　　　　:

　　　　　Defendants/Cross-Plaintiffs.　:

　　　　　　　　　　　　　　　　　　　　　:

- - - - - - - - - - - - - - - - - - - - x

　　　　　　　　　　Arlington, Virginia

　　　　　　　　　　Wednesday, April 12, 2006

　　　　　The hearing commenced at 10:20 o'clock, a.m.

　　　　　BEFORE:

　　　　　The Honorable Joanne F. Alper, Judge

　　　　　APPEARANCES:

　　　　　FOR THE PLAINTIFFS/CROSS-DEFENDANTS:

　　　　　JAMES M. MANSFIELD, ESQ.

　　　　　Of:　Hartsoe, Mansfield and Morgan, PLLC

　　　　　10621 Jones Street

　　　　　Suite 201A

　　　　　Fairfax, Virginia　22030

Reported by:　Bernard Engel

EXHIBIT
DiMuro# 11
12/2/09 SG.
PENGAD 800-631-6989

Mansfield0432

**Page 68**

1  they are resolved by counsel. But obviously this
2  case was not -- that did not happen.
3       I'm going to address first the issue of
4  the -- of -- of Mr. Mansfield of -- I can't say
5  plaintiff and defendant, because you are
6  plaintiff and defendant in different cases. Mr.
7  Mansfield's motion to disqualify Mr. Kearney in
8  the -- I guess in the 225 case, the Declaratory
9  Judgment Action, on the grounds that there is an
10  identity -- two of the individuals on the
11  August -- who were on the August Board are also
12  on the, I'll call it "February" Board; and since
13  they are defendants in the Declaratory Judgment
14  Action, Mr. Faison and Ms. Garretson, objecting
15  to Mr. Kearney's representation.
16       And in considering the arguments there
17  are a number of things that strike me. Number
18  one, this is a Declaratory Judgment Action. This
19  is not an action seeking monetary relief or any
20  kind of a -- rather it's a Declaratory Judgment
21  Action saying, "There is a -- there is an
22  election, there is bylaws and there's condo laws
23  and we believe that the election violated those

**Page 69**

1  laws."
2       Whichever way the Court rules, Ms.
3  Garretson and Mr. Faison remain on the Board.
4  Whether the -- whether Mr. Kearney prevails in
5  his action and the second election is
6  invalidated, they are still on the August Board.
7  If Mr. Kearney does not prevail and the Court
8  rules that as a matter of law the second election
9  was valid and proper, they remain on that Board.
10  So there really is no adverse interest.
11       And taking the argument made by Mr.
12  Mansfield to its logical extreme, no attorney
13  could represent the August Board without a
14  conflict, because the August -- because the
15  person -- those individuals would represent to
16  anyone bringing suit against them as defendants
17  in a Declaratory Judgment Action.
18       The Court believes because of the
19  nature of this action, the Declaratory Judgment
20  Action, 06-225, the nature of the relief
21  requested, that there is no conflict requiring
22  disqualification of counsel. So the motion to
23  disqualify Mr. Kearney in 225 is denied.

**Page 70**

1       With respect to Mr. Kearney's motion to
2  disqualify Mr. Mansfield and his firm as counsel
3  for the plaintiff in 200 and I guess the
4  defendants in 225, the Court --
5       MR. MANSFIELD: I don't represent the
6  defendants, Your Honor, in 225.
7       MR. KEARNEY: That's correct, Your
8  Honor. He has not filed an answer, and so --
9       THE COURT: So, no one represents --
10       MR. KEARNEY: It couldn't -- correct.
11       THE COURT: All right. So, no one
12  represents the defendants in 225. All right.
13       Then counsel for the plaintiff in 200:
14  There are two issues here. Number one that has
15  an issue and has been argued about is whether or
16  not -- who -- who does Mr. Mansfield represent?
17  Does he represent the Association? Does he
18  represent the Board?
19       And what is interesting is: First of
20  all, there is definitely contradictory evidence
21  in the Court's files. When Mr. Mansfield says
22  that he doesn't represent the Board, he only
23  represents the Association, that is clearly

**Page 71**

1  contradicted by at least one filing. I didn't
2  make an exhaustive review of the files, but he
3  actually entered that appearance in 225. So, I'm
4  not sure what the status is on that. But, in any
5  event, that was certainly a representation made.
6       Secondly, there is one entity here and
7  that is the Horizon House Unit Owners
8  Association, the individuals who own condominiums
9  in the Horizon House. There were -- I mean, in
10  both cases, each Board, each group of
11  individuals, whether it be the August Board or
12  the February Board are purporting to represent --
13  they are all -- the Board doesn't have an
14  existence in its own right. They are both
15  purporting to represent the same Association.
16       So when Mr. -- Mr. -- Mr. Mansfield
17  says, "Well, I represent the Association,"
18  clearly he has represented both Boards. He
19  represented the August Board; he counseled the
20  August Board when they were in control. He has
21  now counseled the February Board. And -- and in
22  both situations there is an issue.
23       It's almost as though, you know, in any

**Page 72**

1  kind of a condo litigation the condo is
2  essentially suing itself, one Board is suing
3  another, but they are all parties and they are
4  all participants in the same ownership interests
5  in the condominium.
6       And so there is a question there about
7  who is represented. And I don't think that
8  Mr. -- Mr. Mansfield's interests or issues are
9  protected just by saying, "Well, I represent the
10  whole Association." Clearly he was hired by the
11  August Board, he was terminated by the August
12  Board, he was re-hired by the February Board. So
13  the Board action is very important in this case.
14       And that comes to the issue of -- and
15  so I think there is clear issue of conflict in
16  that respect, having represented both Boards or
17  been retained by both Boards with respect to the
18  conflict.
19       Secondarily and of far greater
20  importance to the Court is the issue of the
21  witness, about whether Mr. Mansfield and members
22  of his firm need to be witnesses in this case.
23  What has been proffered to the Court, not simply

**Page 73**

1  by Mr. Kearney, although some of it came -- but
2  mostly from what Mr. Mansfield said in his
3  arguments objecting to disqualification, shows
4  how central he and his firm were to this whole
5  process of -- of -- of the new election and new
6  Board coming into effect after being terminated
7  by the -- by the Board that was headed by Mr.
8  Carter. His own comments, his own arguments here
9  today made it very clear to me that he is a
10  necessary and essential witness and that there
11  would be issues that would be related to him,
12  directed to him, whether it be about the proxies
13  and how they came about and his involvement and
14  his firm's involvement, not simply counting the
15  votes, but far more essential and far more
16  substantive than that.
17       And he is clearly so central to this
18  entire process, but was a witness to what was
19  happening before which gave rise to the issues
20  and both as the -- as what happened in connection
21  with the next election. I think that I've never
22  seen a case where counsel's actions in a matter
23  have been so central to the issues that are the

Mansfield0444

Page 74

1  decisive issues in this case.
2       And that, I think, in and of itself,
3  makes it very clear to this Court that counsel
4  should not continue to act as counsel, as the
5  advocate, in these proceedings; that someone
6  should come in who is not going to be a witness
7  in this case. Someone should come in who could
8  not potentially be a witness. Mr. Mansfield even
9  admits that at some time in the future that might
10  happen.
11       Well, I don't want to see this case
12  happening -- getting up to the date of trial and
13  time is of the essence in this case and then
14  saying, "Well, gee, I am going to be a witness,
15  so I have to withdraw and we need to get new
16  counsel in here." I think that's -- that would
17  be -- that would be doing everyone a disservice
18  in this case, all the homeowners, whether they --
19  whichever side they are aligned to.
20       Accordingly, the Court is going to
21  grant the motion to disqualify plaintiff's
22  counsel and the firm of Hartsoe, Mansfield and
23  Morgan and order that everything be stayed in

Page 75

1  this matter, all discovery actions be stayed for
2  a period of 21 days to allow the February Board
3  to obtain new counsel to represent them in
4  connection with the interests in connection with
5  the litigation in 06-200. All right.
6       MR. KEARNEY: Thank you, Your Honor.
7       THE COURT: All right. And then
8  everything -- as I said, so that will be 21 days
9  from today and then everything would be stayed.
10  There should be no discovery propounded. If
11  there is any discovery that is due, there is a
12  21-day stay and 21 days would be added on to
13  whatever is due in connection with that, so that
14  will give the -- give them time to find -- find
15  new counsel and get new counsel up to speed.
16       MR. MANSFIELD: The only discovery that
17  we've issued is in 200.
18       THE COURT: All right. Well, as I've
19  indicated, let's put a stay on everything and let
20  new counsel look at that and make sure that
21  there's no -- that there's no issues that need to
22  be addressed. All right?
23       MR. MANSFIELD: Very well.

Page 76

1       THE COURT: All right. Mr. Kearney,
2  will you prepare orders in both cases?
3       MR. KEARNEY: I will, Your Honor.
4       THE COURT: All right. All right. So
5  then they will be endorsed and then up to
6  chambers. Thank you.
7       (Thereupon, at 11:35 o'clock,
8        a.m., the hearing in the above-
9        entitled matter was concluded.)

Page 77

1              CERTIFICATE OF REPORTER
2
3       I, Bernard Engel, being a court
4  reporter, do hereby certify that I was authorized
5  to and did report the above and foregoing
6  proceedings, and that thereafter it was reduced
7  to typewriting, under my supervision, and I
8  further certify the pages numbered 3 through 76,
9  inclusive, contain a full, true and correct
10  transcription.
11
12
13       Bernard Engel, Court Reporter
14
15
16
17
18
19
20
21
22
23

Mansfield0445

# HARTSOE, MANSFIELD & MORGAN, P.L.L.C.

10621 Jones Street, Suite 201-B
Fairfax, Virginia 22030-7511
703-591-2503
Facsimile (703) 273-7292

208 South King Street, Suite 203
Leesburg, Virginia 20175-3018
703-771-4200

## FACSIMILE COVER SHEET

DATE:     February 22, 2006

TO:     Bill Daly

FAX NUMBER:     (703) 848-2530

FROM:     James M. Mansfield, Esq.

RE:   Horizon House v. Carter, et al., Case No. 06-200

NUMBER OF PAGES (including cover sheet): 7

MESSAGE:

---

This facsimile cover sheet and any attached documents may contain confidential information. Such documents and information are protected by the attorney/client privilege and/or work-product doctrine, and are intended solely for the use of the above-referenced individual or entity. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this communication in error, please immediately notify Hartsoe, Mansfield & Morgan, P.L.L.C., by telephone and return the original message to the firm at the above address, via first class mail. Thank you.



**Mansfield0637**

February 19, 2006

**MEMORANDUM**

**TO:**   Horizon House Residents

**FROM:**   Susan M. Morris Resident PH 1

**SUBJECT:**   Michael Ford and the Current Situation

On February 17, 2006, the Arlington County District Court Judge gave a temporary injunction to the "Mansfield Board" of seven to continue to keep Horizon House running until a full hearing is scheduled and held.

For those of you who are wondering why we have not resigned and continue not to resign —the answer is simple. We are accused of taking illegal actions or actions that did not take the community into consideration and placed it in jeopardy. These accusations by the so-called unidentified "Concerned Citizens" are baseless and as such, their motives need to be questioned and examined. For that reason, we believe the community will be better served when the truth comes out. Unfortunately, the only way for that to happen now appears to be through the court system. Furthermore, we feel that if it is us today, who will it be in the future? We do not want this to happen again in our homes, where actions are set in motion, individuals are accused without showing proof, and emotional responses are elicited by fear and threats.

**A.  Mr. Michael Ford**

1. First, I want to let you know of the actual circumstances surrounding the placement of Mr. Michael Ford at Horizon House and provide you with information he has allowed me to share with you.  I am sure you will find that the letter Eric Mucklow distributed from Mansfield dated January 17 under "Client Attorney Privilege," was unconscionable, unethical, and politically motivated.

2. Mr. Ford asked that I relate the fact to everyone in the community that he was trying to do his best, often working late nights and weekends, to improve our residence and building. He pleaded "not guilty" and was found not guilty at his trial on January 26. He felt you may not be aware of this and only received the information Mansfield distributed of the charges against him so that they were received by you on the day of his trial. Mr. Mansfield's associate was in court; therefore, he had every opportunity since that time to let the Association know that Mr. Ford was found not guilty and that the plaintiff was found by the female Judge to lack credibility. After Mr. Ford was exonerated, Eric Mucklow told a resident that while he was found innocent this time, he was not found innocent in 1995. Therefore, Mr. Ford also gave me permission for you to receive the following information from him regarding this matter 11 years ago:

> "In 1995, when I was 30 years old, I was preparing for my mother to come and stay here in Virginia with my family and me. Instead, my mother was rushed to the hospital, where she remained in a coma, had a stroke and died 17 days later. It was a great blow to me as her son and as only child. At my mother's funeral, I overheard two of my aunts saying that they believed my uncle had something to do with my

Mansfield0638

mother's death. They believed that my uncle hit my mother that night, causing her to fall and hit her head. I was so angry to think that he may have caused my mother's death, I immediately confronted my uncle about this at the funeral. When I did, he hit me, thinking I was still a 14-year old, whereupon, I defended myself, causing him bodily harm. My uncle was only 9 years older than me and he was drunk. Charges were pressed against me for a misdemeanor assault. I was offered probation, but if I accepted it, I would have lost my Special Police Commission licenses for D.C. Instead, I admitted that I hit him and was sentenced to 60 days, but the Judge released me after serving only 20 days. To this day, my uncle has never answered the question about my mother's death. Who am I to judge him; he will have to answer to God one day. Since then, my uncle and I have gotten past this and maintain a civil relationship for the family."

Michael A. Ford //s//

3. Mr. Ford held Special Police Commission licenses for Maryland, Virginia and D.C. from 1992 through 1997 (after this matter), and did not renew them because he pursued a career in management. He is a disabled veteran having served in the US Army; is one semester from receiving his Bachelor's Degree in marketing and finance; has a Security Guard License; has a CPR certification; has computer skills and has received training in management and accounting.

4. After legal interviews of candidates, the Panel of Michael Constant, Vondell Carter, Susan Morris and Greg Weatherman, determined that Michael Ford was the best qualified and would be hired contingent upon a security check by Zalco. Zalco reported that Mr. Ford had a charge against him by a former tenant. The case was reviewed, along with all available information by Zalco, Board members, and attorneys. Mr. Ford was advised and willingly discussed the matter with the Board members involved, Zalco, and his attorney contacted Mr. Mansfield. Mr. Ford, at Mr. Mansfield's suggestion, agreed to a lie-detector test as long as he did not have to pay the $500 charge.

5. The Board decided not to hire Mr. Ford as the permanent Building Manager until his situation was resolved. Zalco said they would hire him anyway and place him at one of their other sites. Zalco also said that this type of case against Mr. Ford was not atypical in the industry, they were satisfied with his statements, the plaintiff did not show up at his hearing previously, his former employer was contacted and said they would rehire him, his credentials were outstanding, and he said he was not guilty and willing to take a lie detector test. The Board then decided that they would have him assigned as a temporary Building Manager on a 90-day probationary period, or until his case was heard on Jan 26th.

6. Therefore, Vondell contacted Mansfield and advised him that Zalco was hiring Mr. Ford instead of us and told him the arrangements. Mr. Mansfield advised him that this was a good arrangement; they also agreed that by so doing, there would be no liability to Horizon House. It was fully expected that the case against Mr. Ford would either be dismissed or positively resolved in his favor. He was placed at HH as a contractor on a 90-day probationary period during which time his case would be heard, after which he would either be removed or hired by HH. We had no idea that Mr. Mansfield and his group would use this matter against all of us and the Association.

2

Mansfield0639

7. On Dec 2, Mr. Constant met with Jennifer O'Keefe and advised her that Mr. Ford was hired and her temporary assignment was ended. This procedure was in accordance with industry standards. He requested that she sign out and turn over anything that belonged to HH, such as keys, passwords, etc. Jennifer refused and immediately contacted Marie Eckes, Adrienne, Wayne from Amtek, and Mansfield was contacted. Chaos ensued so that Constant left her office and waited for her to leave the building rather than precipitate a more serious crisis.

8. Jennifer subsequently left and came back with another individual, who took notes behind the desk. Mr. Constant remained in the building until 10:30 pm to lock up. Jennifer returned two weeks later with unpaid bills of HH that were at her home and 139 bills were found by Mr. Ford not to have been paid, along with other problems because of performance.

9. On December 5, Mr. Constant reported that he and Ford were accosted when he was introducing him to the staff. Adrienne contacted Constant's boss to tell him that Jennifer was going to take legal action. Marie wrote threatening emails to Zalco regarding the ultimate demise of Zalco from HH. Mr. Mansfield contacted Zalco on Jennifer's behalf for her reinstatement or purportedly a lawsuit would follow and Mansfield would quit.

B. Mr. Mansfield and the Mansfield Group

1. Mr. Mansfield was fired by a vote of the Association Board (without a meeting) on January 19, which was ratified at a Board meeting on Jan 23. Therefore, he simultaneously worked for and against the Association (clearly a conflict of interest and not too ethical) and worked for the Mansfield group on both sides while fired from the Association.

2. Mr. Mansfield has intentionally misled the residents -- calling a meeting of "Concerned Citizens;" generating a petition with two bylaw questions mixed with removing three board members who fired him, so a resident could not specify their issue; releasing information Mr. Ford to emotionally charge the residents with fear; giving the board members 10 days until a "Kangaroo Court" run by him and his partner, Hartsoe; accusing the board of violating bylaws, which was false; supporting Adrienne, Eric, Marie, Julia, et al, instead of the Association; and subjected the Association to a lawsuit and the threat of lawsuits, which may follow—not once, twice, but three times.

> His "Client Attorney Privileged" letter of Jan 17 was full of inaccuracies and distributed to individuals who are not owners or part of the Association
>
> Prior to and after being fired as the Association attorney, he assisted a group of residents in taking actions against the Association and the duly-elected Board members, which caused the current suit
>
> He and his group were instrumental in having Mr. Ford removed from HH not once, but twice, opening us to further suit

3. As is the case with the negative outcome to HH with respect to the HH vs. Palmer Brothers Crown Molding suit (which was recently lost with Mr. Mansfield as our attorney), he will be paid anyway, win or lose. He recently submitted a bill for $24,000+.

4. Simultaneous with the notices of a "Concerned Citizens'" meeting, Eric Mucklow wrote an email stating that Mansfield assured him that he could distribute the "Attorney Client Privileged"

3

Mansfield0640

letter sent to the Board members. He said this was because he (Mansfield) represented the Association, not individuals.

5. Eric emailed board member David Faison's check-marked copy of Mansfield's letter. This action was intentional as Eric's email states further, "Our plans are to bring all these issues out in a meeting ......As you can see from this letter, the people will be outraged once they are revealed."

6. There has been and will continue to be a significant fall-out to HH from the actions taken by the February 2 Board and others. Mr. Mansfield gave the information on Mr. Ford to Adrienne Garretson after she was reinstated from her resignation, which she denied. Thereafter:

On Dec 17, members of the Board received an anonymous letter stating that Mr. Ford had a history of violence and "if something happens you would be liable."

On or about December 23, Mr. Ford received an anonymous cut-out paper note containing a death threat to him and his family, via U.S. mail calling him the "N" word. Mr. Ford contacted the police, who began an investigation into the matter, which is currently ongoing, with some positive results. Mr. Ford was also contacted by the Arlington Victim/Witness Program in January 2006 to support him in any action he takes in this matter.

An anonymous "..Open Message to Mr. Vondell Carter," was posted on HH Bulletin Boards by a so-called "concerned HH resident." (Note: Everyone seems concerned —Mr. Mansfield may use this in his suits against Associations, which we understand is his forte.) I have attached it for your convenience. Therein, Mr. Carter is portrayed as "pathetic, power hungry, an embarrassment to himself and the rest of the community, and finally exhibiting "sociopathic behavior that suggests you need some dire mental help." It states, "You even had the audacity to illegally hire a criminal—yes, it is public record—to be our building manager!!!"

The morning of Feb 17, Michael Ford reported that he received a Fax that related to his court case in 1995, which he had discussed previously with Board members and Zalco. We understand this was distributed by the Mansfield group on Mr. Ford's case to emphasize statements made and circulated that he is a "convicted criminal."

7. Part of the myth being perpetrated by Mr. Mansfield and his group is the belief that a majority of the Association has spoken at HH. Unfortunately, only between 25 - 42% of our community ever participates at any one time in decision-making. Only the percentage of those that came to the Feb 2 meeting or sent proxies were counted, which did not include residents who did nothing or supported the Board members. Even 62% of those who came to the Feb 2 meeting abstained from voting for any new members. The Mansfield group has an agenda which they hope to implement once they have dispensed with the Association Board because supposedly, "the community has spoken."

## C. In Summary

1. HH lost a competent Building Manager that saved us from having the building shut down due to Amtek's performance and an increased financial situation, which is outlined in Mr. Ford's recent Building Manager's Report.

4

Mansfield0641

2. Zalco, our Building Management Company, has given 90-day notice for termination of their services to HH so we will lose the outstanding leadership of Mr. Michael Constant.

3. The Feb 2 Board has rehired a lawyer, Mr. Mansfield, who is suing us and working both sides of the street. Yet again, the Association will pay for his actions and advice.

4. HH had arson in the South elevator and the case was never satisfactorily resolved. Now, a death threat was sent to our Building Manager that has been ignored by Mansfield and the "Concerned Citizens," and it is still be investigated by the Virginia Police Department.

5. The community and upstanding residents have been subjected to vulgar, threatening and nasty hateful messages by anonymous members of HH.

6. There have been resident and Board members who have underhandedly reported matters to outside officials rather than working with management and the Board to address issues and problems.

7. HH has a Temporary Injunction pursued by Mansfield and his group, a number of whom are part of the Feb 2 Board attempting to finalize their open and/or hidden agenda for HH.

8. HH can expect to pay more attorneys' fees in the future.

9. Amtek is still here earning money ($170K in 14 months); Mansfield wrote a threatening, warning letter regarding any negative statements made about Amtek; Adrienne just defended Amtek against Mr. Ford when he sent one of their employees off the premises caught sleeping in the Community Room; and Adrienne's response was as usual it was misread because he was supposedly on lunch break. He was where the Security Guard use to sleep during her watch.

I hope you will take the time to review the information presented to you. You may feel that it is self-serving; however, it is not. It is a letter to encourage you to ask questions, probe and demand answers, with documentation. It is your community and your investment.

I will be providing you with additional information in the future. Thank you.


Attachment

5

Mansfield0642

An Open Message to Mr. Vondell Carter:

Mr. Carter,

Many of us have read your repeated notices attempting to portray yourself as the Horizon House Board President. You just don't seem to get it, do you? The Board serves at the pleasure of the residents---it is not a paid "job," but a voluntary position. The residents have openly let you know that we are not happy with the way you were exercising these responsibilities and have chosen to remove you.

You ARE NO LONGER PART OF THE HORIZON HOUSE BOARD! Please stop portraying yourself as such--- you are only demonstrating how pathetic and power hungry you are, and you are nothing but an embarrassment to yourself and the rest of the community. You may believe that you have done lots of things for the community but your list entails tiny minutia, while you have left the important issues undone. The balconies are still falling apart, the windows are leaking and wasting lots of money in utility bills for the condo, and the back of the building continues to overflow with trash. And you even had the audacity to illegally hire a criminal ---yes, it is public record----to be our building manager!!!!

Allowing a person with a criminal record to have access to our keys and our records puts yourself and all the rest of us at risk. This act alone should demonstrate to you how poorly you discharged your duties and why we voted you off the board. What about all the other properties in other states that you claim as your primary residence? How can this be if you are so concerned about this building? Please stop this little charade of yours. You continue to create an ugly climate in the building and place us all at risk. Stop embarrassing yourself and the rest of the community. This type of sociopathic behavior suggests you need some dire mental help.

A very concerned HH resident.

Mansfield0643

**Emma Andersson**

| From: | adam macadam [amacadam@capitolsecurities.com] |
| Sent: | Thursday, January 19, 2006 4:51 PM |
| To: | Greg Weatherman |
| Subject: | FW: Thursday Night |

  

Mansfield Letter      Mansfield Letter      Mansfield Letter
2.jpg (721 KB...      3.jpg (261 KB...      1.jpg (554 KB...

-----Original Message-----
From: Eric Mucklow [mailto:mucklowe@nzp.si.edu]
Sent: Thursday, January 19, 2006 12:45 PM
To: adam macadam
Subject: RE: Thursday Night

Thanks, Fred.

I clarified with association attorney that I can share something that is attorney-client
privilege with you as a member of the association since you are a unit owner. Since the
Association, not the board, is his client, you may read the attached scan as you are his
client along with the rest of us.
It is a letter he issued to the Board recently that reveals the magnitude of the problems
that are coming to light. Do not forward or show this letter to anyone who is not a unit
owner at Horizon House. Our plans are to bring all these issues out in the open to the
unit owners.

As you will see from this letter, the people will be outraged once these
issues are revealed. So, it will be hard to keep things civil and
positive, but I will try my best. Wherever you are sitting, please help keep those around
you civil. Just say something to them if they start some kind of outburst.

Eric

>>> "adam macadam" <amacadam@capitolsecurities.com> 1/19/2006 11:55:11
AM
>>>
Eric,

I just read your justification for this meeting which I copied below. I see now why you
sent your follow up notice clarifying the purpose of this meeting and am glad you were
heads up about it. Tensions are high and people are making ill considered remarks.

With no business to discus we will be free to focus on rebuilding out community spirit.
Even healthy family members have disagreements and arguments yet they still love each
other. It's no shortcoming to have differences of opinions and as far as I am concerned I
still love my neighbors even if they do not do things my way. I know others in our
community share my view and behave accordingly. The truth is, we have a solid base of
healthy community spirit to build upon, I know, I've seen it, and now is the time to
remember it.

I am looking forward to being there with you tonight.

Fred

The Board of Directors, as a whole, set forth the schedule of regular board meetings to be



EXHIBIT
DiMuro #18
12/2/09 SG

1

Marked by Plaintiff            Weatherman 0001

now has issued notice that he is cancelling the January meeting as well, and all others in the immediate future.

Without getting into the veracity of the his proposed justification, does the President have the authority on his own to shut down the Board of Directors? His letter claims that "...the business of the Board and Community will continue." But, with respect to the open meeting requirements of the Virginia Condominium Act and our bylaws, how can the

business of the association be conducted legally with no meetings?

Our community needs to have some kind of meeting on schedule next Thursday at 7:00 PM in the Community Room, even if it is without Vondell. Our community needs to come together and get several serious issues that are going around the building out in the open.

_____

From: Eric Mucklow [mailto:MucklowE@nzp.si.edu]
Sent: Wednesday, January 18, 2006 2:09 PM
To: adam macadam
Subject: RE: Thursday Night

Thanks, Fred. I will try to keep things as positive and civil as possible. We need to focus on what must be done to fix the situation for the future, not have a big gripe-fest about the past.

I'm glad you plan to be there,

Eric

>>> "adam macadam" <amacadam@capitolsecurities.com> 1/18/2006 1:24:03 PM
>>>

Hello Eric,

I'm not expecting anything but I'll be there.

I can't see the website because we use a firewall and Yahoo does not allow browsers that do not accept cookies to look at the site.

See you there; let's make this thing a "positive" experience.

Fred

_____

From: Eric Mucklow [mailto:MucklowE@nzp.si.edu]
Sent: Wednesday, January 18, 2006 10:32 AM
To: adam macadam
Subject: Thursday Night

Dear Member,

This is a private message because posting it to the webpage could result in those with the fastest fingers dominating the discussion. I need to hear from other members besides those who have been historically active.

2

Marked by Plaintiff

Weatherman 0002

You may have seen the announcements about tomorrow night - I try to put more up as soon as I find out they have been taken down.

I started this effort to bring the community together because I stopped attending board meetings after I resigned from the board.  Having been out of the loop for so long, I felt blind-sided by the recent flurry of letters and activities at Horizon house.  Along with many other residents of Horizon House, I am very concerned and believe we have a right to be informed.  Like a week, rumors left alone will just grow and spread out of control.  Therefore, the goal of Thursday night is to get to the truth.

It is not a Board Meeting.  It is not an Association meeting.  No one is on trial and no recall votes will be conducted.  Nor will it be a gripe-fest, and out-right slander will not be tolerated; the "he said, she said" rhetoric accomplishes nothing.

I am not acting on behalf of one board member or another.  I am acting in the sole interest of our association and my vested interest in it.
My ultimate goal is to stop the nonsense.

My question to you is this:  what are you expecting (and/or what would you like) to be discussed?

Eric Mucklow

#725

Marked by Plaintiff

3

Weatherman 0003

# HARTSOE, MANSFIELD & MORGAN, P.L.L.C.
### ATTORNEYS AND COUNSELORS AT LAW

10621 JONES STREET, SUITE 201-B
FAIRFAX, VIRGINIA 22030-7511
(703) 591-2503
FAX (703) 273-7292

208 SOUTH KING STREET, SUITE 203
LEESBURG, VIRGINIA 20175-3018
(703) 771-4200
E-MAIL: HARTSOEMANSFIELD@RCN.COM

January 17, 2006

*Via hand delivered*

Vondell Carter, President
Horizon House Condominium
Unit Owners Association
1300 Army-Navy Drive
Arlington, Virginia 22202

*Confidential*
*Attorney Client Privileged*

Dear Vondell:

From the e-mails and correspondence circulated over the holiday weekend, I conclude that the situation at Horizon House is rapidly deteriorating. I brought several matters to your attention last Friday and have yet to hear from you. The following issues must be addressed immediately:

First, consistent with our opinion letter dated June 21, 2005, the resignation of a Director is a question of fact to be determined based on the intent and action of the Board member. With that said, Ms. Garretson clearly never resigned. While difficult circumstances caused Ms. Garretson to contemplate resignation, she agreed with me and others that the best interests of the Association mandated her continuing as a Board member and Treasurer.

Second, you have no authority to unilaterally suspend Board meetings. Pursuant to Article 4.6 of the Association's Bylaws, regular meetings of the Board are called by the Board of Directors and must be held at least quarterly. Moreover, I have had the privilege of acting as the attorney for Horizon House for sixteen years. During this time meetings have routinely been conducted monthly, with rare exception. Your suspending these meetings is illegal. Any resulting actions purportedly taken on behalf of the Association are unauthorized. Individual Board members who participate in these actions are personally responsible (and liable) for any action taken in known derogation of the Horizon House Bylaws. Further, pursuant to Article 4.17 of the Bylaws, any action taken without a meeting requires written consent of *all* Board members, including Ms. Garretson. Accordingly your attempt to remove Ms. Garretson and elect Mr. Weatherman Treasurer and to elect Ms. Morris acting Secretary can only be accomplished if Ms. Garretson consents, along with all other Board members, in writing. Similarly, your using "informal work sessions" between yourself, Susan and Greg is strictly forbidden under § 55-79.75 of the Virginia Code. Meetings of the Board of Directors must be properly noticed and open to the Association membership.

Marked by Plaintiff

Weatherman 0004

Vondell Carter, President
Horizon House Condominium
Unit Owners Association
January 17, 2006
Page 2


Third, concerning the Association's web page and chat room, § 55-79.75:1 of the Virginia Code requires the Association to establish a "reasonable, effective, and free method . . . for unit owners to communicate among themselves and with the executive organ regarding any matter concerning the unit owners' association." The Board may not edit the content or require prior approval of any material submitted concerning the Association. Accordingly, there is nothing improper about the web page and chat room. On the contrary, I opine that any action taken to stop members from communicating among themselves, even if critical of your decisions, my opinions, the Board or Management actions, is improper and statutorily prohibited.

Fourth, your creation of a professional and fiduciary relationship between the Association and Mr. Ford violated the By-Laws and, quite frankly, was a mistake. This individual was hired without the authority of the Board and against my clear recommendations. Mr. Ford was hired with two criminal sexual battery charges pending in Prince Georges County. For the record, I specifically counseled you that these cases should be favorably resolved before Mr. Ford would be eligible to hire. Further, I advised you that Mr. Ford was fired by his previous employer for cause. Despite these clear recommendations and reservations, you insisted on making him an offer. At that time I strongly recommended that the applicant undergo a lie-detector test if you insist on hiring him. With your consent, I confronted Mr. Ford with this request. During my conversation with him he admitted wrongdoings. You were given these facts and nonetheless you chose to conduct an "informal" session of the Board with Susan and Greg, with no notice to the other Board members or the community, and hired Mr. Ford. Minimally, his admissions included that while employed as building manager, he had consensual sexual relations with a tenant on two occasions, once in her apartment and once in his office. The victim alleges that these "encounters" were against her will and, therefore, the subject of her criminal complaints. In order for the charges to be brought there had to be a showing of probable cause. At the very least Mr. Ford, by his own admissions, has demonstrated errors of judgment which alone should have disqualified him. Even more disturbing is that, with the information provided to you, Mr. Ford was hired to a position which gives him access to every unit at Horizon House. To the extent you have attempted to insulate the Association by having Zalco Realty employ Mr. Ford directly, such an arrangement required Board approval and is contrary to the terms of Zalco's management contract. Your actions reflect an agenda which is inconsistent with the best interests of our client. Again, I request that you convene a Board meeting immediately, with the requisite seventy-two (72) hours notice to all Board members and the community, so that these matters might be discussed in detail.

Finally, given the circumstances and your recent decisions, I strongly opine that the best interests of my client mandate you resign as President and as a Board member effective immediately. Further, I strongly recommend that Ms. Morris and Mr. Weatherman also resign to

Marked by Plaintiff

Weatherman 0005

Vondell Carter, President
Horizon House Condominium
 Unit Owners Association
January 17, 2006
Page 3

avoid the appearance of impropriety and mitigate any resulting liability occasioned by the unauthorized acts in which the three of you have been engaged.

The ramifications of your decisions as President and the decisions of the "informal" Board meetings can and must be addressed and neutralized immediately. Otherwise the Association is at risk. Your prompt attention is required.

Sincerely,

Hartsoe Mansfield & Morgan, P.L.L.C.

James M. Mansfield

C:\Documents and Settings\Owner\My Documents\Letter\Horizonhouse4Eletter.wpd

cc:    Susan M. Morris, Vice President, Policy
       Greg Weatherman, Vice President, Facilities
       David Faison, Vice President, Information Systems
       Adrienne Garretson, Treasurer

Marked by Plaintiff            Weatherman 0006

HARTSOE, MANSFIELD & MORGAN, P.L.L.C.
ATTORNEYS AND COUNSELORS AT LAW

10621 JONES STREET, SUITE 201-B,
FAIRFAX, VIRGINIA 22030-7511
(703) 591-2502
FAX (703) 273-7292

208 SOUTH KING STREET, SUITE 202
LEESBURG, VIRGINIA 20175-3015
(703) 771-4200
E-MAIL: HARTSOEMANSFIELD@RCN.COM

February 16, 2006

Client Number 4080

Horizon House Condominium Unit Owners Association
1300 Army Navy Drive
Arlington, Virginia 22202

Billing Summary: January 1, 2006 thru January 31, 2006

RE:   HORIZON HOUSE (general)

| | |
|---|---|
| TOTAL FEES FOR THIS MATTER | $ 10,446.14 |
| TOTAL DISBURSEMENTS FOR THIS MATTER | $ 1,672.14 |

RE:   HORIZON HOUSE v

| | |
|---|---|
| TOTAL FEES FOR THIS MATTER | $ 100.00 |
| TOTAL DISBURSEMENTS FOR THIS MATTER | $ 0.00 |

| | |
|---|---|
| Total Charges For These Bills | $ 12,218.28 |
| Balance Forwarded | $ 9,767.51 |
| Less Prepaid Amount | $ 0.00 |
| Total Balance Now Due | $ 21,985.79 |



EXHIBIT
DMoro #19
12/2/09 SG

Mansfield1574

Hartsoe, Mansfield & Morgan, P.L.L.C.
10821 Jones Street
Suite 201B
Fairfax, VA 22030-7511

Invoice submitted to:
Horizon House Condominium
    Unit Owners Association
1300 Army Navy Drive
Arlington VA 22202

February 14, 2006

In Reference To:   General

Invoice #8804

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 12/29/2005 Telephone call with          ay re: payment and fax. *JMM* | 0.50 100.00/hr | 50.00 |
| ✶ 1/3/2006 Telephone call with Discreet Investigations. *AEM* | 0.20 100.00/hr | 20.00 |
| Receive and review email re: web site. *JMM* | 0.30 100.00/hr | 30.00 |
| Receive and review email from Managment Company. *Jmm* | 0.20 100.00/hr | 20.00 |
| 1/4/2006 Review accounts with .   *AEM* | 1.50 100.00/hr | 150.00 |
| 1/5/2006 Receive and review email re: The View. *JMM* | 0.20 100.00/hr | 20.00 |
| Telephone call with Zaico re: Palmer check. *RJH ?* | 0.30 100.00/hr | 30.00 |
| 1/6/2006 Cover letter to Arlington General District Court. *AEM* | 0.20 100.00/hr | 20.00 |
| Cover letter to Arlington Circuit Court. *RJH* | 0.20 100.00/hr | 20.00 |

2

Mansfield1575

Horizon House Condominium

Page    2

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 1/8/2006 | Prepare, finalize, and file (12) lien releases. *HEM* | 1.50 100.00/hr | 150.00 |
| | Telephone call to Zalco - Mr. Dubin, left message to call. *JMM* | 0.10 100.00/hr | 10.00 |
| 1/9/2006 | Telephone call with Vondell Carter re: unit 212 etc. SRG contract and web page. *JMM* | 0.50 100.00/hr | 50.00 |
| | Review copy of The View and Web Page. *JMM* | 0.60 100.00/hr | 60.00 |
| | Telephone call with Mr. Dubin re: Palmer. *RJH or JMM* | 0.20 100.00/hr | 20.00 |
| | Receive and review email re: sale of unit 212. *JMM* | 0.20 100.00/hr | 20.00 |
| 1/10/2006 | Telephone calls to Vondell Carter, left message to call. *JMM* | 0.20 100.00/hr | NO CHARGE |
| | Fax to Mr. Kaynor at SRG. *JMM* | 0.20 100.00/hr | 20.00 |
| | Receive and review Unit 212 contract. *JMM* | 1.30 100.00/hr | 130.00 |
| | Review Real Estate Contract. *RJH or CAT* | 0.60 100.00/hr | 60.00 |
| 1/11/2006 | Memo to Mr. Carter re: Unit 212 contract. *JMM* | 0.30 100.00/hr | 30.00 |
| | Telephone call with Vondell Carter re: Unit 212 contract. *JMM* | 0.30 100.00/hr | 30.00 |
| | Draft and send memo re: Unit 212. *JMM* | 1.00 100.00/hr | 100.00 |
| | Telephone call from Mr. Dubin re: Palmer check. *JMM or RJH* | 0.20 100.00/hr | 20.00 |
| | Telephone call to SRG – left message to call. *JMM* | 0.10 100.00/hr | 10.00 |
| | Draft Final Order and Cover Letter. *RJH ?* | 1.00 100.00/hr | 100.00 |
| | Telephone call from Ms. Garretson re: Zalco/records. *JMM* | 0.30 100.00/hr | 30.00 |

3

Mansfield1576

Horizon House Condominium

Page   3

| | Hrs/Rate | Amount |
|---|---|---|
| 1/11/2006 Review Zalco contract and Bylaws.   *JMM or CAT* | 0.50<br>100.00/hr | 50.00 |
| 1/12/2006 Letter to Zalco re: Records.   *JMM* | 1.00<br>100.00/hr | 100.00 |
| Telephone call with Adrienne re: Records.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| Receive Palmer Check.   *JMM or RJH* | 0.10<br>100.00/hr | 10.00 |
| Telephone call with Ms. Garretson re: Zalco Records.   *JMM* | 0.40<br>100.00/hr | 40.00 |
| Telephone call with Mr. Ford re:  Landscape Contractor.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Letter to Zalco.   *JMM or CAT* | 1.00<br>100.00/hr | 100.00 |
| Review letter re: Zalco.   *JMM* | 0.40<br>100.00/hr | 40.00 |
| Discuss developments of Board of Directors with JMM.   *CAT or RJH* | 0.30<br>100.00/hr | 30.00 |
| 1/13/2006 Review Bylaws/ letter to Mr. Carter re:  Morris email.   *JMM* | 2.50<br>100.00/hr | 250.00 |
| Telephone call with Jenny at SRG.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Telephone call with Kip Gaynor re:  contract.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| Letter to Vondell Carter re:  SRG.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Telephone call with Ms. Garretson re:  suspension of BOD meeting.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| E-mail response from M. Constant.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Receive and review E-mail from Ms. Morrison.   *JMM* | 0.40<br>100.00/hr | 40.00 |
| Draft letter to Mr. Constant.   *CAT* | 0.90<br>100.00/hr | 90.00 |

4

Horizon House Condominium                                                                      Page     5

| | Hrs/Rate | Amount |
|---|---|---|
| 1/16/2006 Receive and review email re: Petition.   *JMM* | 0.30 100.00/hr | 30.00 |
| 1/17/2006 Review Bylaws and condo account; Draft and finalize letter to Mr. Carter. *JMM* | 4.50 100.00/hr | 450.00 |
| Telephone call from Ms. Garretson re: status.   *JMM* | 0.20 100.00/hr | 20.00 |
| Receive and review email.   *JMM* | 0.10 100.00/hr | 10.00 |
| Telephone call to Ms. Garretson - left message to call.   *JMM* | 0.10 100.00/hr | 10.00 |
| Review and draft Horizon House letter re: issues with President. *CAT or JMM* | 1.00 100.00/hr | 100.00 |
| Telephone calls to Aurther Dubin, left message to call.   *JMM* | 0.20 100.00/hr | 20.00 |
| Letter to to Vondell Carter.   *CAT or JMM* | 2.00 100.00/hr | 200.00 |
| Revise letter; Discuss same with RJH & JMM.   *CAT* | 0.50 100.00/hr | 50.00 |
| 1/18/2006 Telephone call with Ms. Garretson re: status.   *JMM* | 0.20 100.00/hr | 20.00 |
| Telephone call with Ms. Garretson re: procedure.   *JMM* | 0.30 100.00/hr | 30.00 |
| Telephone call from Eric Mucklow re: procedure.   *JMM* | 0.20 100.00/hr | 20.00 |
| 1/19/2006 Receive and review email from Ms. Garretson.   *JMM* | 0.30 100.00/hr | 30.00 |
| ✱ Prepare for Association meeting.   *CAT or JMM* | 1.50 100.00/hr | 150.00 |
| ✱ Proof read letter re: termination of representation; review bylaws re: same. *JMM* | 0.20 100.00/hr | 20.00 |
| ✱ Attend membership meeting.   *JMM* | 3.50 100.00/hr | 350.00 |
| ✱ Draft Proxy.   *CAT or JMM* | 0.50 100.00/hr | 50.00 |

Mansfield1578

Horizon House Condominium

Page   4

| | Hrs/Rate | Amount |
|---|---|---|
| 1/13/2006 Finalize letter and Pleadings.   *JMM or RJH* | 0.20<br>45.00/hr | 9.00 |
| Telephone call with Ms. Garretson re:  Constant email.   *JMM* | 0.50<br>100.00/hr | 50.00 |
| Interoffice conference with CAT re:  Horizon House situation.   *JMM or AEM* | 0.50<br>100.00/hr | 50.00 |
| Receive and review fax re:  Suspension of BOD meetings.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Review letter re:  Board member bias.   *JMM* | 0.50<br>100.00/hr | 50.00 |
| Research misconduct by Board Member.   *CAT* | 2.00<br>100.00/hr | 200.00 |
| Proof read letter.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| 1/16/2006 Review Mr. Weatherman email to Eric Mucklow.   *JMM or CAT* | 0.30<br>100.00/hr | 30.00 |
| Review email re: "working sessions."   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Receive and review email from Ms. Garretson.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| Review email from Mr. Dubin to Ms. Garretson.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| Review memorandum re:  Ms. Garretson.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Review email re:  Officers.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Telephone call with Ms. Garretson re:  status.   *JMM* | 0.20<br>100.00/hr | 20.00 |
| Review Statutes and Bylaws.   *CAT* | 1.00<br>100.00/hr | 100.00 |
| Conference with CAT re:  Board action.   *JMM* | 0.30<br>100.00/hr | 30.00 |
| Review email re:  Board Meeting Request.   *JMM* | 0.30<br>100.00/hr | 30.00 |

5

Mansfield1579

Horizon House Condominium

Page    6

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 1/19/2006 | Revise/Edit and Finalize Petitions.   *JMM or CAT* | 1.50 100.00/hr | 150.00 |
| | Telephone call with Ms. Garretson.   *JMM* | 0.20 100.00/hr | 20.00 |
| | Draft Proxy.   *CAT or JMM* | 1.00 45.00/hr | 45.00 |
| | Letter from Vondell Carter.   *JMM* | 0.20 100.00/hr | 20.00 |
| | Receive and review G. Weatherman email to Mr. Carter.   *JMM* | 0.20 100.00/hr | 20.00 |
| | Receive and review email from Vondel re: dismissal.   *JMM* | 0.20 100.00/hr | 20.00 |
| | Letter to Vondell Carter.   *JMM or CAT* | 2.00 100.00/hr | 200.00 |
| | Telephone call from Senator Mims.   *JMM* | 0.30 100.00/hr | 30.00 |
| 1/20/2006 | Return call to Mr. Dubin - left message to call.   *JMM* | 0.10 100.00/hr | 10.00 |
| | Review correspondence.   *JMM or CAT* | 0.20 100.00/hr | 20.00 |
| | Community meeting.   *JMM* | 3.50 100.00/hr | 350.00 |
| | Review issues re: meeting notification.   *CAT* | 0.40 100.00/hr | 40.00 |
| | Telephone call with Ms. Garretson.   *JMM* | 0.10 100.00/hr | NO CHARGE |
| | Telephone call with Real Estate Board.   *JMM or CAT* | 0.30 100.00/hr | 30.00 |
| | Telephone call from owner   *JMM* | 0.10 100.00/hr | NO CHARGE |
| | Return call to Mr. Dubin, left message to call.   *JMM* | 0.10 100.00/hr | NO CHARGE |
| | Receive and review response to Mr. Carter's email.   *JMM* | 0.10 100.00/hr | 10.00 |

7

Mansfield1580

Horizon House Condominium

Page   7

| | Hrs/Rate | Amount |
|---|---|---|
| 1/20/2006  Receive and review email from Mr. Carter.  *JMM* | 0.10<br>100.00/hr | 10.00 |
| 1/22/2006  Receive and review multiple emails re:  various issues.  *JMM* | 1.00<br>100.00/hr | 100.00 |
| Attend resident meeting re:  special meeting.  *JMM* | 3.50<br>100.00/hr | 350.00 |
| 1/23/2006  Attend Board Meeting.  *JMM, CAT, RJH* | 5.50<br>100.00/hr | 550.00 |
| Telephone call to Virginia Real Estate Board;  left message to call.  *JMM* | 0.10<br>100.00/hr | 10.00 |
| Receive and review Manager's list of Delinquent Owners;  update files for 2006;  review status of litigation;  Draft status letter;  fax same.  *AEM* | 2.00<br>100.00/hr | 200.00 |
| Letter re:  charges to unit owners.  *AEM* | 0.20<br>100.00/hr | 20.00 |
| Review/edit letters/ meet with JMM.  *AEM* | 0.90<br>100.00/hr | 90.00 |
| Revise Proxy.  *CAT or JMM* | 0.50<br>100.00/hr | 50.00 |
| To/from Horizon House;  attend special meeting.  *JMM, CAT, RJH* | 5.50<br>100.00/hr | 550.00 |
| Review documents;  discuss same with JMM;  prepare for special meeting.  *CAT* | 0.60<br>100.00/hr | 60.00 |
| Draft Notice of Special Meeting.  *CAT* | 0.30<br>100.00/hr | 30.00 |
| Receive and review multiple issues (appear to be duplicates).  *JMM* | 0.30<br>100.00/hr | NO CHARGE |
| Email from Mr. Carter.  *JMM* | 0.20<br>100.00/hr | 20.00 |
| Draft letter re:  removal.  *CAT or JMM* | 0.30<br>100.00/hr | 30.00 |
| Draft letter re:  special meeting.  *CAT or JMM* | 0.30<br>100.00/hr | 30.00 |
| Draft Agenda - special meeting.  *CAT or JMM* | 0.30<br>100.00/hr | 30.00 |

8

Mansfield1581

Horizon House Condominium

Page    8

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 1/23/2006 Draft Proof of Notice. *CAT or JMM* | | 0.30 100.00/hr | 30.00 |
| 1/24/2006 Revise/finalize Notice. *JMM* | | 0.60 100.00/hr | 60.00 |
| Revise/finalize Certificate of Notice. *JMM* | | 0.20 100.00/hr | 20.00 |
| ✳Telephone call with Ms. Dragun re: M. Ford. *JMM* | | 0.20 100.00/hr | 20.00 |
| Telephone call with Mr. Garretson re: January 23rd meeting. *JMM* | | 0.20 100.00/hr | 20.00 |
| ✳Edit/Review Member Statement. *JMM* | | 0.30 100.00/hr | 30.00 |
| Telephone call with Mr. Garner. *JERRY JMM* | | 0.20 100.00/hr | 20.00 |
| Revise Proxy. *JMM or CAT* | | 0.40 100.00/hr | 40.00 |
| Telephone call with Board Candidate (Martinez) *JMM* | | 0.40 100.00/hr | 40.00 |
| Revise/finalize Agenda. *JMM or CAT* | | 0.20 100.00/hr | 20.00 |
| Telephone call from Ms. Garretson re: Amtek Contract. *JMM* | | 0.30 100.00/hr | 30.00 |
| ✳ 1/25/2006 Telephone call from JHK re: trial. *JMM* | | 0.20 100.00/hr | 20.00 |
| ✳Telephone call with Ms. Garretson re: status. *JMM* | | 0.20 100.00/hr | 20.00 |
| ✳ Strategy Session. *JMM or CAT* | | 1.00 100.00/hr | 100.00 |
| ✳Telephone call with Mr. Garner re: status. *JERRY JMM* | | 0.30 100.00/hr | 30.00 |
| Telephone call to Northern Virginia Mediation. *CAT or JMM* | | 0.20 100.00/hr | 20.00 |
| 1/26/2006 Receive and review fax from Reese Broome. *JMM* | | 0.20 100.00/hr | 20.00 |

Mansfield1582

Horizon House Condominium

Page   9

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 1/26/2006 Telephone call to Northern Virginia Mediation, left message to call. *JMM* | | 0.10 100.00/hr | NO CHARGE |
| Multiple emails re: special meeting. *JMM* | | 0.40 100.00/hr | 40.00 |
| 1/27/2006 Telephone call with Ms. Garretson re: strategy/status. *JMM* | | 0.50 100.00/hr | 50.00 |
| Receive and review multiple emails. *JMM* | | 1.00 100.00/hr | 100.00 |
| Telephone call with Ms. Garretson re: special meeting. *JMM* | | 0.20 100.00/hr | 20.00 |
| Draft letter to Reese Broome. *CAT or RJH* | | 0.60 100.00/hr | 60.00 |
| Telephone call from owner. *JMM* | | 0.20 100.00/hr | 20.00 |
| Telephone call to Mediation Service, left message to call. *CAT or JMM* | | 0.10 100.00/hr | 10.00 |
| 1/29/2006 Telephone call with Ms. Garretson. *JMM* | | 0.30 100.00/hr | 30.00 |
| Telephone call with Ms. Eckes. *maybe JMM* | | 0.20 100.00/hr | 20.00 |
| 1/30/2006 Receive and review multile emails re: special meeting. *JMM* | | 1.50 100.00/hr | 150.00 |
| ✳ Receive and review fax re: Michael Ford. *JMM* | | 0.30 100.00/hr | 30.00 |
| Telephone call with Mr. Williams re: NOVA mediation. *CAT or JMM* | | 0.30 100.00/hr | 30.00 |
| Telephone calls with various mediators/parlimentarians. *CAT or JMM* | | 0.50 100.00/hr | 50.00 |
| Telephone call from owner. *JMM* | | 0.10 100.00/hr | 10.00 |
| Finalize letter to RB&D. *JMM* | | 0.50 100.00/hr | 50.00 |
| 1/31/2006 Receive and review Reese Broom letter re: special meeting. *JMM* | | 0.60 100.00/hr | 60.00 |

10

Mansfield1583

Horizon House Condominium

Page    10

| | Hours | Amount |
|---|---|---|
| For professional services rendered | 89.30 | $8,774.00 |

Additional Charges :

| | | |
|---|---|---|
| 1/1/2006 Copying fees. | | 63.60 |
| Postage fees. | | 22.08 |
| Postage fees. | | 1.50 |
| 1/10/2006 Investigator. | *WHO AUTHORIZED ?* *2 Bills* | 1,372.50 |
| 1/12/2006 Courier fees. | | 15.51 |
| Courier fees. | | 25.14 |
| Courier fees. | | 26.27 |
| 1/17/2006 Courier fees. | | 53.27 |
| Courier fees. | | 23.27 |
| 2/2/2006 Filing fee - Injunction. | | 69.00 |

| | |
|---|---|
| Total costs | $1,672.14 |
| Total amount of this bill | $10,446.14 |

Mansfield1584

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

**Exhibit 5**

Deposition of David Faison
(Nov. 25, 2009) (excerpts)

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA


- - - - - - - - - - - - - - -x
                             :
MICHAEL FORD,                :
                             :
        Plaintiff,           :
                             :
    vs.                      : Civil Action
                             :
ZALCO REALTY, INC., et al.   : No. 1:08cv1318
                             :
    Defendants.              :
                             :
- - - - - - - - - - - - - - -x


                      Alexandria, Virginia

                      Wednesday, November 25, 2009


        The deposition of DAVID L. FAISON, called

for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, in the

offices of DiMuro Ginsburg, 908 King Street,

Alexandria, Virginia, convened at 9:30 a.m., before

Cathy Jardim, a notary public in and for the

Commonwealth of Virginia, when were present on behalf

of the parties:

17

1   because you felt that they had an agenda that was not

2   necessarily the board's agenda.

3       A.   Correct.

4       Q.   You didn't feel like that about

5   Mr. Weatherman?

6       A.   Correct.

7       Q.   Now, did the board have an election of

8   officers?

9       A.   Yes -- just among board members.

10      Q.   Did the board have an election to elect its

11  officers?

12      A.   Yes.

13      Q.   And the five members of the board besides

14  you, Mr. Weatherman, Mr. Carter, and Ms. Morris, the

15  other one was Adrienne Garretson?

16      A.   Correct.

17      Q.   And did Ms. Garretson support you to be

18  president?

19      A.   I think she would have.

20      Q.   If you recall, was there a vote taken on who

21  would be president of the board?

22      A.   Yes.

     A.    Definitely by the time of those meetings.

          MR. KERNAN:  Counsel, can we take five?

          MS. BERNABEI:  Why don't we go through a few

other documents.  Let's mark this as Exhibit 5.

                    (Faison Exhibit No. 5

                     was marked for identification.)

     BY MS. BERNABEI:

     Q.    Have you seen this document prior to today?

          (Pause.)

          BY MS. BERNABEI:

     Q.    Mr. Faison, if you recall, did you ever see

this document?

     A.    No.

     Q.    Did you ever know that Mr. Mansfield's firm

was doing an investigation to see if there was a link

between Vondell Carter and Michael Ford?

     A.    No.

     Q.    Did you ever authorize Mr. Mansfield to

conduct this investigation?

     A.    No.

     Q.    Did Adrienne Garretson, to your knowledge?

     A.    No.

1     Q.    Did the board ever discuss having such an

2  investigation done?

3     A.    No.

4     Q.    Do you know whether you ever received any

5  information from Ms. Garretson or Mr. Mansfield's

6  firm about this?

7     A.    I did not.

8     Q.    If you had been asked to vote on whether

9  this was an appropriate investigation, would you have

10  voted to do such an investigation?

11      MR. PEARSON:  Objection to form.

12      MR. KERNAN:  Calls for speculation.

13      You can answer.

14      THE WITNESS:  It is hard to say.  Is

15  this -- this is supposing -- no, at the time, no.

16  Emotions were high.  What would we argue to do?  But

17  it would be ludicrous during December because Vondell

18  controlled the board.

19      BY MS. BERNABEI:

20     Q.    Do you think it would have been appropriate

21  for a member of the board to ask Mr. Mansfield to do

22  an investigation of any links between Vondell Carter

1    and Michael Ford?

2         MR. PEARSON:  Objection to form, asked and

3    answered.

4         THE WITNESS:  Seems kind of creepy.

5         BY MS. BERNABEI:

6    Q.   Why?

7    A.   I put myself in Vondell's place, and I know

8    I wouldn't like that.

9    Q.   Why?

10   A.   It just seemed -- I wouldn't like it.

11   Q.   Why not?

12   A.   I couldn't say.  I don't know how to

13   articulate that.

14   Q.   Do you see any connection that you know of,

15   personal connection between Mr. Vondell Carter and

16   Mr. Michael Ford, other than they are both African

17   Americans?

18        MR. PEARSON:  Objection.

19        MR. KERNAN:  Objection.

20        THE WITNESS:  I am not aware of any.

21        BY MS. BERNABEI:

22   Q.   Let me show you what I will ask be marked as

1      A.    Yes, people wondering what is really going

2  on.

3      Q.    And one idea that was floating around was

4  that Vondell Carter wrote it, right, that is one

5  idea?

6      A.    Yes.

7      Q.    And another idea was Michael Ford wrote it?

8      A.    Yes.   In the realm of anybody could have

9  written it, yes, and the motives.

10      Q.    Did you come to know that anyone had talked

11  to Mr. Mansfield about his thoughts of who wrote

12  this?

13      A.    No.

14      Q.    Did Mr. Mansfield come to any meetings with

15  the Arlington County Police?

16      A.    I don't think so.

17      Q.    Did anyone notify Mr. Mansfield about this

18  threat?

19      A.    I certainly didn't.  Vondell should have.

20  Vondell was the conduit to the attorney -- he was the

21  conduit to the manager.

22      Q.    So as you sit here, you don't know what

168

1    A.    Yes.

2    Q.    So it was gossip, innuendo, but you didn't

3  have anything firm?

4    A.    There was no documentation.  I think this

5  was the first -- yes, my copy is the first --

6    Q.    The first documentation you had.  And you

7  considered this letter evidence or support for the

8  things that Mr. Mansfield said?  Let me rephrase the

9  question.  Did you consider this to have some weight

10 in your mind because it came from the association

11 attorney?

12   A.    Yes.

13   Q.    Now, it is fair to say -- you don't have any

14 personal knowledge of any of the things that

15 Mr. Mansfield says in this letter, right?  Personal

16 knowledge meaning you looked up the documents at the

17 court or Mr. Ford said these things to you.

18   A.    No personal knowledge of the allegations

19 against Mr. Ford.

20   Q.    Now, if you know, did anyone, other than

21 Mr. Mansfield in this letter, present you with any

22 documentation that would indicate the correctness or

1      Q.    Was that your understanding at the time of

2   the January 19, 2006, meeting?

3      A.    Yes.

4      Q.    It wasn't a Horizon House association

5   meeting and it wasn't a Horizon House association

6   board meeting, right?

7            MR. KERNAN:  Objection.  Asking him to draw

8   a legal conclusion.

9            BY MS. BERNABEI:

10     Q.    Whatever you understood.  I am just asking

11  for your opinion.

12     A.    This was not an official meeting, yes.

13     Q.    And it was neither an official meeting of

14  the association --

15     A.    Nor of the board.

16     Q.    And that was your understanding when you

17  helped draft this, right?

18           MR. KERNAN:  Objection.  You are asking him

19  to draw a legal conclusion.

20           MR. PEARSON:  Same objection.

21           THE WITNESS:  Yes, that was my

22  understanding.

192

1      Q.    I am trying to -- since none of us were

2    there, none of us in the room were there other than

3    yourself, when you say there were expressions of

4    concern, did people nod their head, did they make

5    noises, did she say that is upsetting -- how did

6    people express their concern?  That is what I am

7    getting at.

8      A.    Spoken, questions like why?  Why did we hire

9    him?  Why did we make this hiring?  Why are these

10   three doing these things?  I don't recall

11   particulars.

12     Q.    If you recall, how many people were at the

13   meeting?

14     A.    I have no idea.

15     Q.    Give me an estimate.

16     A.    I don't know.  A roomful.

17     Q.    Fifty, 75?  Again, I don't know how big the

18   room is.

19     A.    I am terrible --

20     Q.    Just give me your best estimate.  Obviously,

21   we are not going to hold you to it.

22     A.    I just don't know.

210

1          MR. PEARSON:  Objection.

2          THE WITNESS:  In my role as a board member,

3    there wasn't any more -- he didn't deal with us as

4    the association attorney.

5          BY MS. BERNABEI:

6      Q.    That was after that meeting at which he was

7    terminated?

8      A.    Right.

9      Q.    Now, did you know whether he continued to

10   hold himself out as representing the association

11   after the board vote to terminate him?

12     A.    Not to my knowledge.

13     Q.    Do you know whether he continued, after that

14   vote, that he continued to bill Horizon House even

15   though he had been terminated by the board?

16         MR. KERNAN:  Objection.  Foundation.

17         MR. PEARSON:  Same objection.

18         THE WITNESS:  I am not aware of that.

19         BY MS. BERNABEI:

20     Q.    Do you know whether or not the fact that he

21   was formally terminated by the board led

22   Ms. Garretson and others to retain him individually

1   to represent them?

2          MR. KERNAN:  Objection.

3          MR. PEARSON:  Objection.

4          THE WITNESS:  I believe so, yes.

5          BY MS. BERNABEI:

6      Q.    After the board voted at the duly noticed

7   meeting, after that board meeting, it was your view

8   that he was no longer the attorney for the

9   association?

10         MR. KERNAN:  Objection.  Form.  Calls for a

11  legal conclusion.

12         MR. PEARSON:  Same objection.

13         THE WITNESS:  That was my understanding.

14         BY MS. BERNABEI:

15     Q.    Now, if you recall, what, if any, role did

16  you have in organizing the petition that was -- the

17  petition that was sent out to remove the three board

18  members?

19     A.    I tried to keep a distance from this.  I was

20  on the board the whole time.  I helped where I could,

21  but I have no recollection of what specifically that

22  was.

1    from Monday's meeting; is that correct?

2         A.    Right.

3         Q.    And that was the meeting at which the board

4    voted to terminate Mr. Mansfield; is that correct?

5         A.    Yes.

6         Q.    And why did you want those board minutes

7    four days later?

8         A.    To get things on the record, to get more

9    documentation, more official --

10        Q.    Of what?

11        A.    There is so much gossip going on, people

12   conjecturing this, saying that, whatever, so, again,

13   like in my statement here, I have no knowledge other

14   than hearsay.

15             There is nothing -- there are only a few

16   people that attend association meetings, so I wanted

17   to get the minutes approved and published so you

18   don't have to guess what was said or guess what was

19   done.  Here are the minutes.  Here are the facts.

20        Q.    This is a board meeting, January 23, 2006?

21        A.    Yes.

22        Q.    And that was the meeting at which the board

230

1  voted to terminate Mr. Mansfield, right?

2      A.    Yes.

3      Q.    Anything else that happened?

4      A.    I don't recall.

5      Q.    If you know, those board meetings are all

6  public?

7      A.    Right.

8      Q.    And any association member who wanted could

9  have gone?

10     A.    Right.

11     Q.    And if you wanted to send out -- sent out an

12  e-mail or go to the top of the building and shout it

13  out, you could have told anybody who wasn't there

14  what happened, right?

15     A.    Yes.

16     Q.    Was there anything that happened at the

17  meeting that you thought was relevant to the period

18  of January 27 to February 2?

19     A.    I honestly don't recollect anything more

20  than wanting to minimize the hearsay and say, here,

21  look, here it is, it is published, official.  Here is

22  what is going on, here is what is done.  Let's stop

242

1          THE WITNESS:  My understanding is he was not

2     our legal counsel.

3          BY MS. BERNABEI:

4     Q.    Now, if you recall, at some point soon after

5     you wrote that memo on February 2, there was a

6     meeting of the association that was held; is that

7     correct?

8     A.    What was that again?

9     Q.    There was a meeting of the association that

10    was held --

11    A.    Association meeting, right, right.

12    Q.    Did you recall that Mr. Mansfield's office

13    helped send out the packets for that meeting?

14         MR. PEARSON:  Objection to form.

15         THE WITNESS:  No.  As I said, I recall that

16    they received the votes --

17         BY MS. BERNABEI:

18    Q.    I am talking about the packets.

19    A.    I wasn't aware of that.

20    Q.    Let me show you what I will ask be marked as

21    Exhibit 17.

22                    (Faison Exhibit No. 17

243

1                    was marked for identification.)

2            BY MS. BERNABEI:

3        Q.    Mr. Faison, can you take a look at Exhibit

4    17?

5        A.    Can I pause for a minute?

6        Q.    Mr. Faison, we are almost at the end of the

7    deposition.  It won't waste any of our time if you do

8    your e-mailing later.

9        A.    It is my boss.  I need to respond.

10            (Pause.)

11            BY MS. BERNABEI:

12       Q.    Do you want to come back another day?

13            (Pause.)

14            BY MS. BERNABEI:

15       Q.    Mr. Faison, you are interrupting an official

16   court proceeding.

17            MR. PEARSON:  We didn't even take a lunch

18   break.  He could have done this during a lunch break.

19            BY MS. BERNABEI:

20       Q.    Look at Exhibit 17.  Do you recall that this

21   packet of material for the February 2 meeting was

22   sent out by Mr. Mansfield's office?

244

1       MR. PEARSON:  Objection to form, and I want

2  to object to the presentation of this package.

3       MR. KERNAN:  Foundation.

4       THE WITNESS:  I remember the packet.  As I

5  said, I am not aware of Mansfield's office sending it

6  out.

7       BY MS. BERNABEI:

8       Q.   If you take a look at the first couple of

9  pages, it would indicate it was sent out by

10 Mr. Mansfield's office.  Look at the return address.

11      MR. PEARSON:  Objection to form.

12      BY MS. BERNABEI:

13      Q.   First two pages of the exhibit.  The return

14 address on those two pages are Mansfield's office,

15 right?

16      A.   Okay.

17      Q.   Did you know whether the packages were

18 compiled in his office?

19      A.   No, no, and I don't know that I received

20 this packet, because --

21      Q.   You don't recall it?

22      A.   I don't think I saw this packages.

246

1          MR. KERNAN:  Objection.

2          BY MS. BERNABEI:

3      Q.   The board terminated him on January 23 as

4   the attorney, right?

5      A.   Right.

6      Q.   So if he took actions after January 23,

7   2006 --

8      A.   It was not as our attorney.

9      Q.   Is that correct?

10     A.   Yes.

11         MR. PEARSON:  Objection.  Asked and

12  answered.

13         BY MS. BERNABEI:

14     Q.   I will show you what I will ask be marked as

15  Exhibit 18.

16                   (Faison Exhibit No. 18

17                   was marked for identification.)

18         BY MS. BERNABEI:

19     Q.   Take a look at what has been marked as

20  Faison Exhibit 18.  This is a document that you

21  received at your e-mail on or about January 23, 2006;

22  is that correct?

275

1        MR. PEARSON:  Objection.

2        BY MS. BERNABEI:

3   Q.   January 23, 2006, the board at a duly called

4   meeting voted to terminate Mr. Mansfield; is that

5   correct?

6   A.   All I can say is --

7        MR. PEARSON:  Asked and answered.

8        THE WITNESS:  I wouldn't have expected any

9   bills during that time.

10       BY MS. BERNABEI:

11  Q.   You don't know whether, in fact, between the

12  time he was fired by the old board and rehired by the

13  new board, he billed the association?

14  A.   Right.

15  Q.   And you don't know if he --

16       MR. PEARSON:  Objection.

17       THE WITNESS:  Yes.

18       BY MS. BERNABEI:

19  Q.   That is because he wasn't, in your mind, he

20  wasn't the association attorney during that period of

21  time, right?

22       MR. KERNAN:  Objection.



Hartsoe, Mansfield & Morgan, P.L.L.C.
Attn: Mr. James Mansfield
Re: Horizon House
10621 Jones Street
Suite 201-B
Fairfax, VA  22030-7511

soc, Mansfield & Morgan
rneys and    unselors at Law
21 Jones Street, Suite 201-B
fax, VA  22030-7511

>

Exhibit No. Faison 17
Date: 11-25-09
C. Jardim

**MF 0336**



25

APR

PM

Loretta Jean Aiken
1300 Army Navy Drive, Unit #0120
Arlington, Virginia 22202

PLEASE don't

HARASS House

Jones Street, Suite 201-B
x, VA 22 -7511

**MF 0337**

# SPECIAL MEETING OF
# THE HORIZON HOUSE CONDOMINIUM
# UNIT OWNERS' ASSOCIATION

### Thursday, February 2, 2006

### 7:30 p.m.

### Association's Community Room

### <u>AGENDA</u>

1.   **Call to order (7:30 p.m.)**

2.   **Proof of Notice**

3.   **Proof of Quorum**

4.   **Nomination / Election of Voting Inspectors**

5.   **Removal of Directors: An opportunity will be afforded to each Director to be heard as provided in our Bylaws.**

6.   **Proposed Bylaws Amendments and Resolution**

7.   **Casting of Ballots**

8.   **Announcement of Voting Results**

9.   **Call for Adjournment**

**MF 0338**

# HORIZON HOUSE UNIT OWNERS CALL TO ACTION

The community of Horizon House owners has called a Special Meeting of the Association on **Thursday February 2, 2006** at 7:30 in the Community Room to remove Vondell Carter, Susan Morris, and Greg Weatherman in response to their **willful and consistent violation of the laws of the Commonwealth of Virginia and the bylaws of the Horizon House**. These three Board members have taken significant actions without the due process required by Virginia Law and by our Condominium's own governing documents that are mandated to ensure that decisions are made openly and that individuals cannot pursue their own private agendas. Vondell Carter, Susan Morris, and Greg Weatherman have chosen to act and incur liabilities in the name of Horizon House in secret and without the knowledge of the full Board, much less the Association at large. The refusal to comply with the rules and regulations designed to protect and safeguard Horizon House, the abuse of process, and the disregard for the welfare of the residents have put us at **great financial and personal risk**. Among the numerous illegalities are the following:

- The unilateral suspension of Board meetings violates Article 4.6 of the Associations bylaws. Although the bylaws provide that one be held per quarter, the Horizon House Policy has been to hold them monthly. This affords an opportunity to ensure the business of the Horizon House Corporation is done timely. In addition, it is stated Board policy to hold meetings every month. Meetings of the Board of Directors must be properly noticed and open to the Association membership.

- Attempts have been made to circumvent the Virginia Condominium Act and the Horizon House bylaws that require public disclosure of Board decisions at open Board meetings. Utilizing "informal work sessions" between Carter, Morris, and Weatherman to make and implement decisions that must be offered and voted upon in public sessions is forbidden under § 55-79.75 of the Virginia Code. Actions by these three Board members to evade these requirements by using e-mail votes that are less than unanimous, as mandated by law or by our bylaws, are illegal.

- Refusal to provide all Board members and/or residents with information on financial expenditures and other decisions made by Carter, Morris, and Weatherman is a violation of their fiduciary responsibilities. Among other things, the duly elected Treasurer of Horizon House was not informed as to the salary of the current building manager or the severance package provided our previous building manager. Directing our management company, Zalco, not to provide appropriate information to the elected Treasurer of the Board of Directors, information that any Horizon House owner is legally entitled to, is a violation of the Virginia Condominium Act.

- The decision to dismiss without cause our prior building manager, and the undignified manner in which she was removed, has opened us up to liability on several fronts. In addition, this decision was made without the participation of, or notification of all Board members as required by law. The decision to fire the previous building manager was made without the knowledge of all Board members and was not done at an open Board meeting as required by the Virginia Condominium Act and the Horizon House bylaws. This may have extensive legal and financial consequences for us as owners.

- Undertaking personnel actions without legal Board authority has resulted in the hiring of a building manager that has two pending criminal sexual battery charges against him. This individual was also fired, with cause, from his previous position in addition to having no prior experience managing a cond~~~~~~~~

MF 0339

legal counsel, and knowing the situation surrounding the candidate, Carter, Morris, and Weatherman took it upon themselves, without the proper process outlined in our bylaws and the Virginia Condominium Act, to bring this man into our community and give him access to the keys of every unit owner. The personal and financial liabilities of this illegal action are enormous.

- Various attempts have been made by the Board President to fire the Horizon House legal counsel of 16 years by e-mail votes that are in violation of Horizon House bylaws and the Virginia Condominium Act. This action was taken after the Horizon House legal counsel opined on the numerous illegal activities of Carter, Morris, and Weatherman and recommended that they resign immediately. This final action was taken at Monday night's Board meeting with a vote of 3 to 2. Mr. Mansfield has agreed to represent us as legal counsel concerning the activities outlined above and will represent our interests at our Special Meeting.

Reasonable avenues have been pursued to resolve the issues. For example, Board members David Faison and Adrienne Garretson volunteered to resign from the Board if the other three would follow suit. This option would give Horizon House a fresh, new board. Carter, Morris and Weatherman all refused.

The Virginia Condominium Act and the Horizon House bylaws are intended to serve as a system of checks and balances to prevent abuse of power and are designed to protect your investment as homeowners. These have been violated by the illegal actions of Vondell Carter, Susan Morris, and Greg Weatherman. That is why they must be removed from the Board to mitigate against any further financial and personal damage to 'Iorizon House owners. The required fractional shares necessary to call a special meeting have been otained and verified. As such, at the upcoming Special Meeting of the Horizon House Association you will be asked to vote for

- Recall of Vondell Carter, President, Horizon House Board of Directors
- Recall of Susan Morris,
- Recall of Greg Weatherman,
- Limiting to one (1) the number of owners of a unit that can serve on the Board of Directors simultaneously
- Increase the number of seats on the Horizon House Board from five (5) to seven (7)

This is a time sensitive **call to action** for each unit owner to read the attached documentation, understand its critical importance to maintaining our property values, and our right to a peaceful environment, then execute and return the Proxy in the stamped, addressed envelope immediately. **Your Proxies must be received prior to the February 2, 2006 meeting in order to be counted. Time is of the essence.**

Thank you for your time and attention to this matter.

Attachments:
Copy of Agenda for the January 19, 2006 meeting of Concerned Citizens of Horizon House and referenced bylaws
Copy of Association Attorney Mr. Mansfield's letter to the Board President
C  ʝ of Court Record
Copy of the Notice of the Special Meeting of the Association on February 2, 2006
Copy of the Agenda for the February 2, 2006 Special Meeting of the Association
Copy of the Instructed Proxy Ballot for the Special Meeting on February 2, 2006

**MF 0340**



# DISTRICT COURT OF MARYLAND FOR Prince George's County

Located at Courthouse, Bourne Wing, Upper Marlboro, Maryland 20772    **Case No.: 002E00269768**

| | | |
|---|---|---|
| **STATE OF MARYLAND** | **VS** | **FORD, MICHAEL** |
| COMPLAINANT: | | 6320 S. KINGS HIGHWAY #101 |
| Officer: PERRY | | ALEXANDRIA, VA  22306 |
| Agency/Subagency: DA  DIS3 | | CC#: 05-1801226    SID: |
| ID: 2291 | | Local ID: X0230800    DL#:            DL State: |
| | | Race: 1   Sex: M   Height: 6'3"   Weight: 280   Hair: BLK   Eyes: BRN |
| | | DOB: 09/21/1965   Phone(H):            Phone(W): |

## STATEMENT OF CHARGES

UPON THE FACTS CONTAINED IN THE APPLICATION OF PERRY
IT IS FORMALLY CHARGED THAT FORD, MICHAEL at
the dates, times and locations specified below:

| NUM | CHG/CIT | STATUTE | PENALTY | DESCRIPTION OF THE CHARGE |
|---|---|---|---|---|
| 001 | 1 1415 | CR 3 203 | 10 Y &/or $2,500.00 | ASSAULT-SEC DEGREE |
| | | | | On or About  04/17/2005 - 05/30/2005 |
| | | | | 6002 SURREY SQUARE LANE #T-4, |
| | | | | FORESTVILLE PRINCE GEORGE'S COUNTY, MD |
| | | | | ...did assault Camilla Dye in the second degree in violation of CR 3-203, contrary to the form of the act of the assembly in such case made and provided and against the peace, government, and dignity of the state. |
| | | | | Against the Peace, Government, and Dignity of the State. |
| 002 | 4 3600 | CR 3 308 | 1 Y &/or $1,000.00 | SEX OFFENSE FOURTH DEGREE |
| | | | | On or About  04/17/2005 - 05/30/2005 |
| | | | | 6002 SURREY SQUARE LANE #T-4, |
| | | | | FORESTVILLE PRINCE GEORGE'S COUNTY, MD |
| | | | | ...did unlawfully commit a sexual offense in the fourth degree upon Camilla Dye, in violation of CR 3-308 of the Annotated Code of Maryland. |
| | | | | Against the Peace, Government, and Dignity of the State. |

**MF 0341**

Date: 08/03/2005    Time: 10:01 AM    Judicial Officer: _____    5010

Tracking No. 051001483212

**DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY, MARYLAND** (City/County)

LOCATED AT (COURT ADDRESS)

**14735 Main Street**
**Upper Marlboro, Maryland**

DC Case No. **2E00269768**

DATE:
TIME:
REL.
CASE-

| COMPLAINANT/APPLICANT | DEFENDANT |
|---|---|
| **Det. Perry #2291** | **Ford, Michael** |
| Name            (Print) | Name            (Print) |
| **7600 Barlowe Rd.** | **6320 S. Kings Highway  Apt.101** |
| Address     (Number and Street) | Address     (Number and Street) |
| **Landover, MD 20785     (301) 772-4910** | **Alexandria V.A. 22306** |
| City, State, and Zip Code          Telephone | City, State, and Zip Code          Telephone |
| **MD0172100, PGPD   DIST. III #2291** | CC# **05-180-1226** |
| Agency, Sub-Agency, and I.D. # (Officer Only) | |

**DEFENDANT'S DESCRIPTION:** Driver's License #**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**    Sex **M** Race **B** Ht **6'03** Wt **280**

Hair **BLK** Eyes **Brown** Complexion **dark**    Other **NONE**    D.O.B **09-21-1965**    ID.

## APPLICATION FOR STATEMENT OF CHARGES    Page 1 of **2**

I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about **On or between April 17,2005 and May 30,2005** at **6002 Surrey Square Lane Apt t-4 Forestville** Place, Prince George's County, Maryland, the above named Defendant **did make physical contact with the victim Mrs. Camilla Dye by touching the victims breasts and crotch area without the victims consent. Between the listed dates and times at the location of incident the defendant who is the victims apartment manager entered the victims home. After viewing the victims apartment for necessary repairs the defendant confronted the victim in her kitchen. The defendant then touched the victims breasts and crotch area outside her clothing. The victim advised the defendant that she did not want a relationship and to remove his hands from her body. At 6024 Surrey Square Lane**

(Continued on attached ............ pages) (DC/CR I A)

I solemnly affirm under the penalties of perjury that the contents of this Application are true to the best of my knowledge, information and belief.

**08-03-05**
Date                                          Officer's Signature  (Perry) #2291

I have read or had read to me and I understand the Notice on the back of this form.

Date                                          Applicant's Signature

Subscribed and sworn to before me this **3** day of **August**                                    **2005**

Time: **9 : 50 A** M Judge/Commissioner                                    I.D. **5010**

I understand that a charging document has been issued and that I must appear for trial   on ...............
Date

at .............................., ☐ when notified by the Clerk, at the Court location shown at the top of this form.
Time

Applicant's Signature

☐ I declined to issue a charging document because of lack of probable cause.

Date                                          Commissioner

Witnesses' Names and Addresses:                                    **MF 0342**

**Camilla Dye 6002 Surrey Square Lane Apt. # T-4 Forestville Md.**
Name          Number and Street/Agency/Sub-agency I.D          City, State, Zip

Name          Number and Street/Agency/Sub-agency I.D          City, State, Zip

Name          Number and Street/Agency/Sub-agency I.D          City, State, Zip

DC/CR I (Rev. 7/94)                                    TRACKING NUMBER

Court

DISTRICT COURT OF   ARYLAND FOR  PRINCE GEORGE  COUNTY, MARYLAND   (City/County)



LOCATED AT (COURT ADDRESS)

**14735 Main St.,**
**Upper Marlboro, MD 20772-3042**

DISTRICT COURT
CASE NUMBER

2E0026476

DEFENDANT'S NAME (LAST, FIRST, M.I.)

**Ford, Michael**

## APPLICATION FOR STATEMENT OF CHARGES (CONTINUED) Page 2 of 2

Forestville Md. the victim entered the defendants office to discuss her lease and repairs that were not being completed in her apartment. The defendant closed his office door and made a second advancement the defendant touched the victims breasts outside her clothing and placed his hands around her buttocks.At this time the victim told the defendant once agian to stop touching her and that she did not want a relationship with the defendant.All these events occurred in Prince George's County Maryland.

08-03-05
Date

(Perox) #2281
Applicant's Signature

TRACKING NUMBER

MF 0343

DC/CR 1A (Rev. 8/94)

## HARTSOE, MANSFIELD & MORGAN, P.L.L.C.
### ATTORNEYS AND COUNSELORS AT LAW

10621 JONES STREET, SUITE 201-B
FAIRFAX, VIRGINIA 22030-7511
(703) 591-2503
FAX (703) 273-7292

208 SOUTH KING STREET, SUITE 203
LEESBURG, VIRGINIA 20175-3018
(703) 771-4200
E-MAIL: HARTSOEMANSFIELD@RCN.COM

January 17, 2006

*Via hand delivered*

Vondell Carter, President
Horizon House Condominium
Unit Owners Association
1300 Army-Navy Drive
Arlington, Virginia 22202

*Confidential*
*Attorney Client Privileged*

Dear Vondell:

From the e-mails and correspondence circulated over the holiday weekend, I conclude that the situation at Horizon House is rapidly deteriorating. I brought several matters to your attention last Friday and have yet to hear from you. The following issues must be addressed immediately:

First, consistent with our opinion letter dated June 21, 2005, the resignation of a Director is a question of fact to be determined based on the intent and action of the Board member. With that said, Ms. Garretson clearly never resigned. While difficult circumstances caused Ms. Garretson to contemplate resignation, she agreed with me and others that the best interests of the Association mandated her continuing as a Board member and Treasurer.

Second, you have no authority to unilaterally suspend Board meetings. Pursuant to Article 4.6 of the Association's Bylaws, regular meetings of the Board are called by the Board of Directors and must be held at least quarterly. Moreover, I have had the privilege of acting as the attorney for Horizon house for sixteen years. During this time meetings have routinely been conducted monthly, with rare exception. Your suspending these meetings is illegal. Any resulting actions purportedly taken on behalf of the Association are unauthorized. Individual Board members who participate in these actions are personally responsible (and liable) for any action taken in known derogation of the Horizon House Bylaws. Further, pursuant to Article 4.17 of the Bylaws, any action taken without a meeting requires written consent of *all* Board members, including Ms. Garretson. Accordingly your attempt to remove Ms. Garretson and elect Mr. Weatherman Treasurer and to elect Ms. Morris acting Secretary can only be accomplished if Ms. Garretson consents, along with all other Board members, in writing. Similarly, your using "informal work sessions" between yourself, Susan and Greg is strictly forbidden under § 55-79.75 of the Virginia Code. Meetings of the Board of Directors must be properly noticed and open to the Association membership.

MF 0344

Vondell Carter, President
Horizon House Condominium
Unit Owners Association
January 17, 2006
Page 2

Third, concerning the Association's web page and chat room, § 55-79.75:1 of the Virginia Code requires the Association to establish a "reasonable, effective, and free method . . . for unit owners to communicate among themselves and with the executive organ regarding any matter concerning the unit owners' association." The Board may not edit the content or require prior approval of any material submitted concerning the Association. Accordingly, there is nothing improper about the web page and chat room. On the contrary, I opine that any action taken to stop members from communicating among themselves, even if critical of your decisions, my opinions, the Board or Management actions, is improper and statutorily prohibited.

Fourth, your creation of a professional and fiduciary relationship between the Association and Mr. Ford violated the By-Laws and, quite frankly, was a mistake. This individual was hired without the authority of the Board and against my clear recommendations. Mr. Ford was hired with two criminal sexual battery charges pending in Prince Georges County. For the record, I specifically counseled you that these cases should be favorably resolved before Mr. Ford would be eligible to hire. Further, I advised you that Mr. Ford was fired by his previous employer for cause. Despite these clear recommendations and reservations, you insisted on making him an offer. At that time I strongly recommended that the applicant undergo a lie-detector test if you insist on hiring him. With your consent, I confronted Mr. Ford with this request. During my conversation with him he admitted wrongdoings. You were given these facts and nonetheless you chose to conduct an "informal" session of the Board with Susan and Greg, with no notice to the other Board members or the community, and hired Mr. Ford. Minimally, his admissions included that while employed as building manager, he had consensual sexual relations with a tenant on two occasions, once in her apartment and once in his office. The victim alleges that these "encounters" were against her will and, therefore, the subject of her criminal complaints. In order for the charges to be brought there had to be a showing of probable cause. At the very least Mr. Ford, by his own admissions, has demonstrated errors of judgment which alone should have disqualified him. Even more disturbing is that, with the information provided to you, Mr. Ford was hired to a position which gives him access to every unit at Horizon House. To the extent you have attempted to insulate the Association by having Zalco Realty employ Mr. Ford directly, such an arrangement required Board approval and is contrary to the terms of Zalco's management contract. Your actions reflect an agenda which is inconsistent with the best interests of our client. Again, I request that you convene a Board meeting immediately, with the requisite seventy-two (72) hours notice to all Board members and the community, so that these matters might be discussed in detail.

Finally, given the circumstances and your recent decisions, I strongly opine that the best interests of my client mandate you resign as President and as a Board member effective immediately. Further, I strongly recommend that Ms. Morris and Mr. Weatherman also resign to

MF 0345

Vondell Carter, President
Horizon House Condominium
 Unit Owners Association
January 17, 2006
Page 3


avoid the appearance of impropriety and mitigate any resulting liability occasioned by the unauthorized acts in which the three of you have been engaged.

The ramifications of your decisions as President and the decisions of the "informal" Board meetings can and must be addressed and neutralized immediately. Otherwise the Association is at risk. Your prompt attention is required.

Sincerely,

Hartsoe Mansfield & Morgan, P.L.L.C.

James M. Mansfield

C:\Documents and Settings\Owner\My Documents\Letters\Horizonhouse4L.letter.wpd

cc:   Susan M. Morris, Vice President, Policy
      Greg Weatherman, Vice President, Facilities
      David Faison, Vice President, Information Systems
      Adrienne Garretson, Treasurer                        **MF 0346**

# (Agenda presented at the Open Forum)

# Concerned Citizens of Horizon House

*Thursday, January 19, 2006*

This is not a Board meeting.

This is not an Association meeting.

*We have gathered here tonight to bring **clarity** to issues facing our community with first-hand knowledge from the individuals involved.*

## TOPICS FOR DISCUSSION:

Introductions

1. Suspension of the Horizon House Board Meetings

    a. Board Authority vs. Presidential Authority (Bylaws IV-4.2; V-5.4; 4.7)
    b. Alleged "hate mail" incident (special guest ACPD)
    c. Legality of canceling Board meetings (Bylaws 4.6, 4.7, 4.17)
    d. Conduct of business without Board meetings (VA Condo Act § 55-79.75)

2. Current Horizon House Board Process Issues

    a. Use of unofficial resignation to illegally exclude Board Member
    b. Discussion of the process used to select building manager
    c. Legality of the decisions process (Bylaw 4.17)
    d. Financial, personal, and legal consequences of the action by Carter, Morris, and Weatherman

3. Petition for a Special Meeting  (Bylaw 3.5)

4. Fiduciary Responsibilities

    a. Falling concrete and the envelope of the building
    b. Hole in the rear driveway
    c. Prioritization of projects and activities
    d. Financial, personal, and legal consequences of inaction

Further Discussion from the Floor

**MF 0347**

## Bylaws Referenced on the Agenda

- o Bylaw 4.6 Regular Meetings of the Board

*"Regular Meetings of the Board shall be held at such time and place as shall be determined...**by the Board of Directors**."\**

- o Bylaw 4.17 Action Without Meeting

*"Any action required or permitted to be taken by the Board of Directors at any meeting may be taken without a meeting if **all** of the members of the Board of Directors shall individually or collectively **consent in writing** to such action."\**

- o Bylaw 4.7 Special Meetings [of the Board of Directors]

*".... Special Meetings of the Board of Directors **shall** be called by the President...on the written request from **at least two** directors."\**

- Bylaws ARTICLE IV – **BOARD OF DIRECTORS**
  - o 4.1 Powers and Duties, Paragraph D

*"**Designate**, **hire**, and **dismiss** the personnel----"\**

- Bylaws ARTICLE V – **OFFICERS**
  - o 5.4 **President**

*.... he shall have general and active management of the business of the Associations, **subject to the control of the Board of Directors**, and **shall see that all orders and resolutions of the Board of Directors are carried into effect.** The President must be a member of the Board of Directors."\**

- Involvement of other Board Members
  - o Bylaw 4.7 Special Meetings [of the Board of Directors]

*"Special Meetings of the Board of Directors may be called by the President on 72 hours' notice to **each** director...."*

## Sign Petition for Special Meeting

- o Bylaw 3.5 Special Meetings

*"A Special Meeting of the Association may be called at any time in the interval between annual meetings by the President, or by resolution of the Board of Directors, **or upon petition signed and presented to the President or the Secretary of Unit Owners of Units to which not less than twenty five percent (25%) of the Fractional Interests appertain.** The notice of any special meeting shall state the time, place and purpose of such meeting. No business shall be transacted at a special meeting except as stated in the notice."\**

MF 0348

# HORIZON HOUSE CONDOMINIUM
# UNIT OWNERS' ASSOCIATION

## NOTICE OF SPECIAL MEETING OF THE ASSOCIATION
### TO BE HELD THURSDAY, FEBRUARY 2, 2006
### BEGINNING AT 7:30 P.M.
### IN THE ASSOCIATION'S COMMUNITY ROOM

Pursuant to Article III, Section 3.5 of the Association's Bylaws the Membership has called a Special Meeting of the Association of the purposes of:

(1)   The removal of Vondell Carter, Susan Morris and Greg Weatherman as directors and to elect their successors;

(2)   To vote on an amendment to Article IV, Section 4.3 of our Bylaws to make only one individual owner from each unit eligible to serve on the Board of Directors at any one time;

(3)   To vote on an amendment to Article IV, Section 4.3 requiring the number of Directors serving on the Board to be set at seven (7);

(4)   In the alternative, to vote on a resolution increasing the number of Directors serving on the Board to seven (7);

(5)   To elect new Directors if authorized.

The Meeting will be held on **Thursday, February 2, 2006, commencing at 7:30 p.m. in the Association's Community Room.** Proxies enclosed for unit owners who desire to vote, but whom will be unavailable to attend the February 2nd meeting.

**MF 0349**

**AND FOR THE FOLLOWING PROPOSALS:**

(1)     To amend Article 4.3 to make only one individual owner from each unit eligible to serve on the Board of Directors at any one time.

      ( ) FOR           ( ) AGAINST

(2)     To amend Article 4.3 to require the number of Directors serving the Association to be seven (7).

      ( ) FOR           ( ) AGAINST

(3)     In the alternative, to adopt a resolution increasing the number of Directors serving on the Board to seven (7).

      ( ) FOR           ( ) AGAINST

**AND TO ELECT THE FOLLOWING SUCCESSOR AND NEW DIRECTORS:**
**_(VOTE FOR FIVE)_**

| | |
|---|---|
| **Arnold, Charles** | ( ) FOR |
| **Coller, George** | ( ) FOR |
| **Dragun, Julia** | ( ) FOR |
| **McManus, Paige** | ( ) FOR |
| **Martinez - Alvarez, Paco** | ( ) FOR |
| **Mucklow, Eric** | ( ) FOR |
| **Williams, Bonnie** | ( ) FOR |

Write in Candidates: _____  _____  _____

Items left blank will be treated as an abstention.  A member may be the designee of only one proxy.  Uninstructed proxies are for quorum purposes only.

Signature of Owner(s): _____  Date:_____

Printed Name: _____

Unit Number: _____

**MF 0350**

Fractional Shares: _____ *  This item to be completed by meeting registrars

# CONFIDENTIAL

# HORIZON HOUSE CONDOMINIUM UNIT OWNERS ASSOCIATION
## INSTRUCTED PROXY BALLOT
## SPECIAL MEETING OF THE ASSOCIATION
### Thursday, February 2, 2006 at 7:30 p.m.

THIS PROXY IS SOLICITED BY THE ASSOCIATION MEMBERS WHO SIGNED A PETITION CALLING
FOR A MEETING OF THE
HORIZON HOUSE CONDOMINIUM UNIT OWNERS ASSOCIATION

### PART I - PROXY DESIGNATIONS

IN ACCORDANCE WITH **Horizon House Bylaws**, I HEREBY CONSTITUTE AND APPOINT THE
MANAGING AGENT AS MY TRUE AND LAWFUL ATTORNEY AND IN MY NAME AND STEAD, TO
VOTE AS PROXY UPON ALL OF MY FRACTIONAL INTEREST IN HORIZON HOUSE CONDOMINIUM
OWNED BY, OR STANDING IN MY NAME ON THE BOOKS OF THE ASSOCIATION AS OF THE DATE OF
THE SPECIAL MEETING AND/OR AT ANY CONTINUANCE THEREOF FOR THE PURPOSE OF
REMOVING AND ELECTING DIRECTORS AND VOTING UPON ANY OTHER BUSINESS AS MAY
PROPERLY COME BEFORE THE MEETING.  THIS PROXY TERMINATES UPON FINAL ADJOURNMENT
OF THE MEETING.

**FOR REMOVAL OF THE FOLLOWING BOARD OF DIRECTORS,** I HEREBY INSTRUCT MY
PROXY TO VOTE FOR THE REMOVAL OF THE DIRECTORS AS DESIGNATED BY ME AS FOLLOWS:

### Vondell Carter

( ) For Removal       ( ) Against Removal

### Susan Morris

( ) For Removal       ( ) Against Removal

### Greg Weatherman

( ) For Removal       ( ) Against Removal

**MF 0351**

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

**Exhibit 6**

Deposition of Bobbie Fisher
(Oct. 16, 2009) (excerpts)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
----------------------------x
MICHAEL FORD,               :
                            :
            Plaintiff,      :
                            :
            v.              : No. 1:08CV1318
                            :
ZALCO REALTY, INC., et al., :
                            :
            Defendants.     :
----------------------------x
```

Alexandria, Virginia

Friday, October 16, 2009

Deposition of

BOBBIE FISHER

a witness, called for examination by counsel for

Defendants, pursuant to notice and agreement of

counsel, beginning at approximately 9:38 a.m., at

the law offices of Hudgins Law Firm, 515 King

Street, Alexandria, Virginia, before Tiffanie

Jones of Anderson Court Reporting, notary public

in and for the Commonwealth of Virginia, when were

present on behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190
www.andersonreporting.net

22

1         Q    Which room?

2         A    The community room of Horizon House.  It

3    was overwhelmed with people, angry people; and Mr.

4    Mansfield was introduced as the attorney.  What

5    else?

6         Q    Okay.  And my question was if you

7    recalled Mr. Mansfield saying anything relating to

8    Mr. Ford?

9         A    Yes.

10        Q    Okay.  And what do you recall him

11   saying?

12        A    As far as I can remember, I was shocked

13   with his comments personally.  He introduced

14   himself, I can't recall verbatim exactly what he

15   said, but he said some very negative things about

16   Mr. Ford.  I noticed -- I -- I looked to my right,

17   I looked to my left.  I heard screaming from the

18   people who were attending.  Women, white woman

19   were shocked, as I was, as a black female.  There

20   were very few blacks attending the meeting.  It

21   was an angry-like mob crowd, and I was very

22   unhappy about that.

27

```
 1          Q     So it's fair to say that it was your

 2     opinion that the information provided by Mr.

 3     Mansfield -- that the resident manager at Horizon

 4     House, Mr. Ford -- was accused of sexual

 5     harassment of a former tenant, but that was not

 6     information that should have been shared with the

 7     residents as a whole; is that fair?

 8          A     Yes, what I observed -- first, the

 9     crowd.  Immediately when I attended, I knew that

10     it was a very, angry crowd, very angry.  People

11     were quite upset and when I -- when Mr. Mansfield

12     was introduced, and he started off talking about

13     things, I thought -- I thought -- now this is my

14     personal opinion -- that he took advantage of what

15     he saw in the room, and I felt personally that he

16     incited this crowd.

17          Q     Mr. Mansfield didn't, you know,

18     reference Mr.  Ford's race at all; did he?

19          A     No.

20          Q     And he didn't express reference to Mr.

21     Ford's race, correct?

22          A     No.
```

37

1     about his words.  Is it correct that Mr. Mansfield

2     did not accuse Mr. Ford of rape or call him a

3     rapist?  Did he?

4          A    He said everything but call him a

5     rapist.

6          Q    Okay.  So he didn't say -- he did not

7     say that, correct?

8          A    No.

9          Q    That's correct?

10         A    Yes.

11         Q    Did you leave the meeting, that first

12    meeting we're talking about when it was concluded,

13    or did you leave before the end?

14         A    I think I left towards the end, yeah.

15         Q    And when you say towards the end, would

16    you say when --

17         A    When a lot of people were leaving.

18         Q    Okay.  When people were starting to

19    leave?

20         A    Right.

21         Q    Okay.  So you, yourself, did not feel

22    personally threatened in the meeting to the point

41

```
1    resident's concerns about Mr. Ford, whether it was
2    -- whether it was a lack of experience or pending
3    charges or anything else?
4         A    What I recall, again, we're going back
5    to 2000 what -- 3.  When did I move?  Like, 2004.
6    This is 2009.  What I recall, again, is the place
7    was overwhelmed with people, people were shouting,
8    people were not raising their hands; their
9    reaction was that I don't want a rapist in my
10   building.  Their reaction upon hearing what Mr.
11   Mansfield had said -- presented at the meeting,
12   they were quite upset, quite upset, and they were
13   shouting out of turn -- shouting out of turn.  And
14   I sat there with my -- I felt as though I was in a
15   movie; that's how I felt.
16        Q    You used the word rapist a moment ago
17   referring to the residents.  Is that your word, or
18   did any of the residents actually say they do not
19   rapist or --
20        A    That's what I heard, yes; that's what I
21   recall.
22        Q    Any of the residents --
```

42

```
 1        A    There were several -- several people.  I
 2   don't even recall, but I did turn and I looked
 3   because I was taking all of this in.
 4        Q    And can you identify the residents by
 5   name as to who --
 6        A    No.
 7        Q    -- referred to -- well --
 8        A    No.
 9        Q    -- who said they did not want a rapist
10   in the building?
11        A    No.  There were several people that said
12   that I don't want a rapist in the building.
13        Q    Okay.  And as you said before, Mr.
14   Mansfield though, did not use that word, correct?
15        A    Mr. Mansfield never used that word, as
16   far as I recall.
17        Q    And do you recall that -- whether the
18   individuals who made that comment were male or
19   female?
20        A    Both.
21        Q    Do you recall their race?
22        A    White.
```